
# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

SECURITIES AND EXCHANGE COMMISSION,    )
    )
    Plaintiff,    ) Civil Action No.
    )
v.    ) **4-23CV-1224P**
    )
    ) **FILED UNDER SEAL**
AGRIDIME LLC,    ) JURY TRIAL DEMANDED
JOSHUA LINK, and    )
JED WOOD,    )
    )
    Defendants,    )
    )

## PLAINTIFF'S *EX PARTE* MOTION FOR PRELIMINARY INJUNCTION, TEMPORARY RESTRAINING ORDER, ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER ANCILLARY EMERGENCY RELIEF, AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................i-vii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

I.      Agridime is a Cattle and Meat Distributor Operated by Link and Wood ........................... 2

II.     Agridime Solicits Investors to Purchase Cattle Investment Contracts................................ 3

III.    Defendants Misappropriate Investor Funds ...................................................................... 7

        a.      Most Investor Returns for the Last Year Have Been Ponzi Payments ..................... 7

        b.      More Than $11 Million in Commissions Has Been Paid to Sales Associates, Link, and Wood .................................................................................................................. 8

        c.      Defendants' Statements to Investors Are Fraudulent.............................................. 9

IV.     Defendants Defy Orders from State Regulators to Cease and Desist Cattle Contract Sales ....................................................................................................................................... 9

V.      Defendants Continue to Raise Investor Funds ................................................................ 10

ARGUMENT .......................................................................................................... 11

I.      The Court Should Issue an Ex Parte Temporary Restraining Order and a Preliminary Injunction to Halt the Ongoing Fraudulent Offering ....................................................... 11

        A.      The Commission Is Likely to Succeed on the Merits of Its Case ........................... 13

                1.      Defendants Are Violating the Registration Provisions of the Federal Securities Laws ................................................................................................. 13

                2.      Defendants Are Violating the Antifraud Provisions of the Federal Securities Law .................................................................................................. 16

                        a.      Violations of Section 17(a)(2) and Section 10(b) and Rule 10b-5(b) . 18

                        b.      Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c)... 21

B.    The Defendants Are Reasonably Likely to Continue their Illegal Conduct ............ 23

II.    The Court Should Grant Additional Ex Parte Relief ........................................................ 25

A.    It is Appropriate to Grant the Requested Relief on an *Ex Par*te Basis .................. 26

B.    An Asset Freeze Is Necessary ................................................................................ 26

C.    Appointment of Receiver ........................................................................................ 27

D.    Other Ancillary Emergency Relief ........................................................................ 29

1.    Sworn Accounting ...................................................................................... 29

2.    Document Preservation .............................................................................. 29

3.    Expedited Discovery .................................................................................. 29

4.    Alternative Service ..................................................................................... 30

CONCLUSION    ................................................................................................................ 31

**Table of Authorities**

<u>**Federal Cases**</u>

*Aaron v. SEC,*
    446 U.S. 680 (1980) ........................................................................................... 21

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ..................................................................................... 18, 19

*CFTC v. Muller,*
    570 F.2d 1296, 1300 (5th Cir. 1978) ...................................................... 25, 26, 27

*CFTC v. RFF GP, LLC,*
    No. 4:13-CV-382, 2013 WL 4083748 (E.D. Tex. July 10, 2013) ......................... 30

*EEOC v. Cosmair, Inc.,*
    821 F.2d 1085 (5th Cir. 1987) ........................................................................... 12

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ........................................................................................... 18

*Esbitt v. Dutch American*
335 F.2d 141 (2nd Cir. 1964)................................................................................27

*In re San Vicente Med. Partners, Ltd.,*
    962 F.2d 1402 (9th Cir. 1992) ........................................................................... 27

*Janus Capital Grp., Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011) ........................................................................................... 21

*Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co. (In re Living Bens. Asset Mgmt.,
L.L.C.),*
    916 F.3d 528 (5th Cir. 2019) ............................................................................. 14

*Long v. Shultz Cattle Co.,*
    881 F.2d 129 (5th Cir. 1989) ....................................................................... 14, 15

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) ............................................................................ 17, 21, 22

*Paul F. Newton & Co. v. Tex. Commerce Bank,*
    630 F.2d 1111 (5th Cir. 1980) ........................................................................... 21

*Quilling v. Schonsky,*
    246 F. App'x 583 (5th Cir. 2007).......................................................................... 22

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990) ............................................................................................. 13

*SEC v. Ahmed,*
　　72 F.4th 379, 406 (2d Cir. 2023) ........................................................... 21

*SEC v. American Bd. of Trade, Inc.,*
　　830 F.2d 431 (2d Cir. 1987) .................................................................. 28

*SEC v. AmeriFirst Funding,*
　　No. 3:07-CV-1188-D, 2007 WL 2192632 (N.D. Tex. July 31, 2007) ................... 27

*SEC v. Blatt,*
　　583 F.2d 1325 (5th Cir. 1978) ........................................................ 11, 23, 24, 26

*SEC v. Brooks,*
　　No. 3:99-CV-1326-D, 1999 WL 493052 (N.D. Tex. July 12, 1999) .................... 12

*SEC v. Bryant,*
　　No. 4:17-CV-00336, 2017 WL 3492311 (E.D. Tex. Aug. 15, 2017) .................... 25

*SEC v. Carter,*
　　No. 4:19-CV-100-SDJ, 2020 WL 6304889 (E.D. Tex. Oct. 28, 2020) ................. 22

*SEC v. Cavanagh,*
　　155 F.3d 129 (2d Cir. 1998) .................................................................. 12

*SEC v. Cayman Is. Reinsurance Corp.,*
　　734 F.2d 118 (2d Cir. 1984) .................................................................. 12

*SEC v. Continental Tobacco Co.,*
　　463 F.2d 137 (5th Cir. 1972) ................................................................. 15

*SEC v. Current Fin. Servs., Inc.,*
　　783 F. Supp. 1441 (D.D.C. 1992) .......................................................... 28

*SEC v. First Fin. Grp.,*
　　645 F.2d 429 (1981) ........................................................................... 28

*SEC v. Helms,*
　　No. 1:13-CV-01036 ML, 2015 WL 5010298 (W.D. Tex., Aug. 21, 2015).......... 22

*SEC v. Krishnan,*
　　No. 4:23-cv-885-SDJ, Doc. 16, at 6 (E.D. Tex. Oct. 11, 2023) ...................... 12

*SEC v. Koscot Interplanetary, Inc.,*
　　497 F.2d 473 (5th Cir. 1974) ................................................................. 14

*SEC v. Management Dynamics, Inc.,*
　　515 F.2d 801 (2d Cir. 1975) .................................................................. 12

*SEC v. Manor Nursing Centers, Inc.,*
　　458 F.2d 1082 (2d Cir. 1972) ................................................... 21, 22, 25, 27, 29

*SEC v. Materia*,
    745 F.2d 197 (2d Cir. 1984) ......................................................... 25

*SEC v. Mattera*,
    No. 1:11-cv-8323-PKC, 2012 WL 4450999 (S.D.N.Y. Sept. 25, 2012) ............... 30

*SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*,
    No. 1:08-CV-1402-KAM-JMA, 2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) ...... 16

*SEC v. Oxford Capital Secur., Inc.*,
    794 F. Supp. 104 (S.D.N.Y. 1992) .................................................... 29

*SEC v. Prater*,
    F. Supp.2d 39, 49 (D. Conn. 2003)..................................................... 10

*SEC v. Reliable One Res., Inc.*,
    No. 6:23-cv-00006, 2023 WL 177687 (E.D. Tex. Jan. 9, 2023) ..................... 12

*SEC v. Reynolds*,
    No. 3:08-CV-0438-B, 2008 WL 4561560 (N.D. Tex. Oct. 9, 2008) .................. 27

*SEC v. Scott*,
    565 F. Supp. 1513 (S.D.N.Y. 1983) ................................................... 12

*SEC v. Sethi*,
    910 F.3d 198 (5th Cir. 2018) ............................................... 18, 23, 31

*SEC v. Sethi Petroleum, LLC*,
    229 F. Supp. 3d 524 (E.D. Tex. 2017)................................................. 23

*SEC v. Sethi Petroleum, LLC*,
    No. 4:15-CV-338, 2015 WL 11197824, (E.D. Tex. May 14, 2015) .................. 30

*SEC v. Sharp Cap., Inc.*,
    No. 3:98-CV-2792-M, 2001 WL 169722 (N.D. Tex. Jan. 16, 2001) .................. 25

*SEC v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) ................................................ 16

*SEC v. Sullivan*,
    68 F. Supp. 3d 1367 (D. Colo. 2014) ................................................. 22

*SEC v. Unifund Sal*,
    910 F.2d 1028 (2d Cir. 1990) ............................................ 12, 26, 27, 29

*SEC v. Tyler*,
    No. 3:02 CV 0282 P, 2002 WL 32538418 (N.D. Tex. Feb. 21, 2002).................. 30

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ................................................... 1, 13, 14

*SEC v. Zale Corp.*,
    650 F.2d 718 (1981) .................................................................................. 23

*Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................... 18

*Swenson v. Engelstad*,
    626 F.2d 421 (5th Cir. 1980) ................................................................... 15

*TSC Indus. v. Northway*,
    426 U.S. 438 (1976) .................................................................................. 18

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ................................................................... 13

**<u>Federal Statutes</u>**

**Securities Act of 1933**

Section 2
    [15 U.S.C. § 77b] ...................................................................................... 13

Section 5(a)
    [15 U.S.C. § 77e] .................................................................................. 2, 15

Section 17(a)
    [15 U.S.C. § 77q] .............................................................................. 2, 16, 18

Section 20
    [15 U.S.C. § 77t] ............................................................................ 2, 11, 12

Section 21
    [15 U.S.C. § 77u] ...................................................................................... 12

**Securities Exchange Act of 1934**

Section 3
    [15 U.S.C. § 78c] ...................................................................................... 13

Section 10
    [15 U.S.C. § 78j] .................................................................................. 2, 16

Section 20
    [15 U.S.C. § 78t] ...................................................................................... 23

Section 21

[15 U.S.C. § 78u] ........................................................................................ 2, 11

**Securities Exchange Act of 1934 Rules**

Rule 10b-5
[17 C.F.R. § 240.10b-5] .............................................................................. 2, 16

## **Other**

Fed. R. Civ. P. 65(b) ............................................................................. 11, 12, 27

Plaintiff U.S. Securities and Exchange Commission (the "SEC" or "Commission") submits this *Ex Parte* Motion for Preliminary Injunction, Temporary Restraining Order, Asset Freeze, Appointment of Receiver, and Other Ancillary Emergency Relief, and Brief in Support, to halt an ongoing securities fraud by Defendants Agridime LLC ("Agridime"), Joshua Link ("Link"), and Jed Wood ("Wood") that is harming investors and dissipating investor funds, and to protect the ability to recover assets for harmed investors.

## **INTRODUCTION**

Since 2021, Agridime, Link, and Wood have raised at least $191 million from more than 2,100 investors in at least 15 states by selling investment contracts concerning the sale and re-purchase of cattle ("Cattle Contracts"). Defendants have represented that when an investor purchases one of these Cattle Contracts, Defendants will: (a) buy cattle on the investor's behalf; (b) raise, feed, and finish the cattle within their "proprietary supply chain;" and, after a year and seven days, (c) "repurchase" the cattle from the investor for a "guaranteed" return ranging from 15% to 32%.

Defendants' representations, however, are materially false and misleading. Rather than use investor funds for cattle operations as promised, Defendants have diverted a significant portion of the proceeds to wholly unrelated purposes, including to make Ponzi payments to prior investors and to pay significant commissions to salespeople. The Cattle Contracts are securities because they are investment contracts under the U.S. Supreme Court's test in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Additionally, the Defendants offer and sell the Cattle Contracts to investors without filing a registration statement with the Commission and without an exemption from registration.

Defendants' representations and business practices have defrauded, and continue to

defraud, investors in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act")

[15 U.S.C. § 77q(a)(2)] and Section 10b-5 [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.

§ 240.10b-5(b)] of the Securities Exchange Act ("Exchange Act").  In addition, Defendants have

violated, and continue to violate, the securities-registration provisions of Sections 5(a) and 5(c)

of the Securities Act [15 U.S.C. § 77e(a) and (c)].  These violations are ongoing and, if not

addressed, will lead to irreparable harm to investors.

To halt Defendants' ongoing violations, the Commission moves pursuant to Section 20(b)

of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C.

§ 78u(d)(1)] and Rule 65(b) of the Federal Rules of Civil Procedure for *ex parte* orders:

(1) temporarily restraining, and thereafter preliminarily enjoining, immediately and pending final adjudication on the merits, Defendants from violating the antifraud and securities-registration provisions of the federal securities laws;

(2) Freezing Defendants' assets;

(3) Appointing a receiver;

(4) Requiring Defendants to provide a sworn interim accounting;

(5) Preventing the destruction of documents;

(6) Authorizing expedited discovery; and

(7) Authorizing service by alternative means.

## STATEMENT OF FACTS

I.     **Agridime is a Cattle and Meat Distributor Operated by Link and Wood.**

Agridime is a cattle and meat distribution company headquartered in Fort Worth, Texas.

Ex. A-1, Cert. of Formation (APP. 0003-5)1; Ex. E-5, Link Tr. at 13:21-14:22 (APP. 0214-215);

Ex. B-1, Web Capture, "Cattle Backgrounding" (Oct. 13, 2023) (APP. 0009-10); Ex. C-1 Web

---

1 Citations to the appendix of supporting documents filed herewith will be made in the format APP. [page #].

Capture, "Farm to Table Beef" (Nov. 20, 2023) (APP. 0016, 0022-23, 0028).  It holds itself out as a wholesaler and retailer of "farm fresh beef," connecting local farmers to consumers across the country.  Ex. E-5, Link Tr. at 93:13-16 (APP. 0294); Ex. B-2, Web Capture, "Meat Distribution" (Oct. 13, 2013) (APP. 0011-12).  With operations purportedly in Texas, Arizona, Kansas, North Dakota, and other states, the company claims that its "proprietary beef supply chain" allows it to offer "guaranteed pricing" and "year-round availability" to its customers.  Agridime, "Meat Distribution," https://www.agridime.com/meat-distribution (last visited Nov. 20, 2023); Ex. B-2 (APP. 0011-12).

Link and Wood co-founded Agridime in 2017.  Ex. A-1 (APP. 0005).  Since that time, they have served as Agridime's highest ranking officers—Link as the Executive Director and Wood as the Operations Director.  Ex. C-1 (APP. 0022).  Link has described his role as equivalent to a Chief Executive Officer ("CEO").  Ex. E-5, Link Tr. at 13:10-20 (APP. 0214).  Wood signed Agridime's Texas Certificate of Formation as Agridime's President.  Ex. A-1 (APP. 0005).  He controls Agridime's books, including overseeing the firm's finances.  Ex. E-5, Link Tr. at 38:18-22 (APP. 0239).  He signs Agridime's checks, and, with the assistance of the company's financial controller, he is primarily responsible for overseeing the bank accounts, including payments to and from investors.  *Id.* at 75:3-76:23 (APP. 0276-277).

II.   **Agridime Solicits Investors to Purchase Cattle Contracts.**

As early as October 2021, Agridime began offering investors, through its publicly available website, unrestricted Facebook page, and team of sales representatives, an opportunity that it described as sounding "too good to be true" to "make money raising cattle without having to do all the work."  Ex. D-1, Web Capture, "Buy Cattle Here" (Apr. 26, 2023) (APP. 0056-66).  Agridime specifically offered investors a contract to purchase calves for $2,000 a head.  *Id.*

3

Agridime promised that, in exchange for $2,000, Agridime would raise the calf and, after one year and seven days, Agridime would buy back the calf at a higher price to provide a promised return. *Id.*; Ex. F, Turley Decl. ¶ 4 (APP. 0405); Ex. E-5, Link Tr. at 27:5-18 (APP. 0228). The company offered "guaranteed 15-20% yearly profits" on the contracts. Ex. D-1 (APP. 0057). It even guaranteed returns as high as 32% for certain contracts. Ex. E-6, Williams Tr. at 31:19-32:25 (APP. 0327-328); Ex. D-3, Fulfilled Cattle Contracts (APP. 0081); Ex. D-4, Unfulfilled Cattle Contracts (APP. 0092). The rate typically depended on the number of cattle purchased—the more calves the investor bought, the higher the promised profit. Ex. D-1 (APP. 0057) ("Ask about a higher guaranteed return for purchases of 50 head or more."). Agridime further claimed that the Cattle Contracts were protected by USDA bonding and insurance. *See, e.g.*, Ex. D-3 (APP. 0073-75, 0078-79, 0083) and Ex. D-4 (APP. 0087-92); Ex. E-6, Williams Tr. at 19:18-21:16 (APP. 0315-316). These guarantees were included in contracts and displayed prominently on Agridime's publicly available website and social-media ads promoting the investment, as reflected in the images below[2]:

## BUY LIVE CATTLE

### Have you ever wanted to make money raising cattle without having to do all the work?

We know it sounds too good to be true, however, in order to meet increased demand we are partnering with individuals and organizations to contract cattle into our beef supply chain.

We supply retails outlets, meat distributors and restaurant food service companies with farm fresh beef. We are inviting individuals and organizations to purchase cattle with us in order to supply beef to these customers.

All cattle purchased during Q1 of 2023 will be guaranteed 15-20% yearly profits. We also offer 20% yearly profits on contracts of 50 or more.

*Figure 1, Online Advertisement for Cattle Contract Offering (Ex. D-1 [APP. 0063])*

---

2 Agridime admitted in its Answer to an Arizona Temporary Order to Cease and Desist (discussed below) that Figures 1 and 2 were displayed on its website. *Compare* Ex. E-1, Temp. Order to Cease and Desist, ¶ 19 (APP. 0122) *and* Ex. E-3, Agridime Answer to Temp. Order to Cease and Desist ¶ 19 (APP. 0142).

4



*Figure 2, Online Advertisement for Cattle Contract Offering (Ex. D-1 [APP. 0064])*

This Contract entered into on **January 9th, 2023** by and between ▮▮▮▮▮▮ hereinafter called Seller, and **Agridime** Of **Fort Worth, TX** hereinafter called Buyer. The Seller agrees to sell and Agridime (the "Buyer") agrees to purchase from the Seller the below described cattle in accordance with the preceding terms and conditions, which are legally binding on the Seller and Buyer. Agridime is licensed and bonded in accordance with the USDA. All cattle are insured for death loss. In the event of death, Agridime will replace any lost cattle and maintain the guaranteed return set forth below.

| Number of Head | Sex | Breed, Sire & Dam Breakdown or Color | Base Wt (lbs) | Price | Delivery Schedule And Dates |
|---|---|---|---|---|---|
| 50 | Steers And/Or Heifers | Home raised calves, Angus Based | 1,300-1,500 | $2,600 per head | Freight on Buyer-Hope, KS: January 9th, 2023 to January 19th, 2024 |

CONTRACT TERMS: ▮▮▮▮▮▮▮ agrees to purchase fifty steers and/or heifers for $2,000 per steer or heifer ($100,000 total). Agridime agrees to pay 30% per year profit on those cattle. Guaranteed yearly profits of 30%. Contract to be paid 7-10 business days after the final date set forth in the above delivery schedule. Payment to be made by Agridime via wire transfer or check. Contract terms are payable 12 months post the date set forth in this contract, or upon receipt of funds from the aforementioned "seller".

*Figure 3, Excerpt of Cattle Contract (Ex. D-4 [APP. 0087])*

Agridime has also advertised the Cattle Contracts on Facebook with an animated video titled "Make 15%-20% Yearly Returns by Purchasing Cattle With Us." Ex. E-8, Video Offering Cattle Contracts (APP. 0390); *see* Notice of Manual Filing (filed herewith). The video described how investors could purchase cattle for $2,000 per head, an amount covering the cost to "feed that animal to finish, fully process the beef into retail packaging, and then ultimately sell the beef." *Id.*

As noted above, from January 2021 through September 2023, Agridime has raised

approximately $191 million from more than 2,100 investors in multiple states through its sales of the Cattle Contracts. Ex. F, Turley Decl. ¶ 5 (APP. 0406). Agridime continues to sell Cattle Contracts, although it has removed some of its advertisements and altered some of its web pages. Ex. E-5, Link Tr. at 40:20-41:9 (APP. 0241-242); Ex. E-6, Williams Tr. at 41:3-44:2, 48:1-9, 60:19-24 (APP. 0337-340, 0344, 0356).

In each Cattle Contract, the investor's role is passive. In testimony before the Arizona Corporation Commission, Link confirmed that cattle purchased through Cattle Contracts are raised and maintained by Agridime. Ex. E-5, Link Tr. at 14:15-22, 16:13-19, 35:13-37:1 (APP. 0215, 0217, 0236-238). This testimony aligns with representations on Agridime's website, which stated that investors would "make money raising cattle without having to do all the work." Ex. D-1 (APP. 0063). Agridime's operations manager confirmed in separate testimony that, even though the Contracts describe the transaction as a "purchase," investors never take possession of the cattle and that the cattle at all times remain in Agridime's supply chain. Ex. E-6, Williams Tr. at 75:8-77:18 (APP. 0371-373). Consequently, investors depend entirely on the efforts and expertise of Agridime and its "proprietary beef supply chain" to generate returns on their investments. *Id.*

Link acknowledged in testimony that investors can "just purchase through online checking or checkout shopping cart" on Agridime's website without any income verification or disclosures. Ex. E-5, Link Tr. at 28:6-12 (APP. 0229). Agridime sends investors their Cattle Contracts by email only *after* investors send funds to Agridime (via wire transfer, check, Shopify, transfers from self-directed IRAs, or a number of other payment options, including installment payments). Ex. F, Turley Decl. ¶ 5 (APP. 0406). At that point, the investor signs the contract, and Link (or an authorized Agridime sales representative) signs it in Link's name on

behalf of Agridime, electronically via DocuSign. Ex. E-6, Williams Tr. at 25:6-18 (APP. 0321).

Link personally solicits investors, trains and directs the activities of Agridime's salespeople, and

executes the Cattle Contracts on Agridime's behalf. *Id.* at 18:15-19:6 (explaining that Link

trained Williams to sell Cattle Contracts) (APP. 0314-315); *id.* at 22:23-24:5, 25:6-27:15 (APP.

0318-320, 0321-323); *see also* Exs. D-3 (APP. 0072-0085) and D-4 (APP. 0086-92) (signed

Cattle Contracts).

**III.   Defendants Misappropriate Investor Funds.**

     While Agridime represents that it will use investor funds to purchase and maintain cattle,

Defendants have actually used more than $70 million of investor funds to make Ponzi payments

and for other undisclosed purposes.

     **a.   Most Investor Returns for the Last Year Have Been Ponzi Payments.**

     Based on a review of the Company's financial records and bank records, Agridime has

acquired far fewer cattle than it has purported to "sell" to Cattle Contract investors. Ex. F,

Turley Decl. ¶ 23 (APP. 0411). And it has not generated, and cannot generate, sufficient revenue

from its cattle business to repay its investors. For instance, between December 2022 and

September 2023, bank account records show net credits of approximately $106 million in

Agridime's primary account used for investor transactions. *Id.* ¶ 27 (APP. 0412). Agridime's

bank records also show that it had only $32 million from sources other than investors available in

this account during this time period. *Id.* During this same period, the bank records show that

Agridime paid investors $90 million on Cattle Contracts from this account. *Id.* ¶ 28 (APP.

0412). Because Agridime's account received only $32 million from non-investor sources, at

least $58 million of these payments to investors were Ponzi payments. *Id.*

     As of September 5, 2023, Agridime owed investors approximately $123 million in

principal (obligations to repurchase cattle) plus approximately $24 million in guaranteed "profits." *Id.* ¶ 24 (APP. 0411). And it continues to offer and sell new Cattle Contracts. *Id.* ¶ 31 (APP. 0413); Ex. D, Johnson Decl. ¶ 7 (APP. 0053-54); Ex. E-5, Link Tr. at 40:20-41:9 (APP. 0241-242); Ex. E-6, Williams Tr. at 41:3-44:2, 48:1-9, 60:19-24 (APP. 0337-340, 0344, 0356); Ex. E, Frieberg Aff. ¶¶ 16-26 (APP. 0116-117). Given the company's insufficient operating revenues, it appears that, unless Agridime continues to raise larger amounts of investor funds each month, its Ponzi scheme will soon implode. Ex. F, Turley Aff. ¶¶ 19-20, 23-24 (APP. 0409-411).

### b. More Than $11 Million in Commissions Has Been Paid to Sales Associates, Link, and Wood.

Agridime uses at least 20 people, including its own employees and outside salespeople, to solicit investors to invest in the Cattle Contracts. Ex. F, Turley Decl. ¶ 11 (APP. 0407-0408). Under the terms of Agridime's standard Sales Representative Agreement, each salesperson receives a 10% commission for each contract sold. Ex D-7, Agridime Sales Agreement with T.B. (APP. 0101-105); Ex. D-9, Agridime Sales Agreement with G.M. (APP. 0108-113); Ex. E-6, Williams Tr. at 16:15-22 (APP. 0312). Agridime has paid commissions of at least $5.6 million to one representative in North Dakota. Ex. F, Turley Decl. ¶ 11 (APP. 0407-408); Ex. D, Johnson Decl. ¶ 8 (APP. 0054). According to Agridime's financial statements, Link and his wife each received at least $650,000 in sales commissions, while Wood received $1.3 million. Ex. F, Turley Decl. ¶ 11 (APP. 0407-408). Through May 2023, Agridime has paid more than $11.1 million in commissions to its salesforce, largely for sales of Cattle Contracts. *Id.* Agridime lists specific uses of investor funds in its representations to investors, but does not disclose on its website, in its advertisements, or in the Cattle Contracts themselves that it uses investor funds to pay commissions. *Id.*; *see also* Ex. D-1 (APP. 0056-66); Ex. E-8 (APP. 0390); Ex. E-9 (APP.

0391-402).

# Financial Summary

**Here's how the financials breakdown for the 15-20% return on our cattle contracts:**

The customer purchases cattle from us for $2,000 per head. That $2,000 is used to purchase one steer or heifer, feed that animal to finish, fully process the beef into retail packaging and then ultimately sell the beef.

*Figure 4, Excerpt of Online Advertisement for Cattle Contract Offering (Ex. D-1 [APP. 0058])*

### c.   Defendants' Statements to Investors Are Fraudulent.

Based on the foregoing, Defendants' statements in their offerings to investors are materially false and misleading.  Defendants represent that investor funds will be used to purchase cattle when, in reality, Agridime's records reveal that the majority of funds generated from recent Cattle Contract sales (and a significant portion of the funds from all sales over time) were used to pay investors in prior Cattle Contracts that came due.  Ex. F, Turley Decl. ¶¶ 27-28 (APP. 0412).

## IV.    Defendants Defy Orders from State Regulators to Cease and Desist Cattle Contract Sales.

In or around April 2023, the Arizona Corporation Commission began investigating Agridime in connection with its sale of the Cattle Contracts.  Ex E, Frieberg Aff. ¶ 6 (APP. 0115).  On April 18, 2023, the Arizona Corporation Commission issued to Agridime a Temporary Order to Cease and Desist from selling Cattle Contracts within Arizona, and to cease violating the antifraud provisions of the Arizona Securities Act.  Ex E, Frieberg Aff. ¶¶ 7, 9-13 (APP. 0115-116); Ex. E-1, Temp. Order to Cease and Desist (APP. 0119-130).

Around this same time period, the North Dakota Securities Department also initiated an investigation into Agridime.  Ex. D, Johnson Decl. ¶ 3 (APP. 0052).  On May 24, 2023, it issued

a Cease-and-Desist Order to Agridime and Link, directing Agridime to cease selling its Cattle Contracts to North Dakota residents.  *Id.* ¶ 4 (APP. 0052); Ex. G, Cease-and-Desist Order (APP. 0431-438).

Despite these cease-and-desist orders from state authorities, Agridime continued to sell Cattle Contracts to investors in both North Dakota and Arizona.  Agridime records show that the company has sold more than $1 million worth of Cattle Contracts to Arizona residents since the Arizona cease-and-desist order was entered.  Ex E, Frieberg Aff. ¶ 17 (APP. 0116).  Agridime's operations manager even admitted to selling Cattle Contracts to parties within Arizona, despite knowing of the cease-and-desist order.  Ex. E-6, Williams Tr. at 41:3-42:12, 60:19-24 (APP. 0337-338, 0356).  He also admitted to selling Cattle Contracts on behalf of Agridime *from* Arizona during this period, which is prohibited by the cease-and-desist order.  *Id.*  Further, an undercover agent for the State of Arizona contacted Agridime as recently as October 2023 and was offered a Cattle Contract, even though the agent repeatedly told the Agridime representative that he was an Arizona resident.  Ex. H, Woerner Aff. (APP. 0439-443).  The Agridime sales representative offered to sell the contract to the undercover agent by permitting him to use an out-of-state address.  *Id.* ¶¶ 16-18 (APP. 0441).  Agridime records likewise show that it has sold at least 18 Cattle Contracts to residents in North Dakota since the cease-and-desist order was issued in that state.  Ex. D, Johnson Decl. ¶ 7 (APP. 0053-54).

## V.      Defendants Continue to Raise Investor Funds.

As noted above, Agridime's Cattle Contract offerings continue nationwide.  Ex. E-5, Link Tr. at 40:20-41:9 (APP. 0241-242); Ex. E-6, Williams Tr. at 41:3-44:2, 48:1-9, 60:19-24 (APP. 0337-340, 0344, 0356).  Recently, Agridime began offering a new variant of its Cattle Contract, soliciting investments of $4,500 "for the purchase of one bred cow in [Agridime's]

10

supply chain and [for Agridime] to feed that cow until it gives birth to its calf. This cow will remain on [Agridime's] ranches & will be fed and cared for during this time." Ex. I-1, Web Capture, "1 Live Bred Cow" (Oct. 27, 2023) (APP. 0446-448). Agridime makes similar representations regarding these "live bred cow" offerings as it did with its other Cattle Contracts, promising that it will re-purchase the cattle one year and seven days after initial purchase for a "22% return+" and assuring investors that it carries "all associated liability insurances throughout our supply chain." *Id.*

Agridime has also started offering a "Land Purchase and Leaseback" based on purported interests in real estate in Kansas. Ex. K-1, Web Capture, "Land Purchase and Lease Back" (Nov. 20, 2023) (APP. 0451-455). Agridime offers to sell land for $100,000 per acre, coupled with a guarantee that Agridime will lease back the purchased property at $10,000 per acre, per year for a 15-year lease period. *Id.*

## ARGUMENT

I. **The Court Should Issue an *Ex Parte* Temporary Restraining Order and a Preliminary Injunction to Halt the Ongoing Fraudulent Offering.**

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)] expressly authorize the Commission to seek and a court to enter "a permanent or temporary injunction or restraining order" upon "a proper showing" that the defendant "is engaged or is about to engage" in violations of the federal securities laws. Federal courts have broad equitable powers enabling them to fashion appropriate remedies necessary to grant full relief, including injunctions and asset freezes. *See SEC v. Blatt*, 583 F.2d 1325, 1335-1336 (5th Cir. 1978). Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may grant an *ex parte* temporary restraining order to prevent immediate and irreparable injury, loss, or damage. FED. R. CIV. P. 65(b).

11

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). Many courts—including courts within this district—have held that the Commission need not show irreparable injury or a balance of equities in its favor.[3] *Id.*; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990); *SEC v. Brooks*, No. 3:99-CV-1326-D, 1999 WL 493052, at *3 n.2 (N.D. Tex. July 12, 1999) ("The SEC is not required to show risk of irreparable injury or unavailability of remedies at law"); *SEC v. Prater*, F. Supp.2d 39, 49 (D. Conn. 2003); *see also EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1090 (5th Cir. 1987) (explaining that when "an injunction is expressly authorized by statute and the statutory conditions are satisfied, the movant need not establish specific irreparable injury to obtain a preliminary injunction."). While some courts have recently required the Commission to meet the requirements of Rule 65(b)(1), including a clear showing of irreparable injury, to obtain a temporary restraining order, *see SEC v. Reliable One Resources, Inc.*, No. 6:23-cv-00006, 2023 WL 177687, at *2-3 (E.D. Tex. Jan. 9, 2023), the underlying showing of securities violations required of the SEC is usually made with proof of past substantive violations that indicate a reasonable likelihood of future substantive violations. *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *see also* 15 U.S.C. §77t(b); 15 U.S.C. §77u(d); *SEC v. Krishnan*, No. 4:23-cv-885-SDJ, Doc. 16, at 6 (E.D. Tex. Oct. 11, 2023) (granting temporary restraining order and other emergency relief, and identifying differing standards for entry of a temporary restraining order in SEC cases).

---

3 The Commission is also relieved of demonstrating the lack of an adequate remedy at law, as private litigants must, to obtain an injunction. *Management Dynamics, Inc.*, 515 F.2d at 808*; SEC v. Scott,* 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983), *aff'd sub nom., SEC v. Cayman Hedens Reins. Corp.,* 734 F.2d 118 (2d Cir. 1984).

As outlined in further detail below, the Commission meets its burden under whichever standard the Court applies.  The evidence establishes that **(A)** the SEC is likely to succeed on the merits because Defendants are violating the registration and antifraud provisions of the federal securities laws and **(B)** Defendants are reasonably likely to continue their illegal conduct, resulting in irreparable injury to investors through Defendants' misappropriation of investor funds.

### A.     The Commission Is Likely to Succeed on the Merits of Its Case.

As detailed below, the Commission presents evidence showing that Defendants are violating **(1)** the securities-registration provisions of Sections 5(a) and 5(c) of the Securities Act through their unregistered offering of the Cattle Contracts, and **(2)** the antifraud provisions of Sections 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, through multiple materially false and misleading misrepresentations and a scheme to defraud investors.

### 1.     Defendants Are Violating the Registration Provisions of the Federal Securities Laws

The Cattle Contracts are securities because they are investment contracts.  *See* 15 U.S.C. §77b(a)(1); 15 U.S.C. § 78c(a)(10).  An investment contract constitutes a security under the federal securities laws if it meets three requirements: "(i) an investment of money; (ii) in a common enterprise; and (iii) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *W.J. Howey Co.*, 328 U.S. at 298-99; *Williamson v. Tucker*, 645 F.2d 404, 417-418 (5th Cir. 1981).  In applying these requirements, the Supreme Court has directed courts to disregard "legal formalisms" and instead focus on "the economics of the transaction." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).  In the Fifth Circuit, courts considering the existence of a common enterprise apply the "broad vertical commonality test" in

13

which "the second and third prongs of the *Howey* test may in some cases overlap to a significant degree." *Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.*, 916 F.3d 528, 536 (5th Cir. 2019) (quoting *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989)).  Under the broad vertical commonality test, "the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise." *Shultz Cattle*, 881 F.2d at 141.

The Cattle Contracts offered and sold by Agridime satisfy each element of *Howey*.  First, investors send Agridime money (via wire transfer, check, Shopify, transfers from self-directed IRAs, or a number of other payment options).  Ex. F, Turley Aff. ¶ 5 (APP. 0406).  Second, the investors' fortunes are tied to the efforts and expertise of Agridime, Link, Wood, and others, who handle every aspect of the cattle business and guarantee a fixed annual return, thus creating a "broad vertical commonality" element.  *See SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) ("the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter]").  Third, investors are entirely passive and do not participate in the cattle business.  Indeed, Agridime offers investors the opportunity to "make money raising cattle without having to do all the work."  Ex. D-1 (APP. 0056-66); Ex. E-9 (APP. 0391-402).  Investors depend entirely on the efforts and expertise of Agridime and its "proprietary beef supply chain" to generate (guaranteed) returns on their investments.  Ex. D-1 (APP. 0056-66); Ex. E-6, Williams Tr. at 75:8-77:18 (APP. 0371-373).  Investors do not take possession of cattle.  *Id.*  Nor do they participate in the acquisition, feeding, finishing, slaughter, or sale of cattle.  *Id.*  In practice, investors do not invest in specific, identifiable calves.  Their fortunes are instead dependent on the success of Agridime's purported cattle operation, including its ability to attract new investors.  The Cattle Contracts therefore qualify as securities under *Howey*.  *See also Shultz Cattle*, 881 F.2d at 140-141 (finding broad

14

vertical commonality where the plaintiffs had a substantial degree of theoretical control over their investment in a cattle-feeding program but relied solely on Shultz Cattle's efforts and expertise to manage their investments).

Because the Cattle Contracts are securities, Defendants have violated and continue to violate Sections 5(a) and 5(c) of the Securities Act by offering and selling them to investors without registering those securities offerings with the Commission. *See* 15 U.S.C. § 77e(a) and (c). Section 5 prohibits the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972). Because Section 5 is a strict liability statute, a defendant's intent is irrelevant. *Swenson v. Engelstad,* 626 F.2d 421, 424 (5th Cir. 1980). To establish a *prima facie* violation of Sections 5(a) and 5(c), the Commission need only prove that: (i) defendants, directly or indirectly, offered or sold securities; (ii) no registration statement was in effect or filed for the offer or sale of those securities; and (iii) interstate transportation or communication, or the mails, were used in connection with the offer or sale. *See* 15 U.S.C. §§ 77e(a) and (c); *Cont'l Tobacco,* 463 F.2d at 155. Once a *prima facie* case is established, the burden shifts to defendants to prove that the securities offerings fall within an exemption to Section 5. *Id*. at 156.

The evidence establishes that Defendants offer and sell the Cattle Contracts in interstate commerce with no registration statement in effect. Ex. F, Turley Decl. ¶ 7 (APP. 0407). All offers and sales of Agridime's securities have been unregistered. *Id.* Additionally, Defendants use the Internet, including Agridime's publicly available website, unrestricted Facebook page, and other social media, among other means, to find and communicate with potential investors. Ex. D-1 (APP. 0056-66); Ex. E-8 (APP. 0390); Ex. E-9 (APP. 0391-402); Ex. E-5, Link Tr. at 27:22-28:1, 43:18-25 (APP. 0228-229, 0244). Defendants obtain funds from investors via wire

transfer, check, Shopify, transfers from self-directed IRAs, and a number of other payment options.  Ex. E-5, Link Tr. at 42:16-18 (APP. 0243); Ex. F, Turley Decl. ¶ 5.  Investors are located in multiple states.  Ex. F, Turley Decl. ¶ 5.  Based on this information, Defendants have offered and sold, and continue to offer and sell, securities through interstate commerce in violation of Sections 5(a) and 5(c) of the Securities Act.  *See SEC v. Straub*, 921 F. Supp. 2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce'"); *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No. 1:08-cv-1402-KAM-JMA, 2009 WL 3233110, at *4 (E.D.N.Y. Oct. 2, 2009) (holding that wire transfers were instrumentalities of interstate commerce).

### 2. Defendants Are Violating the Antifraud Provisions of the Federal Securities Laws

Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities, to (1) employ any device, scheme, or artifice to defraud; (2) to obtain money or property by means of any material misstatement or omission; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act prohibits using a manipulative or deceptive device or contrivance in connection with the purchase or sale of a security.  15 U.S.C. § 78j(b).  Rule 10b-5 thereunder makes it unlawful, in connection with the purchase or sale of a security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.  17 C.F.R. § 240.10b-5.  The Supreme Court has held that these antifraud provisions are "expansive" and "capture a wide range of conduct."  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-102

16

(2019).

Defendants have violated, and continue to violate, **(a)** Section 17(a)(2) of the Securities and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder through multiple material misrepresentations (and omissions) in connection with their offering and sale of Cattle Contracts and **(b)** Sections 17(a)(1) and (3) of the Securities Act and Rules 10b-5(a) and (c) of the Exchange Act through acts, practices, or a course of business that operate as a fraud on investors.

a.      *Violations of Section 17(a)(2) and Section 10(b) and Rule 10b-5(b)*

A defendant violates Securities Act Section 17(a)(2) and Exchange Act Section 10(b) and Rule 10b-5 if the defendant (i) makes material misrepresentations or materially misleading omissions, (ii) the misrepresentations are made in connection with the purchase or sale of a security (and in the offer or sale of a security), and (iii) the defendant acts with scienter.  *SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018).  Under Section 17(a)(2), the defendant must also make the material misrepresentation or materially misleading omission "to obtain money or property."  15 U.S.C. 77q(a)(2).  Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in his or her investment decision and would view it as having significantly altered the total mix of available information.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Fifth Circuit, scienter may be established by showing that the defendant acted intentionally or with severe recklessness.  *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers is either known to the defendant or so obvious that the defendant must have been aware of it.'") (citations omitted).

17

Defendants have violated, and continue to violate, Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder. As an initial matter, Defendants have made, and continue to make, multiple material misrepresentations and omissions to investors. Specifically, Agridime, Link, and Wood promised to investors that their funds would be used to "feed that animal [purchased by the investor] to finish, fully process the beef into retail packaging, and then ultimately sell the beef." Ex. E-8 (APP. 0390). In fact, however, Defendants used more than $58 million in investor funds not for cattle-related expenses but to pay principal (obligations to repurchase cattle) and investment returns directly to existing investors. Ex. F, Turley Decl. ¶ 28 (APP. 0412). Defendants continue to raise funds from investors—now including a $4,500 per head "bred cow" option—and have never revealed to investors their persistent use of Ponzi payments to create the appearance of success and prosperity. Ex. I-1 (APP. 0446-448).

Similarly, Defendants' promises of guaranteed 15-32% yearly profits on the Cattle Contracts—that, in their own words, sound "too good to be true"—are highly misleading. Ex. D-1 (APP. 0063). Agridime's financial statements and accounting records, available to Link and Wood, show that the company's cattle business does not generate, and has not generated, revenues sufficient to pay the promised profits to its investors. Ex. F, Turley Aff. ¶¶ 19, 28 (APP. 0409, 0412). Defendants misled, and continue to mislead, investors by failing to disclose that they used investor funds directly to pay the 15-32% yearly profits that they promised to existing investors.

Additionally, Defendants paid at least $11 million in undisclosed commissions to the salespeople who solicited investments in the Cattle Contracts. Ex. F, Turley Decl. ¶ 11 (APP. 0407-408). While investors thought that their funds were being used to maintain and finish cattle

and then process beef, Defendants diverted nearly $70 million in investor funds for other undisclosed purposes. *Id.* ¶¶ 11, 28 (APP. 0407-408, 0412). By concealing this misuse of investor funds, Defendants misled investors.

These false and misleading statements and omissions are material. False claims about how investor funds are being used—and omissions about the massive diversion of funds—are critically important to a reasonable investor. *Basic*, 485 U.S. at 231-32 (citing *TSC Indus.*, 426 U.S. at 449). Further, reasonable investors would have considered it important to know the truth about the baselessness of Defendants' promises regarding guaranteed returns. Knowledge of the actual facts would have allowed investors to better evaluate Agridime's offerings.

Defendants made, and are making, these representations in connection with the offer, purchase, and sale of Cattle Contracts, which, as demonstrated above, are securities. They specifically made the representations regarding the "too good to be true" returns in their offerings on their website and through social media. Ex. D-1 (APP. 0063); Ex. E-8 (APP. 0390); Ex. E-9 (APP. 0391-402). They made similar misrepresentations in the contracts they provided to investors and are continuing to make similar representations and promises in their live bred cow offerings. *See, e.g.*, Ex. D-3 (APP. 0073-85); Ex. I-1 (APP. 0446-448). While they claimed that investor funds would be used to "finish, fully process the beef into retail packaging, and then ultimately sell the beef" (Ex. E-8 [APP. 0390]) and, more recently, to purchase one "bred" cow and feed that cow until it gives birth (Ex. I-1 [APP. 0446-448]), Defendants have never disclosed that investor funds were actually being diverted to make Ponzi payments to other investors or to pay salespeople.

Finally, the evidence shows that Defendants engaged in this conduct with scienter. Link and Wood, and through them, Agridime, knew the truth—or were at least severely reckless in not

19

knowing the truth—about: (1) the actual use of investor funds, including the payment of significant sales commissions, (2) the actual number of cattle purchased and held by Agridime, and (3) the massive Ponzi scheme they were conducting.  Specifically, Link and Wood are Agridime's highest ranking officers, its only managing members, and the authorized signors on Agridime's bank accounts.  Ex. A-1 (APP. 0004-5); Ex. E-5, Link Tr. at 76:20-22 (APP. 0277). Wood controls Agridime's operations, including overseeing the firm's finances.  *Id.* at 38:18-22 (APP. 0239).  Wood also signs Agridime's checks and, along with the company's controller, he is primarily responsible for overseeing the bank accounts, including payments to and from investors.  *Id.* at 38:18-22, 75:3-76:23 (APP. 0239, 0276-277).  Link is Agridime's Executive Director, which he has characterized as being equivalent to CEO.  *Id.* at 13:10-20 (APP. 0214). This means he regularly engages with investors, directs the activities of Agridime's salespeople, has intimate knowledge of Agridime's actual cattle holdings, and executes the Cattle Contracts on behalf of Agridime.  *Id.*; Ex. E-6, Williams Tr. at 22:23-24:5, 25:6-27:15 (APP. 0318-320); Exs. D-3 (APP. 0072-85) and D-4 (APP. 0086-92) (executed Cattle Contracts).  By virtue of their positions in Agridime, both Link and Wood knew or should have known how investor funds were being used and whether funds were actually being used to purchase cattle as represented.  Both Link and Wood knew or were severely reckless in not knowing that funds were being used to pay obligations on expiring Cattle Contracts, yet did not disclose this material fact to investors.  Instead, both Link and Wood caused Agridime to pay them, Link's wife, and other sales representatives, substantial sales commissions, and they otherwise used significant amounts of investor funds to make Ponzi payments.  Ex. F, Turley Decl. ¶ 11 (APP. 0407-408).

Because Link and Wood had ultimate authority over the materially false and misleading statements they and Agridime made to investors, they violated Rule 10b-5(b).  Further, their

20

scienter may be imputed to Agridime, which therefore is also liable for the violations.  *See, e.g.*, *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096-97 n.16-18 (2d Cir. 1972) (abrogated on other grounds by *SEC v. Ahmed*, 72 F.4th 379, 406 (2d Cir. 2023)).   Because Link and Wood were acting on behalf of Agridime in making or authorizing the statements, the company may likewise be held liable for violating Section 17(a)(2) under the theory of *respondeat superior*. *See Paul F. Newton & Co. v. Texas Comm. Bank*, 630 F.2d 1111, 1115-19 (5th Cir. 1980) (recognizing doctrine of *respondeat superior* as a basis for an entity's vicarious liability under the securities laws).

              *b.*      *Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c)*

Defendants also violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by engaging in a fraudulent scheme, and in acts, practices, or a course of business that operates, and has operated, as a fraud or deceit. Proof of scienter is required for Rules 10b-5(a) and (c) and Section 17(a)(1), but a showing of negligence is sufficient for Section 17(a)(3).  *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980).  The scienter of an officer acting on a company's behalf may be imputed to the company.  *See, e.g., Manor Nursing Ctrs.*, 458 F.2d at 1096-97 nn.16-18.  These provisions are "expansive" and "capture a wide range of conduct."  *Lorenzo*, 139 S. Ct. at 1101.  Furthermore, in *Lorenzo*, the Supreme Court held that knowingly disseminating a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c) and Section 17(a)(1), even if the defendant is not a "maker" of the statement for purposes of Rule 10b-5(b), as that term was defined in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Defendants sought to maintain the false appearance of a lucrative and successful cattle business by using new investment funds to make payments of principal and investment returns to existing investors.  Using new investment funds to make such payments is "by definition, a

fraudulent scheme." *SEC v. Helms*, No. 1:13-CV-01036 ML, 2015 WL 5010298, at *13 (W.D. Tex., Aug. 21, 2015) (citing *Quilling v. Schonsky*, 246 F. App'x 583 (5th Cir. 2007)). Defendants' fraudulent course of conduct also includes making the material misrepresentations set forth above, which, in addition to violating Section 17(a)(2) and Rule 10b-5(b), also constitute violations of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c). *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *SEC v. Carter*, No. 4:19-CV-100-SDJ, 2020 WL 6304889, at *5 (E.D. Tex. Oct. 28, 2020) (noting this reasoning applies to Section 17(a)(3) as well); *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1379 (D. Colo. 2014) (finding that generating false account statements provided to investors violated Section 17(a)(1) and (3) and Rule 10b-5(a) and (c)). Defendants repeatedly represented, and continue to represent, personally or through Agridime employees and salespeople that the investor funds would be used to purchase cattle and that the investors could expect a guaranteed return—based on cattle operations, not investments from new investors. Ex. D-1 (APP. 0063); Ex. E-8 (APP. 0390); Ex. E-9 (APP. 0391-402); *see also* Ex. E-6, Williams Tr. at 18:19-20:7 (APP. 0314-316) (describing typical explanation of Cattle Contracts to prospective investors). All the while, however, it has been Defendants' course of business to use investor funds to meet the company's financial obligations under the Cattle Contracts (i.e., making Ponzi payments). Ex. F, Turley Decl. ¶¶ 27-28 (APP. 0412). As described above, Defendants have undertaken this misconduct with scienter to perpetuate the materially false impression that Agridime's Cattle Contracts are generating profits as promised. They therefore have, and are presently, violating Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c).

Additionally, Defendants Link and Wood are liable as control persons for Agridime's violations of the Exchange Act Section 10(b) and Rule 10b-5 thereunder, pursuant to Section 20(a) of the Exchange Act (15 U.S.C. § 78t). "To establish that Defendant is a control person under Section 20(a) of the Exchange Act, the SEC must show an underlying violation and that person's control of the violating entity." *SEC v. Sethi Petroleum, LLC*, 229 F. Supp. 3d 524, 541 (E.D. Tex. 2017). Link and Wood indisputably exercised control over Agridime in connection with the foregoing violations of the federal securities laws. Ex. A-1 (APP. 0004-5); Ex. E-5, Link Tr. at 13:10-20, 38:18-22, 75:3-76:23, 93:13-16 (APP. 0214, 0239, 0276-277, 0294). They are therefore jointly and severally liable with Agridime for any violations of the federal securities laws committed by Agridime.

## B.    The Defendants Are Reasonably Likely to Continue their Illegal Conduct

The Commission establishes a reasonable likelihood that illegal conduct will continue when "the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a reasonable likelihood of future transgressions." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *Blatt*, 583 F.2d at 1334 (explaining that the critical question is whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future). To determine whether there is a "reasonable likelihood" of future violations, courts consider the "sum of the circumstances surrounding the defendant and his past conduct," including (i) the nature of the past violation, (ii) the defendant's present attitude, and (iii) objective constraints on (or opportunities for) future violations of the securities laws. *Zale Corp.*, 650 F.2d at 720. In this context, courts also consider the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's recognition of the wrongful nature of their conduct, and

the likelihood that the defendant's occupation will present opportunities for future violations. *Id.*

(quoting *Blatt*, 583 F.2d at 1334 n.29).

Here, the evidence points to a virtual certainty that Defendants will continue their illegal

conduct unless restrained and enjoined by this Court.  For multiple years, Defendants have

conducted, and continue to operate, a scheme through which they have obtained millions of

dollars in investor funds using materially false and misleading statements and deceptive acts and

practices.  Ex. D-1 (APP. 0056-66); Ex. E-8 (APP. 0390); Ex. E-9 (APP. 0391-402); Ex. F,

Turley ¶¶ 27-29 (APP. 0412).  Beyond that, Defendants persist in selling their Cattle Contracts,

even after state securities authorities in Arizona and North Dakota found that Defendants'

actions violated state securities laws and issued cease-and-desist orders to that effect.  Ex. D,

Johnson Decl. ¶ 7 (APP. 0053-54); Ex E, Frieberg Aff. ¶¶ 9-13 (APP. 0115-116).  An Agridime

sales representative has confirmed that Agridime continues to sell the Cattle Contracts in direct

contravention of Arizona's cease-and-desist order.  Ex. E-6, Williams Tr. at 41:3-42:12, 60:19-

24 (APP. 0337-338, 0356).  An undercover investigation by Arizona authorities has likewise

shown that Agridime was willfully evading Arizona authorities' orders to sell more cattle

contracts by offering an undercover agent posing as an Arizona resident the opportunity to use an

out-of-state address to purchase cattle.  Ex. H, Woerner Aff. (APP. 0439-443).  More recently,

Defendants have begun offering and selling bred cattle at a higher cost and parcels of land with

similar promises of guaranteed returns.  Exs. I-1 (APP. 0446-448) and J-1 (APP. 0451-455).

If Defendants are not immediately restrained and enjoined from continuing their sales of

the Cattle Contracts, investors will be irreparably harmed.  Defendants' Ponzi payments are

indispensable in propping up their business.  Ex. F, Turley Decl. ¶¶ 27-28 (APP. 0412).

Defendants must therefore continue to use new investor funds to pay their obligations to existing

investors, or their scheme will fall apart. *Id.* Moreover, Defendants must continue to raise larger amounts of investor funds from new investors through continued sales of Cattle Contracts or they will not be able to make payments to existing investors. *Id.* ¶ 24 (APP. 0411). The likely dissipation of existing assets and continued Ponzi payments is sufficient to show irreparable harm. *See, e.g.*, *SEC v. Bryant*, No. 4:17-CV-00336, 2017 WL 3492311, at *6 (E.D. Tex. Aug. 15, 2017) (finding irreparable harm existed to justify preliminary injunction to protect against dissipation of assets in Ponzi scheme). A temporary restraining order (and thereafter a preliminary injunction) is therefore appropriate to foreclose Defendants' future misconduct and to avoid additional irreparable harm to investors.

## II.     The Court Should Grant Additional *Ex Parte* Relief.

In addition to a restraining order (and a preliminary injunction), the Commission also seeks an asset freeze, the appointment of a receiver, and orders requiring an accounting, prohibiting the destruction of documents, allowing expedited discovery, and permitting alternative service. Federal courts have broad equitable powers enabling them to fashion appropriate ancillary remedies necessary to grant relief. *See Manor Nursing Ctrs.*, 458 F.2d at 1103-04; *Blatt*, 583 F.2d at 1335-36. "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984); *see also SEC v. Sharp Cap., Inc.*, No. 3:98-CV-2792-M, 2001 WL 169722, at *5 (N.D. Tex. Jan. 16, 2001), *aff'd*, 315 F.3d 541 (5th Cir. 2003) ("Once invoked, the equity jurisdiction gives the court the necessary powers to fashion an appropriate remedy."); *see also CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) ("It has long been recognized that in an action brought to enforce the requirements of remedial statutes such as this Act, a district court has broad discretion to fashion appropriate relief.").

25

### A.    It Is Appropriate to Grant the Requested Relief on an *Ex Parte* Basis

Rule 65(b) of the Federal Rules of Civil Procedure authorizes courts to issue a temporary restraining order without notice to the adverse party if "specific facts in an affidavit for verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b).

Here, the evidence demonstrates that immediate and irreparable injury will result to the Commission and investors before Defendants can be heard. The evidence establishes that Defendants' scheme is ongoing, that Defendants' only path forward is to continue to raise money from investors to pay purported profits/returns to investors, and that Defendants will further dissipate the investor funds received from the offering. Further, the Rule 65 certification (filed separately herewith) sets forth experience in more than 100 cases since 1998 in which the Commission's Fort Worth Regional Office has sought and obtained emergency and/or *ex parte* relief for the protection of defrauded investors, which is an additional basis for the Commission's belief that irreparable injury and loss will occur if the Court requires notice and a hearing.

### B.    An Asset Freeze Is Necessary

An asset freeze may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established." *Unifund SAL*, 910 F.2d at 1041. The Commission need not show a reasonable likelihood of future violations, because an asset freeze only preserves the status quo. *See Muller*, 570 F.2d at 1300; *Unifund SAL*, 910 F.2d at 1039. When there is evidence that a defendant might dissipate assets, a court need only find "some basis" to infer a violation of the securities laws to impose a freeze order and grant other

26

ancillary relief. *See Unifund SAL*, 910 F.2d at 1041; *SEC v. Reynolds*, No. 3:08-CV-0438-B, 2008 WL 4561560, at *2 (N.D. Tex. Oct. 9, 2008); *SEC v. AmeriFirst Funding*, No. 3:07-CV-1188-D, 2007 WL 2192632, *3 (N.D. Tex. July 31, 2007).

The evidence of Defendants' past and ongoing illegal conduct justifies an asset freeze here. The evidence establishes that Defendants have engaged in egregious violations of the federal securities laws by raising millions of dollars misrepresenting the nature and outcome of their investments and that Defendants will engage in future violations unless restrained and enjoined. An asset freeze is therefore necessary to maintain the status quo by preventing further misappropriation, misuse, and dissipation of investor funds and to facilitate the satisfaction of whatever equitable relief the Court may ultimately order, as well as preventing further dissipation of investors' assets.[4] *See, e.g.*, *Manor Nursing Ctrs.*, 458 F.2d at 1106; *Muller*, 570 F.2d at 1300; *AmeriFirst Funding*, 2007 WL 2192632, at *3.

### C. Appointment of Receiver

The appointment of a receiver is a well-established equitable remedy in civil enforcement proceedings for injunctive relief. *See, e.g.*, *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 438 (5th Cir. 1981). Courts have wide discretion to order equitable relief in Commission actions. *In re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1406 (9th Cir. 1992). Courts will appoint a receiver where necessary: (1) to preserve the *status quo* while various transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct, *Manor Nursing Ctrs.*, 458 F.2d at 1105; (2) to protect "those who have already been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to prevent the dissipation of the

---

[4] In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon, and civil penalties.

27

defendant's assets pending further action by the court, *SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431,436 (2d Cir. 1987); (4) to install a responsible officer of the court who could bring the companies into compliance with the law, *id*. at 437; or (5) to place hopelessly insolvent entities in bankruptcy to effect their liquidation, *id*. at 436.

"The Court may appoint a receiver upon a *prima facie* showing of fraud and mismanagement." *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992). As discussed above, the Commission has made a strong *prima facie* showing of fraud. The Defendants have raised nearly $200 million under the guise of purchasing cattle, and then misappropriated a large portion of those funds to pay commissions to themselves and to make Ponzi payments so they could continually attract more investors. The appointment of a receiver will preserve assets by preventing the Defendants, who illegally obtained investor funds, from disposing of or wasting assets that would otherwise be available to satisfy a judgment against them, potentially for the benefit of the investors.

The Commission staff has vetted receiver candidates to provide a recommendation to the Court and has identified two candidates who possess superior skill and experience in this area, agree to the standard billing and reporting requirements, agree to reduce professional fees, are located in the Dallas/Fort Worth area where Defendants' headquarters and principal place of business are located, and have cleared conflicts. Both candidates have extensive experience in law enforcement, white-collar investigations, and forensic accounting analysis. The Commission is submitting the application materials of its proposed candidates concurrent with this filing.

### D.   Other Ancillary Emergency Relief

#### 1.   Sworn Accounting

An order requiring Defendants to prepare a sworn accounting is appropriate here because it will enable the Commission and the Court-appointed receiver to accurately determine the scope of the fraud and disposition of investor funds, as well as to identify all available assets. A sworn accounting will also help ensure that funds and assets are frozen properly and preserved to satisfy any future order of disgorgement or civil penalties against Defendants. *See Manor Nursing Ctrs.*, 458 F.2d at 1105; *SEC v. Oxford Cap. Secs., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992).

#### 2.   Document Preservation

An order prohibiting the movement, alteration, destruction, concealment, or disposing of books, records, accounts, electronic storage devices, and computers is necessary to protect records for discovery. Such orders are routinely granted to protect the integrity of the litigation. *See, e.g., Unifund SAL*, 910 F.2d at 1040 n.11. Moreover, many of the videos and posts soliciting investors in cattle are no longer available on Agridime's publicly available website. A document preservation order is therefore particularly important here so that the evidence of Defendants' fraud may be preserved.

#### 3.   Expedited Discovery

An order providing for expedited discovery will allow the Commission to: (a) act quickly to obtain records necessary to identify and preserve assets for the benefit of investors; (b) depose Defendants, their employees, and others on short notice; and (c) seek other discovery on an expedited basis from Defendants and third parties prior to a hearing on the Commission's application for a preliminary injunction. Courts routinely grant the SEC leave to take expedited

29

discovery in anticipation of such a hearing. *See, e.g.*, *SEC v. Mattera*, No. 1:11-cv-8323-PKC, 2012 WL 4450999, at *10-11 (S.D.N.Y. Sept. 26, 2012) (holding defendant in contempt for violating expedited discovery provisions); *SEC v. Sethi Petroleum, LLC*, No. 4:15-CV-338, 2015 WL 11197824, at *4 (E.D. Tex. May 14, 2015) (ordering expedited discovery in anticipation of a preliminary injunction); *SEC v. Tyler*, No. 3:02 CV 0282 P, 2002 WL 32538418, at *11 (N.D. Tex. Feb. 21, 2002) (same); *CFTC v. RFF GP, LLC*, No. 4:13-CV-382, 2013 WL 4083748, at *8 (E.D. Tex. July 10, 2013).

### 4.   Alternative Service

Alternative service on Defendants and financial institutions by email and facsimile is appropriate here because the effectiveness of other relief the Commission seeks could be diminished by any delay in awaiting the formal service of process. *See, e.g.*, *Sethi Petroleum, LLC*, 2015 WL 11197824, at *4 (authorizing service "personally, by facsimile, by electronic mail, by overnight courier, or by mail upon Defendants" or by other means permitted by Federal Rule of Civil Procedure 4 or order of the Court).

## **CONCLUSION**

Based on the foregoing, the Commission respectfully requests that the Court enter orders providing for the relief requested and such other and further relief as the Court may deem just and proper.

Dated:  December 11, 2023                       Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

Matthew J. Gulde
Illinois Bar No. 6272325
Tyson M. Lies
Texas Bar No. 24087927
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-3821
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorneys for Plaintiff*

31