**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND** | § | |
| **EXCHANGE COMMISSION,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-1224-P** |
| | § | |
| **AGRIDIME LLC, JOSHUA LINK, and** | § | |
| **JED WOOD,** | § | |
| | § | |
| *Defendants.* | § | |

## RECEIVER'S COMBINED INITIAL STATUS REPORT AND
## QUARTERLY STATUS REPORT FOR THE PERIOD ENDING MARCH 31, 2024

Steve Fahey, in his capacity as the Court-appointed Receiver ("Receiver") for the Estates of the Receivership Defendants,[1] submits the following Combined Initial Status Report and Quarterly Status Report for the Period Ending March 31, 2024, and would respectfully show the Court as follows:

## I.
## INTRODUCTION

The Court appointed the Receiver in this case because the Court found that a receiver was necessary and appropriate for the purposes of marshaling and preserving assets of the Receivership Defendants that are attributable to funds derived from investors, held in constructive trust for the Receivership Defendants, were fraudulently transferred by Receivership Defendants, and/or may be includable as assets of Receivership Defendants. (ECF No. 15, at 1.)  Among other things, the Order Appointing Receiver (the "Order" or "Receivership Order" herein) directs the Receiver to

---

[1]  "Receivership Defendants" are Agridime LLC, Joshua Link, and Jed Wood. (ECF No. 15, ¶¶ 1-2.)

submit a written status report with the Court, including a summary of the receivership activities to date and a proposed plan for administering the receivership going forward, including (a) whether the receivership should continue, and if so, why; (b) an analysis of whether instituting appropriate bankruptcy proceedings would be in the best interests of investors and creditors; and (c) a proposed deadline by which the Receiver will submit the Liquidation Plan if the Receiver recommends continuing the Receivership going forward. (*Id.*, ¶ 53.)

The Receivership Order further requires that the Receiver submit a full report and accounting of the Receivership Estate reflecting, to the best of the Receiver's knowledge as of the period covered by the report, the existence, value, and location of all Receivership Property and the extent of liabilities, including (a) a summary of the operations of the Receiver, (b) the amount of cash on hand, (c) a schedule of all of the Receiver's receipts and disbursements (to be attached as Exhibit A to the Quarterly Status Report), (d) a description of all known Receivership Property, (e) a description of liquidated and unliquidated claims held by the Receivership Estate, (f) a list of all known creditors with their addresses and the amounts of their claims, (g) the status of Creditor Claims Proceedings, after such proceedings have been commenced, and (h) the Receivers' recommendation for a continuation or discontinuation of the receivership and the reasons for the recommendations. (*Id.*, ¶¶ 54-55.)

Because the initial report was required 30 days after the appointment of the Receiver, to conserve resources of the Receivership Estate, the Court authorized the Receiver to submit an Initial Report simultaneously with the First Quarterly Status Report.

## II.
## INITIAL REPORT

**A.    SUMMARY OF RECEIVERSHIP ACTIVITIES TO DATE**

  **1.    Summary of SEC Allegations and Status of Proceedings.**

On December 11, 2023, the Securities and Exchange Commission ("<u>SEC</u>" or the "<u>Commission</u>" herein) filed the underlying complaint to halt an ongoing, fraudulent, and unregistered offering of securities and an active Ponzi scheme being perpetrated on investors by the Receivership Defendants, Agridime, LLC ("<u>Agridime</u>"); Joshua Link ("<u>Link</u>"); and Jed Wood ("<u>Wood</u>"). (ECF No. 1, ¶ 1.)[2] The Commission alleges that Receivership Defendants raised approximately $191 million in Cattle Contracts by selling investment contracts for the purchase and sale of cattle, with a guaranteed annual return of 15% to 32%. (*Id.*, ¶ 2.) However, rather than using the investment funds to purchase, feed, and process cattle, the Receivership Defendants used the investment funds to make Ponzi payments on prior Cattle Contracts. (*Id.*, ¶ 3.) Despite cease-and-desist orders issued by Arizona and North Dakota in early 2023, Agridime continued selling fraudulent, unregistered securities in those states. (*Id.*, ¶ 4.)

The Commission alleges Receivership Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) and Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933. (*Id.*, ¶ 5.) The Commission further alleges Link and Wood are liable as control persons for Agridime's violations of Section 10(b) and Rule 10b-5. (*Id.*) The Commission seeks, *inter alia*, injunctive relief, disgorgement, and civil penalties, as well as a preliminary injunction, asset freeze, and appointment of a receiver. (*Id.*, ¶ 6.)

On December 11, 2023, the Court signed a temporary restraining order, freezing assets, prohibiting the destruction of documents, requiring a sworn accounting, permitting alternate means

---

[2] The Complaint was initial filed under seal, but the docket was unsealed pursuant to the Commission's motion. *See* ECF Nos. 16, 17.

of service, and setting a hearing on the Commissions' request for preliminary injunction. (ECF No. 14.)

Also on December 11, 2023, the Court signed the Receivership Order appointing Mr. Fahey as receiver over the Receivership Defendants. (ECF No. 15.) Among other things, the Court found that the appointment of a receiver was necessary and appropriate for the purpose of marshaling and preserving all assets of the Receivership Defendants that are attributable to funds derived from investors, are held in constructive trust for the Receivership Defendants, that were fraudulently transferred by Receivership Defendants, and that may be otherwise includable as estates the Receivership Defendants. (*Id.*, at 1.) Thus, the Receivership Order placed an asset freeze on all Receivership Assets and Recoverable Assets. (*Id.*, ¶ 3.)

The Receiver was granted all powers possessed by officers, directors, managers, and general and limited partners of Agridime, in addition to all powers and authority of an equity receiver and in addition to all powers conferred by 28 U.S.C. §§ 754, 959, and 1692, as well as FED. R. CIV. P. 66. (*Id.*, ¶ 4.) Among other things, the Receiver was authorized:

A. To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B. To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

C. To manage, control, operate and maintain the Receivership Estates and hold in his possession, custody and control all Receivership Property, pending further Order of this Court;

D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Defendants;

F. To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H. The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I. To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J. To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estates; and,

K. To take such other action as may be approved by this Court.

(*Id.*, ¶ 7.)

## 2.    Summary of Activities of the Receiver.

The following is not intended to be an exhaustive list of each activity performed by the Receiver; rather, this summary identifies general categories of the Receiver's activities and provides a brief description of those activities.

### a.    Initial Activities

At the commencement of the Receivership, the Receiver first sought to stabilize and maintain the business operations of Agridime. Because the chief assets of Agridime are both perishable – its inventory of frozen and fresh meat and the cattle owned at various locations across

the Midwest United States – it was important for the Receiver quickly to locate these assets and sustain them in the most economical manner possible. The Receiver also focused on streamlining the company and shedding numerous inefficient activities that were not essential to Agridime's meat sales business. The Receiver also started implementing a two-step (online and verbal call to a bank representative) approval process for all ACH and wire expenditures made from Agridime's bank account. Highlights of this early process included:

● **<u>Locating Agridime's Cattle</u>**: Company records as to the quantity and location of its cattle were sparse and poorly maintained. It appears that Mr. Link would provide a monthly inventory of cattle via email to Agridime's controller, Royana Thomas, mid-to-late in the following month, often after repeated requests from Ms. Thomas. The last such inventory the Receiver could locate was sent from Mr. Link to Ms. Thomas on November 17, 2023, and purported to be an inventory of Agridime's cattle for October 2023. Mr. Link's inventory accounted for 17,852 head of cattle owned by Agridime, spread out over 18 different locations in Colorado, Kansas, Illinois, and Oklahoma.[3] This inventory was not consistent with the company's balance sheet as it existed when the Receivership began, which showed $59,175,734.60 in cattle at locations including Cattle Empire, Morgan Creek Farms, Mid-America, and "various." Using a conservative value of $2,000 per head of cattle, this book value suggested that Agridime had more than 29,500 cattle on hand.

Unfortunately, the Receiver's investigation in December 2023 determined that the company had far less cattle than either Mr. Link's inventory or Agridime's balance sheet suggested

---

[3] The locations referenced by Mr. Link were: Garden City, Kansas (340 head); Barnsdale, Oklahoma (292 head); Edna, KS/Rok'N'H Farms/Altamont, KS (430 head); Kelvin Grass Lease/Lazy SK Ranch (625 head); Morgan Creek Farms (4,542 head); Goracke Farms (791 head); Ohiowa, Nebraska (Mid-America) (503 head); PX Feeders (98 head); Circle L (Chad Lorson) (401 head); NextGen Cattle (678 head); Beef City (2,772 head); Woodward, OK (181 head); Jabez (976 head); CRI (1,273 head); Riffel (251 head); Davidson (69 head); Cattle Empire (3,277 head); and Illinois Cedar Valley Farms (403 head).

– only approximately 9,900 head, and more than 2,000 of these were actually not owned by Agridime at all, but rather were placed on feed lots as part of a "retained ownership" program where ownership did not pass from the cattle producer to Agridime until the cattle were sent to slaughter. (See, *infra*, II.A.2.j). Finding the cattle and ascertaining accurate current numbers were challenging; Mr. Link's inventory contained general location information with no specific contact information (e.g., "Barnsdale, Oklahoma"), some locations were under the control of Mr. Link or his family members (e.g., "Riffel"), and some of the specific locations in Mr. Link's inventory were reluctant to share any cattle information with the Receivership without significant back-and-forth effort.

● **Inventorying and Maintaining Agridime's Meat Supply**: Agridime's balance sheet as of December 11, 2023, claimed that the company had a meat inventory valued at $83,499,938.81. The Receivership quickly determined, however, that this number was not close to accurate. Utilizing a reasonable USDA per pound valuation for each cut of meat in Agridime's warehouses in Arizona, Kansas, and Texas, a thorough inventory prepared for the Receiver indicated that Agridime had approximately $20 million in meat on hand. It was not readily apparent how Agridime valued its pre-Receivership meat inventory at $83.4 million, but putting such a large valuation on this asset presumably allowed the company to represent to potential investors that the company had more assets than liabilities.

Maintaining Agridime's supply of frozen and fresh meat presented logistical and financial challenges for the Receivership. Agridime had leased sub-optimal warehouse space in Fort Worth, Texas, where the majority of its meat supply was maintained. For example, Agridime's main warehouse did not have an operable freezer for meat, and a refrigeration room meant for fresh meat did not cool sufficiently to keep the meat there for more than a day. These issues had led Agridime to rent more than 15 "conex" freezer boxes that were kept inside the warehouse and

approximately 40 "reefer" refrigerated trailers that were kept in the warehouse parking lot and used to store frozen and fresh meat. These "reefer" units were energy inefficient, required frequent refueling and maintenance after hours and on weekends to prevent breakdowns, and presented logistical difficulties with loading and unloading pallets of product. But worst of all was the sheer waste of Agridime's meat storage system; the company utilized two Fort Worth warehouses, had signed a lease to rent a third (even larger) space in nearby Burleson, Texas[4], and was forced to rent reefer trailers to make up for the failings of its warehouse space – all at a combined monthly cost of more than $140,000. Through renegotiation of leased space and the termination of two unnecessary lease agreements, the Receivership has cut these rental costs in half already and hopes to push them even lower in the months ahead.

●  **<u>Reduction of Agridime's Workforce</u>**: As of December 11, 2023, Agridime had 83 employees, with the majority hourly workers involved in the handling, packing, and shipping of retail meat orders. The Receiver evaluated Agridime's staffing and attempted to eliminate positions that were not essential to the company's meat sales. Cuts included the closing of Agridime Logistics, LLC, a money-losing trucking subsidiary; Open Range Tallow, a company producing candles and skin care products using tallow from Agridime's cattle production; Farm Fresh Grill, a company-run food truck operating in Gilbert, Arizona; Farm to Home Market, a subsidiary working to create an online platform for ranchers to sell their products (e.g., hay, farm equipment, feed, etc.); and Gilbert Greens, a subsidiary raising "microgreens" for sale on Agridime's retail website. The Receiver reduced Agridime's employee count by 43 positions, saving approximately $1 million in annual salaries.

---

[4] The monthly rent on the Burleson warehouse was set at $306,000 – an astronomical amount given that the company had two active leases at other Fort Worth warehouses. In January 2024, the Receiver terminated this lease pursuant to an opt-out provision in the agreement.

● **Trimming Agridime's Operating Costs**: The Receiver focused from the outset on reducing Agridime's operating costs so the company could generate the best possible return on its meat and cattle sales for eventual distribution to investor victims. As previously noted, this included shutting down five money-losing businesses that were being funded by Agridime but had little to do with the company's core meat sales business, including Agridime Logistics (trucking), Open Range Tallow (tallow products), and Farm Fresh Grill (a food truck). The Receivership also reduced monthly rent expenses by terminating the lease of one of two Fort Worth warehouses, negotiated a 40% monthly rent reduction on the second Fort Worth warehouse, and reduced by 90% the company's meat marketing budget. Agridime staff recognize the necessity to find efficiencies to operate the company more profitably and have made many suggestions to the Receiver regarding ways to streamline the business's operations. The Receiver anticipates additional cost savings to be identified and implemented in the weeks ahead.

**b.    Handling Disruptions Caused by the Credit Card Chargeback Issue**

Immediately after news broke of the SEC complaint[5] and the appointment of the Receiver[6], some online purchasers of Agridime's product – both retail meat purchases and Cattle Contracts – asserted claims of fraudulent credit card charges to their respective credit card companies. This had a cascading effect. *First*, Agridime's online retail platform, through the credit card payment processor, began debiting those funds from Agridime's bank account in the aggregate amount of more than $600,000. *Second*, after the payment processor was prevented from accessing Agridime's bank account to debit allegedly fraudulent charges, it appears the platform and/or processor began offsetting (*i.e.*, retaining) new incoming online sales. *Third*, the payment

---

[5] *SEC Obtains Emergency Relief to Halt $191 Million Cattle Ponzi Scheme*, Dec. 14, 2023, (https://www.sec.gov/news/press-release/2023-250) (last accessed March 30, 2024).

[6] For example, at least one Reddit thread was created on December 14, 2023. *See* https://www.reddit.com/r/Agridime/?rdt=43675 (last accessed March 30, 2024).

processor refused to facilitate any further online retail meat sales. Thus, the Receiver was faced with the immediate challenge of having approximately 1.3 million pounds of meat product[7] that Agridime could no longer sell online.

The chargeback issue caused the Receiver to spend a large amount of time in the initial weeks of the receivership challenging the allegedly fraudulent charges; discussing the chargeback issue with counsel for the platform and the processor; serving the Receivership Order on the various entities involved; and taking steps to form a new entity (American Grazed Beef, LLC) to maintain Agridime's online retail meat sales.

While not unsympathetic to the motivation behind the chargebacks made by individual investors – but recognizing that acceding to the chargebacks would be preferring some victims be compensated over others – the Receiver lodged a formal dispute as to each chargeback with the platform, processor, and the involved banks, asserting that granting the chargeback violated several provisions of the Court's Receivership Order. Despite these objections, the overwhelming majority of chargebacks were granted by the involved banks, and the disputed funds have not been returned to Agridime's bank account. The Receiver has sent notice and demand letters to the platform, processor, and the banks demanding that the funds removed from Agridime's account be returned, and currently is involved in negotiations on this matter with numerous financial institutions. The Receiver has been able to recover $4,500 in chargebacks to date.

**c.     Establishment of National Jurisdiction for Recovery of Receivership Assets**

The Receiver took steps to establish national jurisdiction for Recovery of Receivership Assets based on the Receiver's current understanding of the location of Receivership Assets.

---

[7] The extent of Agridime's retail meat product is detailed more below.

Accordingly, the Receiver filed Notices pursuant to 28 U.S.C. §754 in the following courts under the following case numbers:

- The United States District Court for the District of Arizona, Misc. Cause No. 24-7-PHX;

- The United States District Court for the Southern District of Illinois, Misc. Cause No. 3:24-mc-8-NJR; and

- The United States District Court for the District of Kansas, Misc. Cause No. 5:24-mc-00401-TC-RES.

As the Receiver's investigation is ongoing, the Receiver may file addition Section 754 notices if it is determined that potential Receivership Assets are located in additional jurisdictions.

### d.    Communications with Investors/Victims and Establishment of Receivership Webpage

The Receiver has communicated via email and telephone with several hundred investors since the establishment of the receivership in December 2023. Investors have reached out with numerous questions, including what happened at Agridime, the current status of the company, whether any funds will remain for compensating victims, and the current posture of the civil case in the Northern District of Texas. These conversations were heartbreaking, as investors told very difficult stories about investing substantial savings in Agridime on the promise of guaranteed returns, only to learn that these funds may now largely be gone. The Receiver gained much knowledge about the workings of Agridime's investment operation through these emails and calls, and was amazed by the polite and helpful demeanor of all of these victims in the face of receiving terrible news regarding their financial investment.

On December 18, 2023, a receivership webpage was created on the agridime.com website (www.agridime.com/information-on-the-agridime-receivership) so that updates could be posted in one place that would be accessible to all investor victims, and the Receiver has made periodic

updates to this page with news on the civil case, guidance on how to handle the Agridime investment for tax purposes, and other notable matters.

e.    **Employment of Professionals**

The Receivership Order authorizes the Receiver to solicit persons and entities ("Retained Personnel") to assist him or her in carrying out the duties and responsibilities described in this Order[,]" but requires the Receiver first obtain Court approval authorizing such engagement. (Order, ¶ 58.)

The Receiver carried out his duties and responsibilities as receiver for approximately 40 days before it became apparent that it would be beneficial to the Receiver and in the best interest of the Receivership Estate to engage the services of a law firm to assist in taking action to preserve and protect Receivership assets, represent the Receiver in matters related to marshaling and preserving assets, and to locate and secure assets that may have been disbursed. Accordingly, the Receiver filed a Motion to Retain the law firm of WICK PHILLIPS GOULD & MARTIN, LLP ("WP"), as counsel for the Receiver. (ECF No. 33.) WP has experience representing receivers in state and federal courts, and as a full-service law firm, WP is able to assist and advise the Receiver on litigation matters, as well as transactional matters and bankruptcy matters. The Motion to Retain explained that WP agreed to the engagement at a discounted hourly rate with senior partners billing at an hourly rate of $575; partners billing at an hourly rate of $475; and associates billing at an hourly rate of $375. On January 23, 2024, the Court signed an order approving and authorizing the Receiver to retain WP as counsel for the Receiver. (ECF No. 34.)

Pursuant to this same authority identified above, the Receiver filed a motion (ECF No. 50) and obtained Court-approval (ECF No. 51) to retain additional legal counsel with the law firm of SPROUSE SHRADER SMITH PLLC, and specifically John Massouh. Because of the underlying business involving cattle, it was necessary to engage Mr. Massouh who has extensive experience

in matters specific to agricultural law, including UCC and agister's liens, as well as lien and trust claims made through the United States Department of Agriculture's Packers and Stockyards Division. Mr. Massouh was approved to bill at the same hourly rate structure as WP identified above. (ECF No. 51.)

Pursuant to the same authority identified above, the Receiver filed a motion (ECF No. 37) and obtained Court-approval (ECF No. 38) to retain AHUJA & CONSULTANTS, PLLC ("AC") as accounting professionals that could assist the Receiver with various financial tasks, including a full accounting of amounts owed to each investor and a determination of whether Agridime operated a Ponzi scheme in its sale of cattle investment contracts. AC agreed to be compensated at discounted hourly rates with the Director hourly billing rate of $345, the Manager hourly billing rate of $285, the Senior Associate hourly billing rate of $235, Associates hourly billing rate of $175; and Project Manager hourly billing rate at $95. (ECF No. 37 at 2.)

To date no payments have been made to the Receiver or any of the Retained Personnel for services rendered.

### f.    Attempts to Obtain Information from Defendants Joshua Link and Jed Wood

The Receivership Order required Link and Wood, within thirty (30) days of the Receivership Order, to file with the Court and serve on the Receiver and the Commission a sworn statement listing the (i) identify, location and estimated value of all Receivership Property; (ii) all employees, personnel, and other agents of the Receivership Defendants; and (iii) the names, addresses and amounts of claims of all known creditors of the Receivership Defendants. (Receivership Order, ¶ 9.) Additionally, within thirty (30) days of the Receivership Order, Link and Wood were required to file with the Court and serve on the Receiver and Commission a sworn statement and accounting with complete documentation covering the period from January 1, 2017 through present, the following: (i) all Receivership Property, including but not limited to all funds

and accounts; (ii) identifying every account at every bank or financial institution where Receivership Defendants have signatory authority and were opened by or in the name of or for the benefit of Receivership Defendants; (iii) identifying all credit, bank, debit, etc. cards utilized by each Receivership Defendant, the balance, and the last 12 months of statements; (iv) of all assets received by Receivership Defendants, including the value, location, and disposition of the same; (v) of all funds in any way relating to the allegations in the Commission's complaint; (vi) of all expenditures exceeding $1,000 by or on behalf of Receivership Defendants; and (vii) all asset transfers by Receivership Defendants. (*Id.*, ¶ 10.) Additionally, within thirty (30) days of the Receivership Order, Link and Wood were ordered to provide Receiver and the Commission with all federal income tax returns from 2017 through 2022, with all supporting documentation. (*Id.*, ¶ 11.)

Neither Link nor Wood timely filed with the Court all of the information required by the Receivership Order. Counsel for Link and Wood have provided the Receiver with detailed information on bank accounts and other assets. The Receiver is continuing efforts to obtain the other information required to be provided by Link and Wood pursuant to the Receivership Order.

### g.    Inventories

As of March 31, 2024, Agridime LLC's assets included several pieces of real property, a collection of farm and business office equipment used in the day-to-day operation of the business, a substantial amount of fresh and frozen meat, and a steadily decreasing inventory of cattle. The Receiver has catalogued these assets for the Court below and in attached exhibits, and is currently seeking to engage licensed appraisers to provide an appraised value on this property.

- <u>Agridime's Real Property</u>: The following real estate is owned by Agridime LLC, and appears to be free and clear of any mortgages:

- o Buildings in Hope, Kansas (23 E. 2nd Ave., 9 E. 2nd Ave., 125 N. Main St., 100 Block N. Park St.) – combined value of $240,575.33 on Agridime's balance sheet as of December 13, 2023.
  - o 6 W. Main St., Herrington, Kansas – value of $18,847.05
  - o 620 W. Main St., Herrington, Kansas – value of $500,000
  - o 106 N. Broadway St., Herrington, Kansas – value of $38,923.39
  - o 12 N. Broadway St., Herrington, Kansas – value of $33,996.89
  - o 2400 Block 400 Ave., Herrington, Kansas and 700 Block S. 5th St., Herrington, Kansas – value of $278,906.50
  - o Cedar Valley Farms, Abingdon, Illinois – value of $750,000

- <u>Agridime's Equipment</u>: A list of office and farm equipment owned by Agridime is attached hereto as **<u>Exhibit C</u>**[8]. All values are from Agridime's balance sheet and reflect the price the company paid for the property, and do not reflect any subsequent depreciation.

- <u>Cattle</u> (approximate inventory as of March 31, 2024)

  - o On Agridime property or property of contractors ("<u>Agridime Cattle</u>"):

    - ▪ Morgan Creek Farms (Kansas): 700 cows and 300 calves

    - ▪ Goracke Farms (Kansas): 140 cows and bulls and 110 calves

    - ▪ Cedar Valley Farms (Illinois): 315 cows and 50 calves

  - o On feed lots ("<u>Feed Lot Cattle</u>")

    - ▪ Cattle Empire, LLC (Kansas): 2486 larger calves[9]

    - ▪ Brookover Feedyards, Inc. (Kansas): 856 larger calves

    - ▪ PX Feeders (Texas): 45 cows

- <u>Leasehold interests</u>

  - o 6601 Will Rogers Blvd., Fort Worth, Texas 76140 – Agridime is a lessee under a 37-month term;

---

[8] Exhibit C consists of: a) a list of equipment purchased by Agridime during 2023 from the company's QuickBooks records; and b) a list of 2022 equipment purchased by Agridime from the company's 2022 federal tax return.

[9] The cattle numbers for Cattle Empire and Brookover include both cattle owned by Agridime, and certain head of cattle owned by North Dakota ranchers and provided to Agridime pursuant to a "retained ownership" contract by which Agridime would pay the rancher for the cattle upon their slaughter.

- 6440 Oak Grove Road, Fort Worth, Texas 76134 – Agridime is a lessee under a 60-month term;

- Penske Truck Leasing – Agridime is a lessee of approximately 20 "reefer" trailers from Penske Truck Leasing, Inc. under a 84-month term;

- Shoppa's – Agridime is the lessee of various warehouse equipment, such as forklifts and pallet jacks.

- Toyota Commercial Finance – Agridime is the lessee of various warehouse equipment, such as forklifts and pallet jacks.

**h.    Freeze Letters**

Since December 12, 2023, the Receiver proactively has worked to send freeze letters to any entity potentially in possession or control of Receivership Defendants' assets. To date, the Receiver has been able to send notice and freeze letters to the following entities: Worthington National Bank, Frost Bank, Shopify (USA) Inc., Stripe Payment Processor, Advance Federal Credit Union, Ally Bank, Bank of America, Barclays Bank of Delaware, Capital One, N.A., Citibank, Goldman Sachs, JPMorgan Chase Bank, US Bank, National Association, Wells Fargo Bank, and Discover. The Receiver anticipates sending additional freeze letters.

**i.    Formation and Operation of American Grazed Beef, LLC**

Due to the large number of credit card chargeback claims made by Agridime cattle contract investors after news of the SEC's suit against the Receivership Defendants became public, all credit card payment processors (e.g., Stripe, Amazon Pay, Shop Pay, etc.) notified Agridime in early January 2024 that they would no longer facilitate credit card payments on the Agridime retail website. With payment processors no longer allowing credit card transactions, Agridime could not complete online sales of retail meat. This was a serious crisis for Agridime, as its retail meat operations are a key component of the company's overall meat sales strategy.

Recognizing that Agridime no longer was a viable retailer seller of meat products, on February 2, 2024, the Receiver filed a motion for court approval to form a new entity, American Grazed Beef, LLC (ECF No. 41), in order to allow the Receiver to obtain a new EIN and continue to utilize its inventory of meat products to make online retail sales and collect retail payments for ultimate distribution to Agridime's victims. The Court granted the motion. (ECF No. 42.) American Grazed Beef, LLC has been formed as a new Texas entity, has its own EIN, and its operating funds are segregated in a separate receivership bank account at Worthington Bank.

American Grazed Beef established a new website and began retail sales of Agridime's meat inventory on February 22, 2024. In all, Agridime could not sell meat on its retail site for nearly seven weeks due to the problems from the payment processors. In its first month of operation, American Grazed Beef completed $250,263.86 worth of sales. The Receiver is optimistic about continued growth in American Grazed Beef's retail sales, as the company builds a social media presence and improves marketing its products. The new company has focused on cutting its costs by not packaging meat in heavy coolers to reduce shipping costs and by reducing reliance on expensive "giveaways" utilized by Agridime before the receivership, such as including a new freezer on all purchases of a quarter side of beef. Improving American Grazed Beef's retail sales allows the Receiver to monetize Agridime's meat inventory in a commercially reasonable manner, and selling down this inventory also permits the Receiver to explore options to reduce Agridime's lease footprint and exorbitant monthly lease payments.

**j.      Activities to Recover Cattle Sale Proceeds and Resolve Competing Claims to Cattle Financed by Receivership Defendants in Agridime's Name.**

A large part of the Receiver's time since his appointment has been spent attempting to facilitate the sale of Agridime-owned cattle in as an efficient, expeditious, and commercially reasonable manner as possible. Particularly problematic has been the situation regarding Agridime

cattle located on three feed lots: Cattle Empire, LLC (Satanta, KS); Brookover Feedyards, Inc. (Garden City, KS); and Beef City, LLC (McClave, CO).[10] While it initially appeared that Agridime owned more than 6,300 head of cattle at these locations (per the Link inventory of November 17, 2023) and that Agridime would be entitled to all of the cattle sale proceeds as the cattle proceeded to slaughter, the reality the Receiver uncovered is much more complicated.

As an initial matter, the Receiver discovered that the Receivership Defendants had financed all or a large portion of the Feed Lot Cattle. Generally speaking, this meant that when Agridime facilitated the delivery of cattle to various feed lots, the feed lots would disburse a percentage of the then-present value of the cattle – usually 78% – to Agridime. In addition to obtaining a promissory note obligating Agridime, the feed lots would obtain a contractual lien (perfected by filing a UCC-1 financing statement) and would maintain an automatic statutory agister's lien (perfected by possession on the cattle) as collateral to ensure repayment of the loan against the cattle. After the cattle have been fed to the optimal weight, the feed lot facilitates the sale of the cattle to a packer for immediate slaughter. The feed lots recover their financing costs for the initial payment and feed and yardage (plus interest) and pay Agridime the balance based on the increased weight and (hopefully) increased value of the cattle at the time of the sale. Therefore, as allegedly secured creditors, feed lots would not simply allow financed cattle to leave the feed lot[11] and would

---

[10] As a general matter, a cattle feed lot operates to feed and care for cattle until the cattle reach a "finished weight," that being a weight when the cattle are ready to be shipped to a packing plant for immediate slaughter. A feed lot typically feeds and cares for company cattle (cattle that the feed lot owns) or customer cattle (cattle that a third-party owns). A feed lot may handle the business transaction for customer cattle in different ways. One way is for the feed lot to simply feed and care for the customer cattle and charge the customer a "feed bill." The feed bill encompasses all charges associated with the feed and care of the cattle, including feed, medicine, processing, yardage, etc. The feed lot may require the customer to pay its feed bill on a monthly basis, but most commonly, the feed lot finances the feed bill until the cattle reach a finished weight. Then upon the sale of the cattle to a packing plant, the proceeds from the sale would be applied to the unpaid feed bill and the remaining proceeds remitted to the customer.

[11] Even if it were possible to require the feed lots to release the cattle back to the Receiver, that would not be advantageous because transporting cattle while they are in the process of being fed to a finished weight can be detrimental to the overall health and value of the cattle. Thus, the Receiver, in consultation with industry-specific personnel did not attempt to have the cattle removed from the feed lots.

be reimbursed a large portion of any final sale to recoup the amounts already advanced to Agridime.

One of the feed lots, Cattle Empire, LLC, upon commencement of the receivership, simply stopped disbursing cattle sale proceeds to the Receiver. This caused the Receiver to spend considerable time and expense corresponding and communicating with Cattle Empire and its counsel to ensure Cattle Empire was distributing cattle sale proceeds. Cattle Empire also began instituting offset and self-help against a calculated equity in the remaining Agridime cattle as a means of withholding cattle sales proceeds. The Receiver eventually was forced to file a motion asking the Court to make Cattle Empire show cause why it was not in flagrant violation of the Receivership Order. (ECF No. 59.) The parties eventually reached a compromise and submitted an agreed order whereby the Court granted the motion and ordered $128,518.72 in funds immediately disbursed to the Receiver and ordered that Cattle Empire begin disbursing other sales proceeds as described more fully in the order. (ECF Nos. 70, 71.)

Additionally, all of the feed lots eventually withheld cattle sale proceeds because there were competing claims asserted on the cattle sale proceeds by various ranchers under purported contracts that Mr. Link, on behalf of Agridime, had entered into with the ranchers. That is, the Receiver discovered that Agridime was not only financing its own cattle on the feed lots, but the company also was financing cattle from ranchers and passing them off as Agridime's cattle. The contracts Agridime entered into with these ranchers vary. Agridime's cattle-industry-specific personnel have informed the Receiver that the terms of these contracts and the manner in which cattle were delivered and paid for under the contracts are not industry standard. It appears that Receivership Defendants were engaging in this as part of their larger scheme.

This issue has been further complicated because the Packers and Stockyards ("P&S") division of the U.S. Department of Agriculture (USDA) has been assisting ranchers in asserting

packer and dealer trust claims on these proceeds, which has further slowed the flow of these cattle sales proceeds to the Receiver. Again, the Receiver has been forced to expend considerable time and expense communicating and corresponding with the USDA, the North Dakota Stockmen's Association, and attorneys for the ranchers (and the ranchers themselves) in an effort to keep these parties apprised of the status of the disputed cattle.

**k.    Notice and Information Letters**

The Receiver has sent letters requesting additional information to the following purported creditor entities: SCRS Fort Worth Industrial (one of Agridime's commercial landlords) and Lucky's Roofing (who put a roof on an Agridime building in Herrington, KS).

**l.    Subpoenas**

The Receiver has issued a subpoena for documents to Worthington National Bank for account information documenting transfers of funds from Agridime to Shady Brook Ranch in Kansas from early 2022 through December 2023.  The Receiver's early investigation into this matter indicates that Agridime, at the direction of Mr. Link, paid Shady Brook Ranch (operated by Mr. Link's brother) monthly for feed and yardage expenses for a varying number of Agridime cattle kept on the property.  However, it appears that the cattle at Shady Brook Ranch already were being supplied with feed Agridime purchased from another vendor, and the amounts being charged by Shady Brook Ranch for yardage were well in excess of the industry standard for these charges. The Receiver anticipates extensive further investigation to determine the propriety of these financial transactions between Agridime and Shady Brook Ranch, and the ultimate recipient of the proceeds from these transactions.

**m.    Receivership Defendants' Assets Under Receivership Control**

Pursuant to the Receivership Order, the Receiver has oversight over several bank accounts and other assets belonging to the Receivership Defendants that are subject to the asset freeze

ordered by the Court. These identified accounts include, for Mr. Link, accounts at Arvest Bank and Fidelity Investments, and for Mr. Wood, accounts at Simmons Bank, Independent Financial, Frost Bank, and Worthington Bank. Both Receivership Defendants also have disclosed vehicles and real estate to the Receiver.

### n.    Forensic Accounting

As noted earlier, AHUJA & CONSULTANTS, PLLC ("AC") has engaged in a forensic accounting analysis of the books and records of Agridime. This work can be separated on two major tasks. First, AC has analyzed the legitimacy of the investor payments on Cattle Contracts since Agridime's business and has been asked by the Receiver to prepare a report on whether, in AC's expert opinion, Agridime's Cattle Contracts business has the indicia of a Ponzi scheme and, if so, when this improper activity began. The Receiver anticipates that AC's report likely will serve as the foundation of a motion to the Court seeking a presumption that Agridime's Cattle Contracts business was a Ponzi scheme.

Second, the Receiver has requested that AC sort through Agridime's complicated books and records to determine how much is owed to each investor victim on Cattle Contracts they have purchased, and the Receiver anticipates that this work will serve as the basis for a mailing to each investor in Q2 of 2024 that provides the Receiver's calculation of the investor's loss and provides a 30-day window to notify the Receiver of any objections to this amount.

Finally, AC is assisting the Receiver with several important federal tax issues, including calculation and payment of due-and-owing federal payroll taxes from 2023, the filing of federal income tax returns for the Receivership Defendants, and the creation of a Qualified Settlement Fund with the IRS to handle potential future distributions to Agridime's investor victims.

o.    **Other Miscellaneous Activities**

*Activities to Reduce Exorbitant Monthly Rent Payments and/or Obtain More Cost-Effective, Efficient, and Appropriate Warehouse Space*

At the commencement of the Receivership, the Receiver discovered Agridime was paying exorbitant monthly rent for warehouse lease space, to store, *inter alia*, Agridime's frozen meat for retail and wholesale sales.[12] Agridime was leasing warehouse space in two different locations, 6601 Will Rogers Blvd., Fort Worth, Texas 76140 ("Will Rogers Warehouse"), and Carter Park Distribution Center, 6440 Oak Grove Road, Fort Worth, Texas 76134 ("Carter Park Warehouse"). The Will Rogers Warehouse is approximately 40,000 square feet, and the Carter Park Warehouse is approximately 122,500 square feet. Agridime's lease for the Will Rogers Warehouse has a 37-month term, and the lease for the Carter Park Warehouse has a 61-month term, commencing as of August 1, 2022.

Upon commencement of the Receivership, the landlord for the Will Rogers Warehouse asserted Agridime was in default under the terms of the sublease agreement simply for being under Court-ordered receivership – despite Agridime being current on its rent – and attempted to lockout Agridime on the evening of Sunday, December 17, 2023. This put Agridime in a precarious position because the warehouse property contained several "reefer" trailers containing Agridime meat, and the landlord's lockout prevented company employees from refueling these trailers. After a conversation between the landlord and the Receiver, the landlord agreed to end the lockout and company employees regained access to the property on December 18, 2023. Unfortunately, this situation arose again just over a month later, when the landlord locked out Agridime from the property on January 16, 2024, after the landlord learned that employees of Agridime Logistics

---

[12] In addition to Agridime meat products, Receivership Defendants are also warehousing large amounts of tallow, which was being provided to supply the Open Range Tallow business.

(who officed on the property) were being laid off for cost-cutting reasons. Again, the landlord asserted that Agridime was in breach of its lease, even though Agridime was current on its rent payments. Given that the lockout clearly violated the Court's Receivership Order, and Agridime did not need this warehouse space to operate given the closing of Agridime Logistics, the Receiver determined that Agridime would no longer pay rent under this lease, as the landlord's termination was improper under the lease and the Receivership Order. The Receiver still is engaging in efforts to recover the remaining few items of Agridime property that have been locked up at the Will Rogers Warehouse.

Upon inspection of the Carter Park Warehouse space, the Receiver discovered that the space is grossly underutilized. Of the 122,500 square feet, approximately 10-15% was being used to store Agridime's meat for retail sale. The Receiver also discovered approximately 40 "reefers" or cold-storage trucks located in the parking lot of the Carter Park Warehouse space, which were provided pursuant to a separate agreement with Penske. The monthly cost for reefers has been approximately $45,000. Apparently, the Receivership Defendants entered into the Carter Park Warehouse lease without ensuring the warehouse could cool to freezing temperatures that would be able to house Agridime's retail meat products. Making matters worse, Receivership Defendants apparently accepted the premises in "as-is" condition, with only minor modification and repair.

All told, at the commencement of the Receivership, Agridime was paying close more than $140,000 per month for warehouse space and reefers, with more than half of the warehouse space unusable for its intended purpose. Thus, the Receiver has engaged in extensive communications and correspondence with the landlords and counterparties in an effort to negotiate a reduced rent, and/or retrofit the unusable space, and/or terminate the economically disadvantageous leases. The Receiver recently has been able to negotiate a reduced monthly rental rate for the Carter Park Warehouse.

*Communications with Prospective Purchasers of Agridime's Assets*

The Receiver has been approached by and engaged with numerous parties interested in purchasing various assets of Agridime. Thus, the Receiver has engaged in a preliminary valuation of Agridime's assets, including real and personal property, consulted with Retained Personnel, and has performed and is performing other relevant due diligence. If the Receiver is presented with a commercially reasonable offer to purchase Agridime's assets that the Receiver deems to be in the best interests of the Receivership Estate, the Receiver intends to seek Court authorization to pursue the sale, take reasonable steps to notify all interested parties, and allow for a reasonable notice period in order to execute such a sale.

As of March 31, 2024, the Receiver is in serious discussions with a North Dakota-based investor group that is interested in purchasing assets of Agridime and American Grazed Beef, including the remaining meat and cattle inventory, with the intention of continuing to operate the retail and wholesale meat business under the American Grazed Beef name.  Should these negotiations proceed, it is possible that such a sale could be submitted for Court approval by mid-June 2024.

**B.     PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP**

**1.     The Receivership should continue.**

The Receiver recommends that the Receivership continue because the Receiver is still working with the accounting and forensic accounting professionals to identify all Agridime investors, amounts repaid to investors, and amounts outstanding to investors. The Receiver is also continuing to work with accounting and forensic accounting professionals to trace monetary transfers from the Receivership Defendants to determine, *inter alia*, any fraudulent transfers.

Additionally, there are approximately 1,615 head of cattle located on Agridime property or the property of contractors working with Agridime, as of March 31, 2024. In Q2 2024, when these

cattle reach sales weight, Agridime intends to both harvest these cattle for slaughter for use in its retail and wholesale meat business and sell any cattle not needed for the meat business.

There also are approximately 3,387 head of cattle remaining on the feed lots as of March 31, 2024. The Receiver has been advised by Agridime's cattle-industry specific personnel that the Feed Lot Cattle are expected to finish sometime in the Summer 2024. However, even upon completion of the Feed Lot Cattle and disbursement of all proceeds, ranchers with competing claims, feed lots with alleged security interests, and USDA P&S packer and dealer trust claims will need to be resolved.

Additionally, as of March 31, 2024, there is approximately 841,000 pounds of beef that is currently being stored at Agridime's warehouse facilities in Arizona, Kansas, and Texas, which is being continually sold through American Grazed Beef's retail website and wholesale channels.

### 2. Instituting bankruptcy proceedings would not be in the best interests of investors and creditors at this time.

The Receiver has consulted with Retained Personnel described above regarding bankruptcy proceedings, and the Receiver does not believe bankruptcy would be in the best interest of the investors and creditors at this time. *First*, with the formation of American Grazed Beef, LLC, the Receiver has been able to resume online retail meat sales as of February 22, 2024, after a seven-week shutdown due to the credit card payment processors refusing to do business with Agridime due to excessive credit card chargebacks for cattle contract purchases. In its first month of operation, American Grazed Beef completed $250,263.86 worth of sales. In total, from January 1, 2024, through March 31, 2024, gross wholesale and retail meat sales together were $2.8 million. And, as noted above, there is currently approximately 841,000 pounds of meat located in Agridime's warehouses, which is continuing to be sold. *Second*, there are still approximately 3,400 Agridime cattle located at Cattle Empire, LLC and Brookover Feedyards, Inc., which are being

slaughtered and sold in the ordinary course of business. The feed lots have represented to the Receiver that the cattle are scheduled to be finished sometime in the Summer of 2024. With the sales of these feed lot cattle, a large of amount of funds (often hundreds of thousands of dollars) are being disbursed to Agridime.[13] *Third*, there are approximately 1,600 head of Agridime Cattle located on Agridime property. These cattle have value that can be realized through continuing the process of feed, care, and finishing.

3. **The Receiver anticipates that it will submit the Liquidation Plan by July 31, 2024.**

For the reasons described above, the Receiver recommends that the Receivership continue. This is the Receiver's first report, and much work remains in this case, including continuing to secure, maintain, and sell assets, recover any fraudulent conveyances, investigate damages claims against third parties, administer the investor and creditor claims, and carry out any Court-approved Liquidation Plan. In light of what the Receiver has uncovered to date, and what continues to be uncovered, the Receiver proposes an initial deadline of July 31, 2024, for the Receiver to submit the Liquidation Plan.

### III.
### QUARTERLY STATUS REPORT FOR THE PERIOD ENDING MARCH 31, 2024

**A.      Summary of the operations of the Receiver.**

The operations of the Receiver consists of the activities detailed in subpart II.A.2. above, which is incorporated as if fully set forth herein.

**B.      The amount of cash on hand in the estate.**

The amount of cash on hand in the Receivership Estate as of March 31, 2024 was $2,011,299.85.

---

[13] The Receiver notes that various ranchers are asserting competing claims to some of these Agridime cattle, which is detailed in the Receiver's Motion to Order Cattle Sale Proceeds Disbursed to the Receiver. *See* ECF No. 58.

C.    **A schedule of all of the Receiver's receipts and disbursements.**

**Exhibit A** (attached) contains the receipts and disbursements of Agridime LLC and American Grazed Beef, LLC, as operated by the Receiver from December 13, 2023, through March 31, 2024.

D.    **A description of all known Receivership Property.**

The inventory of all known Receivership Property belonging to Agridime is set forth in subpart II.A.2.g, *supra*, and in **Exhibit C**.  Regarding all cattle owned by Agridime, in reliance on Agridime's cattle-industry-specific personnel, the Receiver assumes that an approximate value of $2,000 per head of cattle is a reasonable valuation, with the caveat that cattle currently at Cattle Empire and Brookover have been financed at up to 78% of their initial value, which will reduce the amount that Agridime ultimately will receive for these animals at sale.

E.    **A description of liquidated and unliquidated claims held by the Receivership Estate.**

The Receiver is still investigating this matter and is not currently able to fully list all such claims. The Receiver anticipates identifying such claims held by the Receivership Estate shortly.

F.    **A list of all known creditors with their addresses and the amounts of their claims.**

A list of all known creditors as of March 31, 2024, with their addresses and amounts of their claims, is attached as **Exhibit B**.  This list includes, as general categories, all Cattle Contract investor victims, all ranchers with "retained ownership" contracts with Agridime, and several other creditors demanding payments for goods and services provided to Agridime before the Receiver assumed control of the business.  This list is strictly provided for purposes of the inventory that the Court has requested, and is not meant as an acknowledgement by the Receiver as to the legal validity of an asserted claim or the legal creditor status of any individuals or entities listed in **Exhibit B**.  Accordingly, the Receiver expressly reserves the right to dispute any asserted claims made by any of the individuals or entities in **Exhibit B**.

**G.      The status of Creditor Claims Proceedings.**

Given this is the first quarter of the Receiver's work on this matter, no Creditor Claims Proceedings have been commenced as of March 31, 2024.

**H.      The Receivers' recommendation for a continuation or discontinuation of the receivership and the reasons for the recommendations.**

For the reasons described in subpart II.B.1 above, which is incorporated as if fully set forth herein, the Receiver recommends that the Receivership continue. Specifically, the Receiver intends to (1) continuing securing, maintaining, and selling assets and recovering fraudulent conveyances; (2) investigate damages claims against third-parties; (3) petition the Court to establish an investor and creditor claims process; and (4) upon a determination of liability, agreement of Defendants, or further order of the Court, eventually make distributions pursuant to a Court-approved distribution plan.

Dated: April 30, 2024                    Respectfully submitted,

                                          **RECEIVER STEPHEN P. FAHEY**

                                          */s/ Stephen Fahey*
                                          Stephen P. Fahey, as Court Appointed Receiver
                                          State Bar No. 24101249
                                          *Steve.Fahey@kirkland.com*

                                          **KIRKLAND & ELLIS, LLP**
                                          4550 Travis Street
                                          Dallas, Texas 75205
                                          Telephone:    (214) 972-1809
                                          Fax:          (214) 972-1771

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on April 30, 2024, a true and correct copy of the foregoing instrument was filed and served on all counsel of record through the Court's CM/ECF filing system.

*/s/ Stephen Fahey*
Stephen P. Fahey