**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | Case No. 4:23-CV-1224p |
| AGRIDIME LLC, JOSHUA LINK, and JED WOOD | § § § § | |
| *Defendants*. | § § § | |

**NORTH DAKOTA RANCHERS' BRIEF IN SUPPORT OF
MOTION FOR PAYMENT OF PROCEEDS FROM SALE OF CATTLE
FREE AND CLEAR OF CLAIMS FROM FEEDYARDS**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE, MARK T. PITTMAN:**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 4

FACTS ......................................................................................................................... 4

    November & December, 2023 Retained Ownership Agreements Between Agridime and North Dakota Ranchers ........................................................................................................... 5

    Purported Security Agreements Between Agridime and Feedyards.................................... 5

    Trucking of Retained Ownership Cattle from North Dakota to Kansas .................................... 7

        Table 1: Breakdown of Retained Ownership Cattle at Feedyards at Time of Commencement of Receivership Proceeding ............................................................................................. 8

    Agridime Receivership and Subsequent Actions........................................................... 9

    Pre-Receivership Dealings Between Cattle Empire, Brookover, Agridime and the North Dakota Ranchers ...................................................................................................... 10

        Table 2: Cattle Deliveries to Feedyards from North Dakota Ranchers Prior to Retained Ownership Cattle In Dispute Evidenced By Brand Inspection Papers from North Dakota Stockmen's Association................................................................................................ 11

    Harvest of North Dakota Ranchers' Retained Ownership Cattle and Proceeds Therefrom ..... 12

        Table 3: Jaeger Retained Ownership Cattle and Net Proceeds to Receivership ................... 13

    Jaeger 70 Head of Already Harvested Cattle Issue................................................... 14

LAW AND ARGUMENT ............................................................................................... 14

        Conflict of Law Issues ........................................................................................ 15

        Application of Dealer Trust Claims.................................................................... 15

        The Feedyard's Security Interest Failed to Attach to the Collateral................................ 19

            Even If the Court Determines that the Feedyards had Sufficient Rights in the Collateral for the Security Interest to Attach, the Security Agreements' Descriptions of the Collateral Were Insufficient To Create an Enforceable Security Interest for Either Feedyard................................................................................................................ 20

        Brookover Security Interest Collateral Description........................................................ 21

        Cattle Empire Security Interest Collateral Description .................................................. 23

    To the Extent Either of the Feedyards Have a Valid and/or Perfected Security Interest in the Cattle, Which is Denied, they were on Actual or Constructive Notice of the Ranchers' Ownership Interest and Remain Subject to the Trusts.......................................................... 24

    Because the North Dakota Ranchers Have Valid and Enforceable USDA Dealer Trust Claims, They are Entitled to a Priority Trust Claim to All Proceeds arising from Retained Ownership Cattle, Less Feeding and Care Provided by the Feedyards. .......................... 24

    The Feedyards Still Have Claims Against Agridime...................................................... 26

CONCLUSION............................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

A & J Produce Corp. v. Bronx Overall Econ. Dev. Corp., 542 F.3d 54 (2d Cir. 2008) ............... 16

Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A., 362 F.3d 33, 38 (2d Cir. 2004) ........... 16

Endico Potatoes, Inc., *67 F.3d at 1067 (2nd Cir. 1995)* ...................................................... 16, 24

General Electric Capital Commercial Automotive Finance, Inc. v. Spartan Motors, Ltd., 246
    A.D.2d 41, 52 (N.Y. App. Div. 2, 1998 ............................................................................. 20

In re Fernandos, 402 F.3d 147, 156 (3d Cir 2005) ....................................................... 19

In re Frosty Morn Meats, Inc., 7 B.R. 988, 1003 (E.D. Cal. 1991) .............................................. 15

In re Roxford Foods Litig., 790 F. Supp. 987, 990 (E.D. Cal. 1991) ......................................... 16

Kingdom Fresh, LLC. v. Stokes Law Office, LLP, 845 F.3d 609, 613 (5th Cir 2016)............... 16

Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d 591, 599 (4th Cir. 2010) ...................... 24

Schauss v. Metals Depository Corp., 757 F.2d 649, 654 (5th Cir. 1985).................................. 14

SEC v. Hardy, 803 F.2d 1034, 1038 (9th Cir. 1986) ................................................................ 14

SEC v. Stanford Int'l Bank Ltd., 424 F. App'x 338, 341 (5th Cir. 2011) ................................ 14

SEC v. Wencke, 742 F.2d 1230, 1231 (9th Cir. 1984)............................................................... 14

**Statutes**

7 C.F.R. § 46.46(c)................................................................................................................... 20

7 U.S.C. § 181 et. seq............................................................................................................... 7

7 U.S.C. § 196.......................................................................................................................... 20

7 U.S.C. § 196(a) ..................................................................................................................... 29

7 U.S.C. § 499(e)(c)(2) ............................................................................................................ 20

7 U.S.C. § 499e(c)................................................................................................................... 20

7 U.S.C. § 499e(c)(2)............................................................................................................... 20

7 U.S.C. §499a et. seq............................................................................................................. 29

7 U.S.C.A. § 182(4) ................................................................................................................. 20

7 USCS § 217b(a) .................................................................................................................... 19

7 USCS § 217b(d) .................................................................................................................... 19

Dealer Trust of §217b............................................................................................................. 29

K.S.A. § 84-9-203(b) .............................................................................................................. 23

K.S.A. Chapter 84-9; Texas Business and Commerce Code §9.................................................. 22

Texas Business & Commerce Code § 9.108............................................................................. 24

Texas Business and Commerce Code § 9.203(b) ..................................................................... 23

Title 9 C.F.R. § 86 .................................................................................................................. 11

UCC 9-108 (K.S.A. § 84-9-108 ............................................................................................... 24

UCC 9-203 ............................................................................................................................... 23

Uniform Commercial Code 9-102(47)...................................................................................... 22

Uniform Commercial Code Section 9-102(34).......................................................................... 22

Uniform Commercial Code Section 9-203(b)............................................................................ 23

**Other Authorities**

The Packers and Stockyards Statutory Trust and the Unpaid Cattle Supplier............................ 17

**INTRODUCTION**

1.      Pending before the Court are Lonnie Jaeger, Mario Ost, and Lance Lenton ("North Dakota Ranchers")'s Motion for Payment of Proceeds from Sale of Cattle relating to proceeds held in the Receivership after cattle were harvested during the early months of 2024.  The North Dakota Ranchers assert their claims (the "Dealer Trust Claims") under section 318 of 7 U.S.C. § 217b referred to as the Dealer Trust Act (the "Act"), as the 2020 amendment to 7 U.S.C. § 181 et. seq., the Packers and Stockyards Act of 1921 (the "PSA").

2.      The North Dakota Ranchers entered contracts for cash sales of cattle to Agridime, LLC. Parties-in-interest Cattle Empire, LLC ("Cattle Empire") and Brookover Feedyards, Inc. ("Brookover") (collectively the "Feedyards") possessed actual and/or constructive knowledge that the North Dakota Ranchers had "retained ownership" agreements with Defendant Agridime, LLC both prior to and during the Receivership. The Dealer Trust Claims against the proceeds from the cattle arising from the ownership interests of the North Dakota Ranchers are superior to purported lien interests claimed by the Feedyards. If the Feedyards had prudently established any method to process bills of sale, inspection certificates or other ownership documentation, then the Feedyards would know that Agridime did not own the cattle.  Because of the timely and valid USDA Dealer Trust Claims made by each of the North Dakota Ranchers, the Court should **GRANT** the North Dakota Ranchers' Motion and Order the Receiver to pay the North Dakota Ranchers Dealer Trust Claims for the retained ownership cattle (the "Retained Ownership Cattle") free and clear of any liens or claims asserted either by Brookover or Cattle Empire.

**FACTS**

3.      Some of the substantive facts of this matter have already been set forth in the Affidavits of Lonnie Jaeger, Mario Ost, and Lance Lenton, and Mark Western all filed in March

2024 and identified on the Court's Docket as Doc. 65-1, 65-2, 65-3, and 65-4, which are incorporated herein. At that time the North Dakota Ranchers sought relief to protect cattle. That relief was denied as moot (Doc. 95). The livestock have now been killed and sold. The Feedyards have been paid in full for feeding, boarding, and medical care for all cattle received from the North Dakota Ranchers whose proceeds are at issue. The North Dakota Ranchers have timely submitted USDA claims. Sufficient time has passed for any party with an interest in those proceeds to know of the liquidation and the receivership. There is no longer a need to maintain the status quo as to the asserted Dealer Trust Claims.

### November & December, 2023 Retained Ownership Agreements Between Agridime and North Dakota Ranchers

4.      By the prior filings, the Court is made generally aware that the North Dakota Ranchers had contractual cash sale agreements with pre-receivership Agridime, LLC. Those agreements provided the North Dakota Ranchers would deliver certain numbers of cattle to Agridime to be cared for at the Feedyards. At the Feedyards, when the North Dakota Ranchers' cattle reached a certain target delivery weight, the Feedyards would sell the cattle and, according to the contract, the North Dakota Ranchers would receive a guaranteed amount for the cash sale of cattle per pound of cattle from the Feedyards.  [*See* generally, Retained Ownership Agreements, [*See* Exhibit "Jaeger A" and Exhibit "Jaeger H" to the Jaeger Affidavit, Exhibit "Ost A" to the Ost Affidavit, and Exhibit "Lenton A" to the Lenton Affidavit.]  According to the Retained Ownership Agreements, the North Dakota Ranchers retained ownership of the cattle and "[t]itle of cattle will transfer to Buyer [Agridime] upon tender of payment.

### Purported Security Agreements Between Agridime and Feedyards

5.      What the Ranchers did not know, however, is that while the North Dakota Ranchers enjoyed business relationships with Agridime for the sale of cattle and care at the

Feedyards, Agridime had financing agreements with the Feedyards providing that the Feedyards advanced sums of money independent of the Retained Ownership Agreements in exchange for purported security interests in the property of Agridime, LLC. [*See* Security Agreements between Agridime, LLC and Feedyards, attached to the Affidavit of Mark Western (Exhibit "Western A" at Brookover_000011 (Brookover/Agridime Security Interest documents) Exhibit "Western B" at Cattle Empire_000278 (Cattle Empire/Agridime agreements and Security Interest documents).]

6.      The document entitled "Security Agreement" between Brookover and Agridime dated August 23, 2023, provides that Agridime grants "a security interest" to Brookover in

> All cattle, whether now owned or hereafter acquired, and being located at; Brookover Ranch Feed Yard in Garden City, Finney County Kansas; or Brookover Feed Yard, Garden City, Finney County, Kansas, or Brookover Feed Yard Scott County, Kansas.

[*See* Exhibit "Western A" at Brookover_000009.] Brookover filed a UCC-1 filing regarding its purported security interest on or about August 24, 2023 with the Kansas Secretary of State's office. [*See* Exhibit "Western A" at Brookover_000011.]

7.      The document evincing Cattle Empire's purported security interest as to Agridime is entitled a "Promissory Note Credit & Security Agreement." [*See* Exhibit "Western B" at Cattle Empire_000278.] The description of a claimed security interest in livestock, inventory, and accounts receivables and intangibles, is set forth in more detail in that document. In relevant parts as to livestock, it provides that:

> **Grant of Security Interest.** Borrower [Agridime] hereby grants to Lender [Cattle Empire] a security interest in the following property:
> (a) **LIVESTOCK:** All livestock (or proceeds therefrom) now owned or hereinafter acquired by Borrower…

8.      In prior filings, the Feedyards take the position that representation of Agridime of its claimed ownership in the Retained Ownership Cattle carries the dispute in favor of those Feedyards. That Feeding Agreement contains the incorrect representation that "Owner [Agridime]

has legal title to the cattle and there are no liens, encumbrances, security interest, and agreements encumbering such cattle other than in favor of the Feeder or filed by Brookover Financial Services, Inc." (As defined in that document). The previously filed Affidavit of Forest Brookover (Doc. 89-1 page 32) has the summary representation that Agridime represented to Brookover it was the owner of cattle, but does not say how or when such alleged representation was made. The Feeding Agreement has the representation that it was entered on the 23rd day of August 2023, so the representation of ownership with respect to the Retained Ownership Cattle is to a future event.

9.    The documents related to shipping contradicted that prior representation of a future event, and put the Feedyards on notice of a conflicting claim of ownership. The record does not appear to include evidence that Brookover took any action to verify the accuracy of the Feeding Agreement statement as cattle were received from the North Dakota Ranchers. Just as notably, by way of prior course of dealings and the plain language of the Local Inspection Certificates presented to Brookover, it was on notice that Agridime's claim of present ownership was incorrect.

**Trucking of Retained Ownership Cattle from North Dakota to Kansas**

10.    The process of trucking the Retained Ownership Cattle communicated information to the Feedyards, which the Feedyards would have received upon taking possession of the North Dakota Ranchers' Retained Ownership Cattle at issue here. The process of delivery of livestock is set forth in greater detail in the contemporaneously filed Affidavits of Adam Monson and Clinton Haman. Each trucker would bring the Retained Ownership Cattle into the Cattle Empire or Brookover Feedyards receiving pens. After the Cattle Empire or Brookover yard manager counted and weighed the cattle, one of the truckers would present the yard manager with the Health Papers and the Local Inspection Certificates explaining ownership of the cattle. Title 9 C.F.R. § 86 requires the shipment of cattle interstate to be accompanied by an "interstate certificate of veterinary inspection." Afterwards, the Cattle Empire yard manager would provide the trucker

with a weigh ticket which would be provided to the corresponding North Dakota Rancher thereafter, along with a trucking invoice. [*See* Affidavits of Clinton Haman and Adam Monson, filed contemporaneously herewith.]

11.     Pursuant to their Retained Ownership Agreements with pre-receivership Agridime, in November and December, 2023, the North Dakota Ranchers caused certain amounts and breeds of cattle to be transported to Brookover and Cattle Empire, as more fully set forth in the Affidavits contemporaneously filed affidavits of Jaeger, Ost, and Lenton.  The breakdown of the cattle are as follows:

**Table 1: Breakdown of Retained Ownership Cattle at Feedyards at Time of Commencement of Receivership Proceeding**

| Contract Number | Rancher | Number & Breed of Cattle | Feedyard |
|---|---|---|---|
| 81021[1] | Lonnie Jaeger | 274 Heifers | Brookover |
| 81021 | Lonnie Jaeger | 127 Steers<br>147 Heifers<br>274  total head | Cattle Empire |
| 81018[2] | Lance Lenton | 131 Heifers | Cattle Empire |
| 81020[3] | Mario Ost | 65 Steers<br>63 Heifers<br>128 total head | Cattle Empire |

12.     The North Dakota Ranchers' cattle at the Feedyards had staggered dates for harvest between January and August of 2024.  Local Inspection Certificates received by the Feedyards have already been made a part of the record and are further included as part of Exhibit "Western A" and Exhibit "Western B" to the Affidavit of Mark Western. The Feedyards received the Local Inspection Certificates and veterinary inspection certificates reflecting ownership of the livestock

---

[1] *See* Doc. 65-1, and Affidavit of Lonnie Jaeger, "Jaeger Exhibit A"
[2] *See* Doc. 65-3, and Affidavit of Lance Lenton, "Lenton Exhibit A"
[3] *See* Doc. 65-2, and Affidavit of Mario Ost, "Ost Exhibit A"

other than by Agridime. By way of example, Local Inspection Certificates and veterinary inspection certificates are included respectively on Exhibit "Western B" at pages Cattle Empire_000009, 24, 29, 39, 40, 54, 91, 95, 156, 160, 214, 215, 273, and Cattle Empire_000012, 16, 25, 27, 41, 42, 53, 94, 96, 157, 158, 216, 218, and 272. Local Inspection Certificates and veterinary inspection certificates received by Brookover are included at Brookover_000002 and Brookover_000003. In the Lenton and Ost Local Inspection Certificates provided to the Feedyards, "Retained Ownership" is clearly marked to put the Feedyards on notice of the interests of the North Dakota Ranchers. The certificates of veterinary inspection indicate that Triple J Farms is the consignor or present owner of many of the shipments and the carrier or transporter of the shipments. The notation received by the Feedyards of the present owner of the shipment placed them on notice that additional confirmation of the purchase and cash payment for the livestock was required. The conduct and documentation while receiving cattle should have placed the Feedyards on notice as to all cattle that ownership might be retained.

13.    The North Dakota Ranchers were not given notice of any purported security interest asserted by the Feedyards in any of the Retained Ownership Cattle. They have expressly stated they did not consent to a lien. The Feedyards did not request a confirmation ownership of the cattle from the North Dakota Ranchers.

### Agridime Receivership and Subsequent Actions

14.    On or about December 11, 2023, this Court placed all the assets of Agridime, LLC into the instant Receivership and Steven Fahey was appointed the Receiver to administer the property and respond to and resolve claims against Agridime.

15.    In March 2024, the North Dakota Ranchers filed a Motion before this Honorable Court requesting relief from the Receivership Stay so that the Receiver (vis a vis the Feedyards) turn over possession of the North Dakota Ranchers' cattle subject to the Retained Ownership

Agreements not harvested pre-receivership. [*See* Doc. 63.] This Court did not grant the North Dakota Ranchers' Motion, and subsequently, all the cattle belonging to the North Dakota Cattle Ranchers were ultimately harvested with payments for the cattle being remitted to the Feedyards pursuant to an Agreed Upon Order issued by this court on March 27, 2024. [*See* Doc. 71.]

16.    After learning that the Court would not permit the North Dakota Ranchers to retain possession of the Retained Ownership Cattle at issue, each of the Ranchers made USDA Dealer Trust Claims. [*See* declarations of Jaeger, Lenton, and Ost, contemporaneously filed.]

17.    On information and belief, Agridime used some of the sums advanced to it by the Feedyards to keep the money spigot pumping to pay investors in cattle investment schemes that have since been declared by this Court to be a Ponzi scheme as of October 1, 2021. [*See* Doc. 118.] It is appropriate to pay obligations that were not part of the Ponzi scheme. One example of such payment reflects the receiver paid Greg Wanner and Dave Wanner $235,013.82 for retained ownership cattle in what appears to be a pre-receivership transaction that was resolved during the receivership. [S*ee* Doc. 96, Exhibit A page 360, Receiver's Combined Initial Status Report and Quarterly Status Report For the Period Ending March 31, 2024.]

**Pre-Receivership Dealings Between Cattle Empire, Brookover, Agridime and the North Dakota Ranchers**

18.    The Feedyards' business relationship with Agridime did not take place in a vacuum.

19.    Between February of 2020 and December of 2023, the North Dakota Ranchers sent approximately 2,835 head of cattle to Cattle Empire. The required Local Inspection Certificates prepared by the North Dakota Stockmen's Association on behalf of the North Dakota Ranchers evidences ownership of cattle, the destination of the cattle, and whether the ownership status is to be retained. Here, except for the Jaeger certificates, the Local Inspection Certificates prepared by the North Dakota Stockmen's Association that accompanied North Dakota Ranchers' Cattle to

Cattle Empire indicate that the ownership status is "retained." If the Feedyards knew some cattle were not owned and paid for in cash by Agridime, then it was on actual or at least constructive notice that representation of ownership of some of the cattle was false. True and accurate copies of the North Dakota Stockmen's Association Local Inspection Certificates from the North Dakota Ranchers' prior retained ownership cattle dealings with Agridime are attached to the Affidavit of Corby Ward, the Chief Brand Inspector of the North Dakota Stockmen's Association, filed contemporaneously herewith. A more specific breakdown of the information in each Brand Inspection Certificate accompanying the Affidavit of Corby Ward is set forth in the corresponding table below. The contracts for cash sales between the North Dakota Ranchers and Agridime included the intent of the parties that title to the cattle would not pass until payment. This term was not concealed. The notation retained ownership was available to any person receiving the cattle, placing the receiving party on notice that there was a reason to question any contrary representation by Agridime.

**Table 2: Cattle Deliveries to Feedyards from North Dakota Ranchers Prior to Retained Ownership Cattle In Dispute Evidenced By Brand Inspection Papers from North Dakota Stockmen's Association**

| Date | Rancher | Head of Cattle | Destination | Retained Ownership Box Marked |
|---|---|---|---|---|
| February 28, 2020 | Lonnie Jaeger | 300 | Santana (Cattle Empire) | Yes |
| May 22, 2020 | Lonnie Jaeger | 320 | "Santa Anna" (Cattle Empire) | Yes |
| May 26, 2020 | Lonnie Jaeger | 80 | "Santa Anna" (Cattle Empire) | Yes |
| June 18, 2020 | Lonnie Jaeger | 160 | "Santa Anna" (Cattle Empire) | Yes |
| | **2020 Totals** | **860** | | |
| January 2, 2021 | Lonnie Jaeger | 40 | Santana (Cattle Empire) | Yes |

| June 16, 2021 | Lonnie Jaeger | 265 | Hope (either 3R or Walker Feedyard) | Yes |
|---|---|---|---|---|
| July 14, 2021 | Lonnie Jaeger | 430 | Santana (Cattle Empire) | Yes |
| October 12, 2021 | Lonnie Jaeger | 256 | Santana (Cattle Empire) | Yes |
| | **2021 Totals** | **726** | **Only Cattle Empire** | |
| April 20, 2022 | Lance Lenton | 175 | Santana (Cattle Empire) | Yes |
| May 18, 2022 | Lonnie Jaeger | 150 | Santana (Cattle Empire) | Yes |
| July 13, 2022 | Lonnie Jaeger | 192 | Santana (Cattle Empire) | Yes |
| July 20, 2022 | Lonnie Jaeger | 52 | Santana (Cattle Empire) | Yes |
| July 20, 2022 (2) | Lonnie Jaeger | 180 | Santana (Cattle Empire) | Yes |
| | **2022 Totals** | **749** | | |
| April 1, 2023 | Lonnie Jaeger | 173 | "Empire Cattle" (Cattle Empire) | Yes |
| April 6, 2023 | Lonnie Jaeger | 87 | Santana (Cattle Empire) | Yes |
| April 6, 2023 (2) | Lonnie Jaeger, Mark Anderson | 170 | Cattle Empire, Santana KS | Yes |
| May 6, 2023 | Lonnie Jaeger | 70 | "Empire Cattle" (Cattle Empire) | Yes |
| | **2023 Totals** | **500** | | |
| **Totals** | **2020-2023** | **2,835** | **Only Cattle Empire** | |

*[See* Brand Inspection Papers, Exhibits to Affidavit of Corby Ward, N.D. Stockman's Association.]

**Harvest of North Dakota Ranchers' Retained Ownership Cattle and Proceeds Therefrom**

20.    Proceeds were remitted to the Receivership pursuant to the order of this Court on March 27, 2024, as Doc. 71.  Based on the information provided by the Feedyards, the sale and proceeds of the North Dakota Ranchers' Retained Ownership Cattle proceeds to the Receivership broke down as follows:

**Table 3: Jaeger Retained Ownership Cattle and Net Proceeds to Receivership**

| Feedyards | Pounds Harvested | Net Proceeds | Contract No. | Lot Number |
|---|---|---|---|---|
| Cattle Empire | 200,243 | $ 276,928.76[4] | 81021 | 2855 |
| Cattle Empire | 207,525 and 2,706 | $ 287,416.98 and $5,032.06 | 81021 | 2856 |
| Subtotal Proceeds Cattle Empire | 410,474 | $570,231.88 | | |
| Brookover | 191,386 | $257,754.29 | 81021 | 7641 |
| Brookover | 191,357 | $257,442.25 | 81021 | 7642 |
| Subtotal Proceeds Brookover | 382,743 | $515,176.54 | | |
| **Total Proceeds Jaeger Retained Ownership Cattle** | | $1,084,554.34 | | |

21.    Because the Lenton and Ost Retained Ownership Cattle were all situated at Cattle Empire prior to harvest, the breakdown of payments, is less complicated than Jaeger, supra. Progress reports and settlement reports (described in the industry as "Kill Sheets"), provided by Cattle Empire show that Cattle Empire received $365,171.07 for **Lenton Retained Ownership Cattle**, that Cattle Empire incurred $82,116.38 in feeding, care, and interest expense in caring for the Lenton claimed cattle, and that Cattle Empire remitted a net of $283,054.69 to the Receiver for the Lenton claimed cattle. [*See* the contemporaneously filed Affidavit of Lenton].

22.    Kill Sheets from Cattle Empire show that Cattle Empire received $318,738.47 for **Ost Retained Ownership Cattle**, and that Cattle Empire incurred $82,618.18 in feeding, care, and interest expense in caring for the claimed cattle, and that Cattle Empire remitted $236,120.09 to the Receiver for the Ost claimed cattle. [*See* the contemporaneously filed Affidavit of Ost.]

---

[4] Summary of amounts from Exhibit "Western D".

**Jaeger 70 Head of Already Harvested Cattle Issue**

23.     In addition to the Retained Ownership Cattle described, North Dakota Rancher Lonnie Jaeger additionally had 70 head of pre-Receivership Retained Ownership Cattle harvested pre-receivership for which he had not been paid ("Jaeger Already Harvested Cattle").  Agridime received a sum of no less than $126,913.68 from the sale of the Jaeger Already Harvested Cattle and paid $6,768.61 for trucking services for the Jaeger Already Harvested Cattle, for a net sum of $120,145.07, which Agridime continues to hold pending the current disputes.  [*See* Jaeger Affidavit, paragraph 40].

## LAW AND ARGUMENT

24.     Courts have recognized the importance of preserving a receivership court's ability to issue orders preventing interference with its administration of the receivership property. *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985). A district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership. *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986).

25.     The Court has considered those factors relevant to lifting the stay [5] and determined that relief requested was moot. There is no longer a need to maintain the status quo as to a decision on the proceeds of the sale of the proceeds of the cattle of the North Dakota Ranchers. This case has been pending for a total of not less than eighteen (18) months and settlement negotiations have

---

[5] "To determine whether an exception should be made to a stay of proceedings in a case such as this, the court should consider "(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim." SEC v. Stanford Int'l Bank Ltd., 424 F. App'x 338, 341 (5th Cir. 2011) (quoting SEC v. Wencke, 742 F.2d 1230, 1231 (9th Cir. 1984). The Fifth Circuit has not explicitly required the district courts to use the Wencke test but noted that these factors are a useful set of considerations in determining whether a stay should be modified or lifted.

not resulted in a resolution of the conflicting positions of the parties. The passage of time makes this dispute ripe for resolution.

**Conflict of Law Issues**

26.    There are multiple jurisdictions involved in the instant matter.  The North Dakota Ranchers are all residents of the State of North Dakota.  *E.g.*, the affidavits of Jaeger, Ost, and Lenton attached.  Agridime, LLC was a Texas limited liability company principally in Fort Worth, State of Texas.  Brookover and Cattle Empire are Kansas business entities whose principal place of business in the Kansas.

27.    The Retained Ownership Agreements between the North Dakota Ranchers and Agridime provide that "this Contract and all confirmations shall be governed by the laws of the State of Colorado, without regard to conflict of law principles."  *E.g.*, Exhibit "Jaeger A" to the Jaeger Affidavit.  The document entitled "Security Agreement" between Brookover and Agridime does not contain any choice of law or governing law provisions.  [*See*, Cattle Empire_000278.] The "Promissory Note, Credit & Security Agreement" between Cattle Empire and Agridime provides that it is to be governed by the law of Kansas, including Kansas' codification of the Uniform Commercial Code.  *Id.*, at 47.  Fortunately, as set forth in greater detail below, it appears that Kansas and Texas' codification of the Uniform Commercial Code's relevant provision are the same.  There may be instances where state law issues are subordinated to the federal law principles described below.

**Application of Dealer Trust Claims.**

28.    The trust fund provisions of 7 U.S.C. § 196 was enacted by Congress under the commerce power to remedy the burden on livestock producers and commerce. *In re Frosty Morn Meats, Inc.*, 7 B.R. 988, 1003 (E.D. Cal. 1991). In 2020, Congress amended the law creating a

dealer statutory trust in livestock.  The law provides that all livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers. 7 USCS § 217b(a). Cash sale means a sale in which the seller does not expressly extend credit to the buyer. 7 USCS § 217b(d).  [*See also In re Roxford Foods Litig.*, 790 F. Supp. 987, 990 (E.D. Cal. 1991).] The law protects "livestock" meaning cattle, sheep, swine, horses, mules, or goats whether live or dead. 7 U.S.C.A. § 182(4).

29.    The amendment adding section 318 was enacted in December of 2020 and is not analyzed by authoritative case law. Courts may compare the dealer trust at 7 U.S.C. § 196 and the Perishable Agricultural Commodities Act (PACA) statutory trust at 7 U.S.C. § 499e(c). The PACA trust located at 7 U.S.C. § 499(e)(c)(2) is comprised of language that provides the perishable agricultural commodities and any receivables or proceeds from the sale of such commodities or products are held by the merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities. For this reason, it is predictable that the statutory dealer's trust may be interpreted in a manner similar to the PACA trust. The PACA trust was patterned after the PSA trust, *Kingdom Fresh, LLC. v. Stokes Law Office, LLP*, 845 F.3d 609, 613 (5th Cir 2016) and courts may look to the case law of one to interpret the other.

30.    PACA, in 7 U.S.C. § 499e(c)(2), section "imposes a 'non-segregated floating trust' on the commodities and their derivatives, and permits the commingling of trust assets without defeating the trust." *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33, 38 (2d Cir. 2004), citing *Endico Potatoes*, 67 F.3d at 1067 (quoting 7 C.F.R. § 46.46(c)). This "highly unusual trust beneficiary status" permits sellers, in the event of default, "to trump the buyers' other creditors, including secured ones." *Am. Banana Co.* at 38. In the context of a PACA sale, this trust

priority applies even if the creditor holds a perfected security interest in those inventories, receivables, or proceeds. *A & J Produce Corp. v. Bronx Overall Econ. Dev. Corp.*, 542 F.3d 54 (2d Cir. 2008). The only burden on the unpaid cash sellers is to prove the balance due to them and the existence of a floating pool of commingled inventories of livestock products, accounts receivables and proceeds derived from cash and credit livestock sales. *In re Gotham Provision Co.*, 669 F.2d 1000, 1011 (5th 1982). Logically, the public policy behind the dealer and packer trust statutes, and the absence of caselaw suggesting a different result supports a similar application of the dealer statutory trust provisions.

31.     A stockyard is likely to be more sensitive to the need to confirm payment for livestock because of the statute. The PSA requires cash payments by packers to livestock suppliers. This means that livestock packers and stockyards, like receivers of produce, should not be running trade accounts payable balances.  Stockyards are to pay their cattle suppliers on a cash basis. To support the claim of the Feedyards, there should be presented to the Court proof of cash payment to the North Dakota Ranchers. There is a strong argument that any lender to a packer or stockyard that sees an accounts payable aging to livestock suppliers is automatically on notice that the packer is in breach of the stockyards trust because the packer is only allowed to purchase livestock on a cash basis.[6]

---

[6] *See* David LeBas and Craig Stokes, The Packers and Stockyards Statutory Trust and the Unpaid Cattle Supplier, State Bar of Texas, 13th Annual, John Huffaker Agricultural Law Course, May 23-24, 2019, unpublished manuscript, https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://www.naman howell.com/assets/htmldocuments/The-Packers-and-STockyards-Statutory-Trust.pdf&ved=2ahUKEwjhk8Ps2vuNAxXjh-4BHfgeNgEQFnoECBsQAQ&usg=AOvVaw1sDg2oSWyFWKygbpYGqZqk.

A. <u>The Plain Language of the Retained Ownership Agreements are Superior to Purported Security Interest Claims by the Feedyards under the Uniform Commercial Code.</u>

32. Upon transport of the Retained Ownership Cattle to an agent of Agridime, such as the Feedyards, title to the cattle would not and did not pass to the Feedyards because it was reserved by the North Dakota Ranchers. Rather, Agridime's rights regarding the cattle were most comparable to that of a bailee. In other words, Agridime had the temporary right to possess and transport the cattle, but obtained no further rights in the cattle, and thus could not validly encumber the cattle as collateral. Because the North Dakota Ranchers have never been paid for their retained ownership Cattle, their floating trust attaches to the proceeds of the sale of Retained Ownership Cattle.

33. The interest that Agridime had in the Retained Ownership Cattle is akin to an "instrument," which is the "right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in the ordinary course of business is transferred by delivery without any necessary indorsement or assignment." [*See* Uniform Commercial Code 9-102(47) (definition of instrument). (The Texas statute varies by including also nonnegotiable certificates of deposit.).]

34. The Court must apply a codification of the Uniform Commercial Code to analyze the interrelationship between the North Dakota Ranchers' agreements with Agridime and the Feedyards' agreements with Agridime. Any claims of the Feedyards against Agridime are subject to Article 9 of the Uniform Commercial Code. Both Kansas and Texas have codified a version of Article 9 of the Uniform Commercial Code into their state statutes. [*See* K.S.A. Chapter 84-9; Texas Business and Commerce Code §9].

35. Section 9-102 of the Uniform Commercial Code contains definitions for the classifications of certain types of legal interests in real and personal property. Uniform Commercial Code Section 9-102(34) provides that livestock are included in the term "farm

products." However, because the interests here revolve around Agridime's post-harvest ability to receive funds from sale and harvest from the cattle, after payment of the North Dakota Ranchers for the contracted hundred weight prices, and for the feeding and care that the Feedyards provided to the Retained Ownership Cattle during the duration of the feeding and care. Kansas U.C.C. and Texas Bus. & Comm. Code.

**The Feedyard's Purported Security Interest Failed to Attach to the Collateral**

36.     To realize upon a security interest, a creditor must establish that the security interest is valid and enforceable. "It is hornbook law that the debtor can only grant a security interest in whatever rights he has in the collateral." *In re Fernandos*, 402 F.3d 147, 156 (3d Cir 2005).

37.     The Kansas and Texas codification of the Uniform Commercial Code Section 9-203(b) provide as follows: a "security interest is only enforceable against the debtor and third parties with respect to the collateral only if: value has been given, and **the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party**" (emphasis added). [*See e.g.*, K.S.A. § 84-9-203(b); Texas Business and Commerce Code § 9.203(b)]. The Court only needs to consider the rights that Agridime has in the "collateral", meaning the Retained Ownership Cattle. The law recognizes various flavors of different types of property rights, but Article 9 of the Uniform Commercial Code does not clearly specify "the **quantum** of rights which a debtor must have in collateral to support a security interest[.]" *State Bank of Young America v. Vidmar Iron*, 292 N.W.2d 244, 249 (Minn. 1980) (quoting 1 G. Gilmore, *Security Interests in Personal Property*, § 11.5 at 353 (1965)) (emphasis added). The myriad classifications of property rights and each of their limits can define whether the debtor has sufficient "quantum" of rights for the security interest to attach under Article 9 of the Uniform Commercial Code.

38.     Though not part of the respective state's statutes at issue, the official UCC

Comment 6 to UCC 9-203 provides:

> 6. Debtor's Rights; Debtor's Power to Transfer Rights. Subsection (b)(2) conditions attachment on the debtor's having "rights in the collateral or the power to transfer rights in the collateral to a secured party." A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach. However, in accordance with basic personal property conveyancing principles, the baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be.
>
> Certain exceptions to the baseline rule enable a debtor to transfer, and a security interest to attach to, greater rights than the debtor has. See part 3, subpart 3 (priority rules). The phrase, "or the power to transfer rights in the collateral to a secured party," accommodates those exceptions. In some cases, a debtor may have power to transfer another person's rights only to a class of transferees that excludes secured parties. See, e.g., section 2-403(2) (giving certain merchants power to transfer an entruster's rights to a buyer in ordinary course of business). Under those circumstances, the debtor would not have the power to create a security interest in the other person's rights, and the condition in subsection (b)(2) would not be satisfied.

[*See*, Official Comment 6 to UCC 9-203, Uniform Commission on Uniform State Laws.]

39.     Agridime did not hold "title" to the Retained Ownership Cattle at the time in which

it attempted to grant the Feedyards a security interest thereon. Again, Agridime's rights regarding

the cattle were most comparable to those of a bailee. In other words, Agridime had the temporary

right to possess and transport the cattle, but obtained no further rights in the cattle, and thus could

not validly encumber the cattle as collateral.

**Even If the Court Determines that the Feedyards had Sufficient Rights in the Collateral for the Security Interest to Attach, the Security Agreements' Descriptions of the Collateral Were Insufficient To Create an Enforceable Security Interest for Either Feedyard.**

40.     Another question of the legal analysis regarding security interests is whether the

collateral described in each Feedyard's so-called security agreements with Agridime sufficiently

and appropriately describe the Retained Ownership Cattle.  Under UCC 9-108 (K.S.A. § 84-9-108,

Texas Business & Commerce Code § 9.108) a description of collateral "is sufficient, whether or

not it is specific, if it reasonably identifies what is being described."  Indeed, "the purpose of judicial inquiry is soley to establish, first, whether the written description may be reasonably construed to include the disputed property and secondly, whether the parties intended that the description include the property. *E.g.*, *General Electric Capital Commercial Automotive Finance, Inc. v. Spartan Motors, Ltd.*, 246 A.D.2d 41, 52 (N.Y. App. Div. 2, 1998) (describing the judicial function under New York's codification of the Uniform Commercial Code).

41.    Respectfully, the North Dakota Ranchers do not believe that the collateral descriptions in either Feedyard's security agreement are sufficient for purposes of creating an enforceable security interest as to the Retained Ownership Cattle in this instance, which should defeat all Feedyard claims.

**Brookover Security Interest Collateral Description**

42.    As described above, the document entitled "Security Agreement" between Brookover and Agridime provides for a security interest to attach to a very narrow category of cattle "owned" or "acquired" by Agridime.  Specifically, the Security Agreement that Agridime grants "a security interest" to Brookover in

> All cattle, whether now owned or hereafter acquired, and being located at; Brookover Ranch Feed Yard in Garden City, Finney County Kansas; or Brookover Feed Yard, Garden City, Finney County, Kansas, or Brookover Feed Yard Scott County, Kansas.

*[See* Exhibit "Western B" at Brookover_000009.]

43.    A deeper examination of the plain language of the Brookover Security Agreement does not precisely or sufficiently describe cattle that meet the retained ownership relationship that existed between Agridime and the North Dakota Ranchers. The words "all cattle, whether now owned or hereafter acquired" that are situated one of the Brookover Feedyards contemplates Agridime cattle over whose ownership position is akin to a fee simple absolute interest.  The

Brookover Security Agreement contains no discussion of any type of interest other than full-on ownership by Agridime that would be pledged as security.

44. As of the signing of the Brookover Security Agreement dated August 23, 2023, there is no question that the Retained Ownership Cattle were not "now owned" by Agridime. The Retained Ownership Cattle were not delivered to Brookover until early December 2023. There is no set of facts upon which Brookover can claim that the Retained Ownership Cattle were "now owned" by Agridime as of the effective date of the Security Agreement. Accordingly, the Court will need to determine whether the Retained Ownership Cattle at issue were "hereafter acquired" by Agridime sufficiently describes the nature of the Retained Ownership Agreements between Agridime and the North Dakota Ranchers. The North Dakota Ranchers submit that the collateral description is insufficient for a security interest to attach to the Retained Ownership Cattle.

45. The Retained Ownership Agreements between the North Dakota Ranchers and Agridime specifically provide that the agreements are to be a purchase of by Agridime from the North Dakota Ranchers whereby "**title of cattle will transfer to Buyer upon tender of payment**." [See Exhibit "Jaeger A" to the Jaeger Affidavit, Exhibit "Ost A" to the Ost Affidavit, and Exhibit "Lenton A" to the Lenton Affidavit (Retained Ownership Agreements, at ¶ 9, emphasis added).] Payment has not been tendered to the North Dakota Ranchers by Agridime, the Receivership, or anyone else for the Retained Ownership Cattle at issue here, so it cannot be said that the Retained Ownership Cattle were ever "hereafter acquired" by Agridime.

46. The security agreement between Agridime and Brookover does not describe the type of cattle transaction that exists by way of the Retained Ownership Agreements and as such, Agridime has no valid security interest to assert in this proceeding and any proceeds of the sales of cattle should be paid to the North Dakota Ranchers.

**Cattle Empire Security Interest Collateral Description**

47.    The Cattle Empire security interest issue is somewhat different from the Brookover matter because the way the collateral is described is different.  The Cattle Empire collateral description language for livestock, inventory, and accounts and intangibles, are set forth fully in the agreement. As to livestock, the long range at issue is as follows:

> **Grant of Security Interest.**  Borrower [Agridime] hereby grants to Lender [Cattle Empire] a security interest in the following property:
> (a) **LIVESTOCK:**  All livestock (or proceeds therefrom) now owned or hereinafter acquired by Borrower…

*[See* Exhibit "Western B" at Cattle Empire_000279.]

48.    Like the Brookover Security Agreement, the North Dakota Ranches do not believe that the descriptive language of the Agridime/Cattle Empire agreement to be sufficient to identify the Retained Ownership Cattle.  Unlike the Brookover collateral description language, the Cattle Empire collateral description includes "proceeds therefrom" all "livestock" regardless of location. There is no reference to retained ownership style agreements, which are common in the livestock industry.  Cattle Empire's failure to specifically address Agridime's right to receive payment from a retained ownership agreement is insufficient to identify the Retained Ownership Cattle at issue. The Security Agreement between Agridime and Cattle Empire does not expressly identify "instruments," either.  *Id.* The Cattle Empire Security Agreement's references to "general intangibles," would likewise not be applicable towards the Retained Ownership Agreements and the rights that Agridime had in the Retained Ownership Cattle. Any claimed security interests asserted by Cattle Empire asserted in this proceeding should be denied and proceeds of sale of the Retained Ownership Cattle should be paid to the North Dakota Ranchers.

**To the Extent Either of the Feedyards Have a Valid and/or Perfected Security Interest in the Cattle, Which is Denied, they were on Actual or Constructive Notice of the Ranchers' Ownership Interest and Remain Subject to the Trusts.**

49.     Even if the collateral descriptions were sufficient, which is denied, as a matter of law, the only thing that could have been pledged to the Feedyards was Agridime's right to receive proceeds from cattle sales *only after the North Dakota Ranchers were paid*.  The North Dakota Ranchers anticipate that the Feedyards will claim that because the Retained Ownership Cattle were represented to them as owned by Agridime, the Feedyards would be in the position of a bona fide purchaser. The Fourth Circuit looked at comparable facts with respect to a similar PACA trust claim.  That court held a commodities sellers' beneficial interest in the trust assets while outstanding obligations exist is superior to secured creditors of the trustee, even when the security interest of such creditors is explicitly imposed on the perishable commodities, proceeds, and accounts receivable. *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 599 (4th Cir. 2010) [*See Endico Potatoes, Inc.*, 67 F.3d at 1067 (2nd Cir. 1995)]. The same logic should be applied to this statute. If the accounts receivable were only subjected to a security interest, then the security interest was subordinate to the prior statutory trust created for the benefit of the commodities sellers. *Nickey Gregory Co., LLC* at 600. The bona fide purchaser defense requires that the party take "for value" and that it take "without notice." The Fourt Circuit found that a financing in the form of a factoring agreement was not a purchase of the receivable, and as such was not a purchase for value. In that case, the security agreements, if valid, were a security interest and not a purchase for value. *Nickey Gregory Co., LLC*, 605. The requirements to purchase for value and purchase without notice both fail in this matter.

**Because the North Dakota Ranchers Have Valid and Enforceable USDA Dealer Trust Claims, They are Entitled to a Priority Trust Claim to All Proceeds arising from Retained Ownership Cattle**

50.    Cattle sale proceeds are subject to a dealer trust that arises under 7 U.S.C. § 217b. The USDA further asserts that dealer trust assets are to be held by such dealer in trust for the benefit of dealer trust claimants until all their valid claims are paid in full. The Receiver is currently in possession of proceeds subject to the Dealer Trust Claims pursuant to § 217b.

51.    The Act has no published regulations and appears to have no published case law interpreting it. The Act does have analogous statutes, specifically the other provisions of the PSA and 7 U.S.C. § 499a et. seq., and PACA. In general terms, all these acts protect agricultural producers who sell their products for cash when the buyer fails to pay for such purchases. The acts set up trusts to assure payment to agricultural producers in perishable markets. The Act, like the PSA and PACA trusts, specifically subordinate liens on trust assets to the trust claimants' claims.

52.    The purpose of the dealer trust claims is to protect the public interest (and the sellers of livestock) from inadequate financing arrangements that are a burden on and obstruction to commerce in the livestock industry.  [*See* 7 U.S.C. § 196(a)].  Trust claims have been a routine part of the livestock industry for more than a century.  The purported financing agreements between the Feedyards and Agridime are the type of financing arrangements the statutes were meant to protect against.  Without regard to the validity of the stockyard financing arrangements, the owners of the livestock should be paid for the cattle in the stream of commerce.

53.    No issue has been raised as to the validity or the compliance of the North Dakota Ranchers' filed USDA Dealer Trust Claims for the Retained Ownership Cattle. The Feedyards' position appears to instead be the alleged liens against Agridime have priority. There is no dispute that the Feedyards received sums from the slaughter/harvest of the Retained Ownership Cattle, and the Feedyards retained the actual costs of feeding, medicine, and care for the Retained Ownership Cattle.

**The Feedyards Still Have Claims Against Agridime.**

54.    The instant Motion does not place the court in a binary choice situation with regard to the Feedyards' claims for additional payment arising from purported financing agreements with Agridime.  Resolution of the pending the North Dakota Ranchers' request for payment does not negate or eliminate the ability for the Feedyards to make claims against the Receiver.  The main issue here is that the North Dakota Ranchers' claims for proceeds from sale of the Retained Ownership Cattle is superior to the claims of the Feedyards, vis a vis their purported liens.

55.    The North Dakota Ranchers request the Court award each of them the full contract price of their livestock sales.

## CONCLUSION

56.    For the reasons set forth above, the North Dakota Ranchers respectfully request that this Court grant the pending motion authorizing and directing payment of the amounts described in that motion.

Dated:  August 29, 2025.

Respectfully submitted,

/s/ Mark Western
Mark Western (ND ID# 06181)
FREMSTAD LAW FIRM
P. O. Box 3143
Fargo, North Dakota 58108-3143
Phone: (701) 478-7620
mark@fremstadlaw.com

By: /s/ Mark J. Petrocchi
Mark J. Petrocchi
State Bar No. 15851750
GRIFFITH, JAY & MICHEL, LLP
2200 Forst Park Blvd.
Fort Worth, TX 76110
Phone (817)926-2500
Fax (817)926-2505
mpetrocchi@lawgjm.com

ATTORNEYS FOR LONNIE JAEGER, MARIO OST, and LANCE LENTON

## CERTIFICATE OF CONFERENCE

The undersigned certifies that he communicated with David LeBas for the Feedyards and with John Massouh for the Receiver and no agreement was reached.

By: */s/ Mark J. Petrocchi*_____
Mark Petrocchi

## CERTIFICATE OF SERVICE

The undersigned certifies that he caused a true and correct copy of the foregoing instrument to be served via email upon those parties registered to receive documents via the ECF mailing system of the Court on August 29, 2025. Based upon prior notices, the people to receive notice include the following.

David Lattimore Evans    evansdavidl@msn.com

Roland K Johnson (Terminated)    rolandjohnson@hfblaw.com, ccole@hfblaw.com, ccyrier@hfblaw.com, clacy@hfblaw.com, ctucker@hfblaw.com

David L LeBas    dlebas@namanhowell.com, jaucoin@namanhowell.com

Jackie Robinson    jrobinson@namanhowell.com, cjohn@namanhowell.com, mneal@namanhowell.com, prien@namanhowell.com

David Allen Klingler (Terminated)    klingler@sbep-law.com

Mark J Petrocchi (Terminated)    mpetrocchi@lawgjm.com, acamarena@lawgjm.com, mkidd@lawgjm.com, mpetrocchi@prodigy.net, mpetrocchi@yahoo.com

Peter C D'Apice (Terminated)    dapice@sbep-law.com

Arnold Augur Spencer (Terminated)    arnoldspencer75225@gmail.com

Jeffrey J Ansley    jansley@vedderprice.com, agoodman@vedderprice.com, ecfdadocket@vedderprice.com, kdevlin@vedderprice.com, nef-filings-4420@vedderprice.com, nstanley@vedderprice.com, phall@vedderprice.com, sdeau@vedderprice.com, tmurrell@vedderprice.com

David J Drez, III    david.drez@wickphillips.com, CourtMail@wickphillips.com, gwen.gonzales@wickphillips.com, samantha.tandy@wickphillips.com

John F Massouh    john.massouh@sprouselaw.com, sherida.stone@sprouselaw.com

Brant C Martin    brant.martin@wickphillips.com, CourtMail@wickphillips.com,

karina.enriquez@wickphillips.com, samantha.tandy@wickphillips.com

Jacob Thomas Fain          jacob.fain@wickphillips.com, CourtMail@wickphillips.com, karina.enriquez@wickphillips.com, samantha.tandy@wickphillips.com

Matthew J Gulde-SEC          guldem@sec.gov, bernsteink@sec.gov, fairchildr@sec.gov, justicet@sec.gov, stewartan@sec.gov

Colin Patrick Benton          colin.benton@wickphillips.com, CourtMail@wickphillips.com, karina.enriquez@wickphillips.com, samantha.tandy@wickphillips.com

Paul Thomas Elkins          paul.elkins@wickphillips.com, CourtMail@wickphillips.com, yessenia.rocha@wickphillips.com

Caroline Marie Cyrier (Terminated)     ccyrier@hfblaw.com, lriley@hfblaw.com

Tyson Mark Lies     liest@sec.gov, bernsteink@sec.gov, fairchildr@sec.gov, justicet@sec.gov, minnickd@sec.gov, stewartan@sec.gov

Schyler Paige Parker          schyler.parker@wickphillips.com, CourtMail@wickphillips.com, karina.enriquez@wickphillips.com, samantha.tandy@WickPhillips.com

Katherine Marie Devlin          kdevlin@vedderprice.com, asmith@vedderprice.com, ecfdadocket@vedderprice.com, nef-filings-4420@vedderprice.com

Emily Bibb          emily.bibb@wickphillips.com, CourtMail@wickphillips.com, yessenia.rocha@wickphillips.com

Stafford Powell Brantley          spbrantleylaw@gmail.com, karina.enriquez@wickphillips.com, samantha.tandy@wickphillips.com

Stephen Fahey     steve@sfaheylaw.com

Mark Robert Western (Terminated)     mark@fremstadlaw.com

By: */s/ Mark J. Petrocchi*_____
Mark Petrocchi