IN THE UNITED STATES COURT FOR THE
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § | Civil Action No. 4:23-CV-1224-P |
| | § | |
| v. | § § | |
| AGRIDIME LLC, JOSHUA LINK, and JED WOOD, | § § § | |
| | § | |
| Defendants. | § | |

**CATTLE EMPIRE, LLC AND BROOKOVER FEED YARDS, INC.'S RESPONSE TO
NORTH DAKOTA RANCHERS' MOTION FOR PAYMENT OF RETAINED OWNERSHIP
CATTLE, AND
FIRST AMENDED CROSS-MOTION FOR SUMMARY DECLARATION OF PRIORITY,
ALTERNATIVE MOTION FOR IMPOSITION OF THE DOCTRINE OF MARSHALING,
ALTERNATIVE MOTION FOR SCHEDULING ORDER FOR FURTHER DISCOVERY,
AND
ALTERNATIVE MOTION FOR COURT-ORDERED MEDIATION**

COMES NOW Cattle Empire, LLC, and Brookover Feed Yards, Inc.[1] by through and the

undersigned counsel, respond to North Dakota Ranchers'[2] Mario Ost, Lance Lenton, and Lonnie

Jaeger's Motion for Payment of Retained Ownership Cattle (Doc. 173), and move for summary

judgment or for declaration of priority, and alternatively move for scheduling order for further

discovery.

In support of this Response and Motion for Summary Judgment or for Declaration of

Priority, or Alternative Motion for Scheduling order for Further Discovery, Feedyards would

respectfully show the Court as follows:

---

[1] Cattle Empire and Brookover are referred to collectively herein as the "Feedyards."
[2] Ost, Lenton, and Jaeger are referred to collectively herein as the "North Dakota Ranchers" or "Ranchers."

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ 2

TABLE OF AUTHORITIES ......................................................................................... 3

I.      INTRODUCTION ............................................................................................... 5

II.     BACKGROUND ................................................................................................. 6

    A.   Current Motions ............................................................................................ 7

    B.   Cattle Empire's Relationship with Agridime ............................................... 8

    C.   Brookover's Relationship with Agridime ..................................................... 9

    D.   Delivery and facts alleged by the Ranchers ............................................... 11

III.    RESPONSE AND CROSS-MOTION FOR SUMMARY JUDGMENT
OR FOR DECLARATION OF PRIORITY ............................................................. 14

    A.   This Court may issue judgment or other declarations of priority in
    receiverships through equitable summary proceedings, but such power is
    constrained by law. ........................................................................................... 14

    B.   The Ranchers failed to preserve their alleged trust rights ......................... 14

        1.   The Dealer Trust Act contains clear and specific notice requirements. ...... 15

        2.   Even if valid, the Ranchers' claims under the Dealer Trust Act are
        subordinate to the security interests of Cattle Empire and Brookover. ............... 18

    C.   Under the UCC, Cattle Empire and Brookover have perfected security
    interests that are superior to any interest that may be held by the Ranchers............ 21

        1.   Any Ranchers' interest terminated on delivery pursuant to the UCC. ....... 21

        2.   UCC Article 2 shelter rules protect Cattle Empire's and Brookover's
        security interests over any interest claimed by the Ranchers. .............................. 22

        3.   Feedyards' Article 9 security interests attached either by contract or by
        estoppel and defeat the claims of the Ranchers .................................................. 24

IV.     ALTERNATIVE MOTION FOR IMPOSITION OF THE
DOCTRINE OF MARSHALING .............................................................................. 27

V.      ALTERNATIVE MOTION FOR ENTRY OF SCHEDULING
ORDER FOR DISCOVERY AND FURTHER BRIEFING ON RELATIVE
PRIORITY OF CREDITORS ................................................................................... 28

VI.     ALTERNATIVE MOTION FOR COURT-ORDERED MEDIATION.................. 29

PRAYER....................................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*All American Holding Corp. v. Elgin State Bank*, 17 B.R. 926 (S.D. Fla. 1982) ........................ 27

*Bank of Beaver City v. Barretts' Livestock, Inc.*, 295 P.3d 1088 (Okla. 2012) .................... 25

*Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1351 (5th Cir. 1983) ..................... 22

*C.H. Robinson Co. v. B.H. Produce Co., Inc.*, 723 F.Supp. 785 (N.D. Ga. 1989) ..................... 20

*Chambersburg Trust Co. v. Eichelberger*, 588 A.2d 549 (Pa. Super. Ct. 1991) .................... 25

*Cont'l Grain Co. v. Brandenburg*, 587 N.W.2d 196 (S.D. 1996) ........................................... 25

*Continental Grain Co. v. Heritage Bank*, 548 N.W.2d 507 (S.D. 1996) ................................ 23

*Estate of Harris v. Harris*, 218 F3d 1140 (10th Cir. 2000) ................................................... 26

*First Nat'l Bank v. Smoker*, 286 N.E.2d 203, 208-09 (Ind. App. 1972) ................................ 22, 25

*Fricke v. Valley Prod. Credit Asso.*, 721 S.W.2d 747 (Mo. Ct. App. 1986) .......................... 25

*In re G & L Packing Co., Inc.*, 20 B.R. 789 (Bankr. N.D.N.Y. 1982) ................................... 20

*In re Gotham Provision Co.*, 669 F.2d 1000 (5th Cir. 1982) .................................................. 27

*In re Gotham Provision Co., Inc.*, 669 F.2d 1000 (5th Cir.) .................................................. 20

*In re Pubs, Inc.*, 618 F.2d 432 (7th Cir. 1980) ..................................................................... 26

*In re Roxford Foods Litig.*, 1992 U.S. Dist. LEXIS 12359 (E.D. Cal. Feb. 28, 1992) ................. 20

*In re Talmo*, 192 B.R. 272 (Bankr. S.D. Fla. 1996) ............................................................ 27

*In re Tanner*, 77 B.R. 897 (Bankr. N.D. Ala. 1987) ............................................................ 20

*Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank*, 705 F.2d 396 (10th Cir. 1983) ................... 25

*Kunkel v. Sprague Nat'l Bank*, 128 F.3d 636 (8th Cir. 1997) ............................................... 23, 25

*Liberty Mutual Ins. Co. v. Bankers Trust Co.* 758 F. Supp. 890 (S.D.N.Y. 1991) ..................... 20

*Lyng v. JDC Enterprises*, 117 B.R. 268 (S.D. Tex. 1990); ................................................... 20

*Maryott v. Oconto Cattle Co.*, 607 N.W.2d 820 (Neb. 2000) ............................................... 25

*Matter of Samuels, & Co., Inc.*, 526 F.2d 1238 (5th Cir. 1976) (*en banc*) ........................... 23, 25

*Meyer v. United States*, 375 U.S. 233 (1963) .................................................................... 27

*O'Brien v. Chandler*, 765 P.2d 1165 (N.M. 1988) ............................................................. 25

*Pleasantview Farms, Inc v. Ness*, 455 N.W.2d 602 (S.D. 1990) ........................................... 26

*Rufenacht v. Iowa Beef Processors, Inc.*, 656 F.2d 198 (5th Cir. 1981) .................................. 23

*Sanzone-Palmisano Co. v. M. Seaman Enters., Inc.*, 986 F.2d 1010 (6th Cir. 1993) .................. 27

*SEC v. Safety Finance Svc., Inc.* 674 F.2d 368 (5th Cir. 1982) ............................................ 14

*SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830 (5th Cir. 2019) ........................................... 14

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980) ................................................................. 14

*Six L's Packing Co. v. W. Des Moines State Bank*, 967 F.2d 256 (8th Cir. 1992) ..................... 28

*Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co.)*, 81 F. 3d 280 (2d Cir. 1996) ......... 28

*United States v. Ables*, 739 F. Supp. 1439 (D. Kan. 1990) ...................................................... 25

*United States v. Coastal Ref. & Mktg., Inc.*, 911 F.2d 1036 (5th Cir. 1990) ................................ 14

*Wynnewood Bank & Tr. v. State*, 767 S.W.2d 491 (Tex. App.—Dallas 1989, no writ)................ 27

**Statutes**

7 U.S.C. § 217b .......................................................................................................... passim

7 U.S.C. § 228b .......................................................................................................... passim

7 U.S.C. §§ 181-229c ......................................................................................................... 20

Kan. Stat. Ann. § 84-9-305 ............................................................................................... 25

Tex. Bus. & Com. Code § 1.201 (UCC § 1.201)................................................................ 20

Tex. Bus. & Com. Code § 1.201 (UCC § 1-201)................................................................ 16

Tex. Bus. & Com. Code § 2.305 (UCC § 2-305)................................................................ 16

Tex. Bus. & Com. Code § 2.319 (UCC § 2-319)................................................................ 17

Tex. Bus. & Com. Code § 2.401 (UCC § 2-401)................................................................ 21

Tex. Bus. & Com. Code § 2.403 (UCC § 2-403)................................................................ 22

Tex. Bus. & Com. Code § 2.501 (UCC § 2-501)................................................................ 16

Tex. Bus. & Com. Code § 9.102 (UCC § 9-102)................................................................ 24

Tex. Bus. & Com. Code § 9.203 (UCC § 9-203)................................................................ 24

Tex. Bus. & Com. Code §§ 9.110 et seq. (UCC § 9-110) ................................................. 23

Tex. Bus. & Com. Code §§ 9.301 et seq. (UCC §§ 9-301 et seq.) .................................... 23

**Rules**

7 U.S.C. 217b .................................................................................................................... 18

9 C.F.R. § 200 ................................................................................................................... 18

**Treatises**

8A Anderson, Uniform Commercial Code, § 9-113:7 ...................................................... 22

## I.    INTRODUCTION

1.    The Feedyards respectfully request that the Court deny the Ranchers' Motion and grant this Motion; enter a judgment or order through summary proceedings determining that Cattle Empire's and Brookover's interest in the proceeds from cattle sales is secured and superior to the interest—if any—of the Ranchers.

2.    The Feedyards have a perfected security interest in the subject cattle.  The Ranchers' purported statutory trust claims were not perfected timely.  Under 7 U.S.C. Sections 217b(b) (the "Dealer Trust Act") and 228b(a), the Ranchers were required to serve and file notices of their claims with 30 days after payment was due, and payment was due under the statute one day after delivery.  "An unpaid cash seller shall lose the benefit of a trust under subsection (a) if the unpaid cash seller has not preserved the trust by giving written notice to the dealer involved and filing such notice with the Secretary [] within" the deadline. 7 U.S.C. § 217b(b).  None of the Ranchers met that deadline and their interests are therefore not perfected.  Further, even if the Ranchers perfected their Dealer Trust Act claims, the Act's safe harbor still gives the Feedyards priority.

3.    In the alternative, the Feedyards respectfully request that, if the Court determines that the Ranchers have an enforceable claim under the Dealer Trust Act, that they be required to marshal claims to the extent they and Feedyards have a claim to the same collateral.

4.    In the further alternative, Feedyards respectfully request that the Court set a Scheduling Conference to discuss and approve a discovery and trial schedule for the matters as to which summary judgment is not appropriate.

5.    When the Receivership was created, Cattle Empire and Brookover were in possession of cattle placed by Agridime for feeding and care pursuant to written agreements, including promissory notes and security agreements.  Cattle Empire's and Brookover's security

interests in the cattle are superior to the Ranchers' interests in the cattle—if any—for the following separate reasons, each of which supports the priority of Cattle Empire and Brookover's claims over those of the Ranchers:

      a.  The Dealer Trust Act required the Ranchers to perfect any claim by the deadline set in 7 U.S.C. §§ 217b and 228b (here, 1 business day plus 30 days from the date of delivery). The Ranchers failed meet their deadlines;

      b.  The Ranchers' interest terminated on delivery to Agridime under the Uniform Commercial Code;

      c.  Cattle Empire's and Brookover's liens attach and are superior to the interests claimed by the Ranchers pursuant to the UCC;

      d.  Cattle Empire's and Brookover's liens attached either by contract or by estoppel and are superior to the interests claimed by the Ranchers; and

      e.  The Ranchers' claims under the Dealer Trust Act are subordinate to the claims of Cattle Empire and Brookover.

6.    Feedyards request summary judgment or other order of this Court determining that their security interests on the cattle and interest in any proceeds therefrom are superior to the claims of the Ranchers.

7.    In the alternative, Feedyards request summary judgment that if the Court determines that the Ranchers have an enforceable claim under the Dealer Trust Act, that they be required to marshal claims to the extent they and Feedyards have a claim to the same collateral.

8.    In the further alternative, Feedyards request the Court to enter a scheduling order, including an order for mediation, for further discovery and briefing on the issue of existence and priority of claims and interests as between the Feedyards and the Ranchers.

## II.    BACKGROUND

9.    Cattle Empire, LLC and Brookover Feed Yards, Inc. are Kansas entities. Receivership Defendant Agridime, LLC is a Texas company. Other interested parties relevant to this response and motion are the Ranchers, Lonnie Jaeger, Mario Ost, and Lance Lenton.

10.     The Receiver previously filed a Motion for Order Requiring Cattle Sale Proceeds to be Disbursed to Receiver, Dkt 58, and Motion for Cattle Empire to Show Cause. Dkt. 59. These motions concerned, among other things, the disbursement of proceeds from sales of cattle that Defendant Agridime, LLC had placed for finishing with Cattle Empire and Brookover. The Feedyards responded, Dkt. 66 (Joint Resp. to Dkt. 58); Dkt. 69 (Cattle Empire Resp. to Dkt. 59)

11.     The Ranchers' previously filed a Motion for Relief from Stay seeking disbursement of payments from the Receivership. Dkt. 63. Cattle Empire and Brookover responded to the motion and sought additional relief regarding the Ranchers' claims. Dkt. 89 (Joint Resp. to Dkt. 63 and Motion for Relief). The Receiver also responded to the Ranchers' Motion. Dkt. 88. The Court denied the Ranchers' motion and Cattle Empire and Brookover's alternative motion in April 2024. Dkt. 95.

12.     The Court entered orders providing for the Feedyards to disburse proceeds to the Receiver while retaining from the proceeds the cost of feed and care and associated feed and care financing for the cattle. Dkts. 71, 95, 98. The orders further reserved for the Feedyards all claims they had to the proceeds. Dkt. 98 at 2 ("this Order does not modify or change the rights of any affected parties, including rights concerning liens, claims, or encumbrances that parties may assert concerning live cattle or proceeds of cattle, and the affected parties reserve all rights regarding same."); *see also* Dkt. 71 at 2.

13.     Cattle Empire and Brookover also filed a Motion for Summary Judgment or for Declaration of Priority and Alternative Motion for Scheduling Order (Dkt. 107, Appendix at Dkt. 108) several months later, which this Court denied as premature at the time (Dkt. 109).

**A.  Current Motions**

14.     Precipitating this response and motion, the Ranchers filed a Motion for Payment of Retained Ownership Cattle, Dkt. 173, a Brief in Support, Dkt. 174, and Appendix, Dkt. 175.

15.     Feedyards rely on the Appendix they previously filed (Dkt. 108), with further references to Ranchers' two Appendices (Dkt. 65 and Dkt. 175).

**B. Cattle Empire's Relationship with Agridime**

16.     For several years, Cattle Empire and Agridime did business as follows:

(a)     Cattle Empire operated a custom feed yard facility in Satanta, Kansas, by which it fed, cared for, and provided financing to customers for feeding and care of cattle.  Cattle Empire offered financing to qualified customers for their cattle feeding and financing activities, which included a Loan Agreement, Promissory Note, and filings of UCC-1 Financing Statements.

(b)     Agridime signed a Promissory Note, Credit & Security Agreement effective January 2, 2022, naming Cattle Empire as payee and secured party.  Dkt. 108 at 2-15.  That security interest was perfected on August 22, 2019, as amended July 20, 2022, Dkt. 108 at 17-19, and by Cattle Empire's possession of the cattle placed with it by Agridime.

(c)     Thereafter, on numerous occasions, Agridime placed cattle for feeding and care with Cattle Empire, and placed those cattle in the feeding and financing program described above.  Among other features, this program involved a market evaluation of the cattle placed by Agridime.  Cattle would be valued based on reported stocker prices and the Chicago Mercantile Exchange ("CME") board, and Cattle Empire advanced loan proceeds to Agridime for the difference between the cattle value and the equity margin requirements of the loan documents, which required maintenance of a 22% collateral value to total loans outstanding basis.  This agreement operated on a rotating basis, pursuant to which cattle were placed, and when they were sold, proceeds were received, applied to reduce the indebtedness, with reconciliations performed on a monthly basis.  Dkt. 108 at 21-22 ¶ 4.

(d)     Depending on cattle placements, cattle sales, and market prices, funds would be advanced to Agridime, held to satisfy margin requirements, or paid to Agridime.  *Id.*

(e)    The Ranchers' Motion to Lift Stay (Dkt. 63) included claims concerning the following cattle delivered to Cattle Empire: Lots 2855 and 2856 (claimed by Jaeger), Lot 2828 (claimed by Ost), and Lot N220 (claimed by Lenton).  Exhibit C (Dkt. 108 at 20) is a Declaration of the Chief Executive Officer of Cattle Empire, which authenticates Exhibits A and B, and describes the loan advances made by Cattle Empire and other facts concerning these cattle.

(f)    Agridime represented to Cattle Empire that it was the owner of the cattle in Lots N220 (received at Cattle Empire Nov. 10, 2023), 2828 (Nov. 17, 2023), 2855, and 2856 (each received Dec. 7, 2023).  Dkt. 108 at 22 ¶ 5; *see also* Dkt. 108 at  6 ¶ 12(b) ("[Agridime] has or will have at the time of acquisition good and marketable title to the Collateral, subject to no lien, claim, mortgage, or other encumbrance, except as disclosed herein.").  The Ranchers' behavior is completely inconsistent with that of a party who is allegedly "retaining" an ownership interest. They loaded the cattle on trucks, shipped them to Cattle Empire, and made no attempt to contact Cattle Empire to assert their interest even though they knew where the cattle were going.  *See* Dkt. 65-1 at 3 ¶ 20 (Jaeger affidavit); Dkt. 65-2 at 1 ¶ 4 (Ost affidavit); Dkt. 65-3 at 1 ¶ 4 (Lenton affidavit);   As a result, Cattle Empire had no reason to believe and did not believe that the cattle were subject to any "retained ownership" agreement.

### C.  Brookover's Relationship with Agridime

17.    Brookover and Agridime did business in the following manner:

(a)    Brookover operated a custom feed yard facility in Garden City, Kansas, by which it fed, cared for, and provided financing to customers for feeding and care of cattle. Brookover offered financing to qualified customers for their cattle feeding and financing activities, which included Promissory Notes for each lot of cattle placed for feeding and financing, a Security Agreement, a Feeding Agreement, and filings of UCC-1 Financing Statements.  Dkt. 108 at 25-27; Dkt. 108 at 28-30;  Dkt. 108 at 31-32.

(b)    On or about August 23, 2023, Agridime signed a Security Agreement and a Feeding Agreement naming Brookover as Feeder and secured party. True copies of these instruments are found at Exhibits D (Dkt. 108 at 23-24) and E (Dkt. 108 at 25-27). That security interest was perfected by filing on August 24, 2023, and March 20, 2024, as shown by Exhibit F (Dkt. 108 at 28-30), and by Brookover's possession of the cattle placed with it by Agridime.

(c)    Thereafter, on several occasions, Agridime placed cattle for feeding and care with Brookover, and placed those cattle in the feeding and financing program described above. As of the date of the Receivership, several lots of cattle, including the disputed Lots no. 7641 and 7642 (received at Brookover Dec. 4, 2023), were located at the Brookover yard. Dkt. 108 at 34. Agridime signed a Promissory Note for each lot. Copies of each note are found at Exhibit G and Exhibit H (Dkt. 108 at 31-32). The stated amount of each note was based on a market evaluation of the cattle placed by Agridime and on estimated feeding and care costs, but the amount could vary to be "such amount as shall actually be advanced."

(d)    Depending on cattle placements, cattle sales, and market prices, funds would be advanced to Agridime, held to satisfy margin requirements, or paid to Agridime. Dkt. 108 at 35 ¶ 4(d).

(e)    The Ranchers' Motion claims that the following cattle were delivered to Brookover: Lot 7641 and 7642 (claimed by Jaeger). Exhibit I (Dkt. 108 at 33) is a Declaration of Forest Ty Brookover, the Corporate Secretary of Brookover, authenticating Exhibits D – H, and describes the loan advances made by Brookover and other facts concerning these cattle.

(f)    Agridime represented to Brookover that it was the owner of the cattle in Lots 7641 and 7642. Dkt. 108 at 35 ¶ 6; *see also* Dkt. 108 at 23 ("[Agridime] has[,] or from the proceeds of the indebtedness secured hereby will acquire, absolute title to the goods free and clear

of all liens, encumbrances and security interests except the security interest hereby granted to [Brookover] . . . ."); Dkt. 108 at 25 ¶ B(5) ("[Agridime] has legal title to the cattle and there are no liens, encumbrances, security interests, and agreements encumbering such cattle other those in favor of [Brookover] or filed by Brookover Financial Services, Inc."). The Ranchers' behavior is completely inconsistent with that of a party who is allegedly "retaining" an ownership interest. They loaded the cattle on trucks, shipped them to Brookover, and made no attempt to contact Brookover to assert their interest even though they knew where the cattle were going. . *See* 65-1 at 2 ¶ 5 (Jaeger affidavit). As a result, Brookover had no reason to believe that the cattle were subject to any "retained ownership" agreement.

D. **Delivery and facts alleged by the Ranchers**

18.    Under the Contracts, risk passed at upon delivery. Paragraph 9 says:

> 9.    Risk will transfer to the Buyer upon the cattle passing inspection at point of delivery. Title of cattle will transfer to Buyer upon tender of payment. Any cattle that do not pass inspection will not be purchased and will no longer be subject of the Transaction.

Paragraph 1 of the Contracts, titled "Definitions," provides in subparagraph (g) a definition of "point of delivery": "'point of delivery' means the place at which the Seller will deliver the cattle to the Buyer, as set out in the Confirmation, and may be the Seller's premises or another location." Dkt. 65-1, page 8; Dkt. 65-2, page 6; Dkt 65-3, page 6. There is no "Confirmation" document.

19.    Cattle Empire agrees that the cattle described in the Ranchers' Motion as having been delivered to Cattle Empire were received at its feedyard in Satanta, Kansas: Lot N220 (11/10/23), Lot 2828 (11/17/23), and Lots 2855 and 2856 (12/7/23). Agridime, LLC represented to Cattle Empire that it was the owner of these cattle (see Dkt. 108 at 6 ¶ 12(b)), and it sought advances from Cattle Empire on a pre-existing line of credit. Cattle Empire made such advances on 11/10/23 (Lot no. N220) ($182,983.94), 11/17/23 (Lot no. 2828) ($182,500.03), and 12/7/23

(Lots no. 2855 and 2856) ($166,598.64 and $179,459.28). The initial advances were made pursuant to a Promissory Note, Credit & Security Agreement, by which Agridime granted a security interest in the cattle in question. Later advances for feeding and care costs were made pursuant to the same documents. The advances and the supporting documents are described in the declaration of Trista Brown Priest, Cattle Empire's CEO. *Id.* The security interest was perfected by filing a UCC-1 in Texas. Dkt. 108 at 17-19.

20.    Brookover agrees that the cattle described in the Ranchers' Motion as having been delivered to Brookover were received at its yard in Garden City Kansas: Lot 7641 (12/5/23) and Lot 7641 (12/5/23). Agridime represented to Brookover that it was the owner of these cattle (Exhibit D (Dkt. 108 at 23)) and sought an advance from Brookover. Brookover made such an advance in the amount of $160,483.94 on December 6, 2023 (Lot 7641) and in the amount of $156,934.81 on December 6, 2023 (Lot 7642). The advances were made pursuant to promissory notes and security agreements, on a lot-by-lot basis by which Agridime granted a security interest in the cattle in question. Later advances for feeding and care costs were made pursuant to the same documents. The advances and the supporting documents are described in the declaration of Forest Ty Brookover, Brookover's Corporate Secretary. *Id.* The security interest was perfected by filing a UCC-1 financing statement in Texas. Dkt. 108 at 28-30.

21.    The Ranchers rely on written contracts with Agridime which they describe as "Retained Ownership Agreements." In fact, the words "retained" and "ownership" do not appear anywhere in the documents, and the word "agreement" appears in an integration clause (paragraph 23) only. The documents signed by the Ranchers are titled "Livestock Contract #81021" (Dkt. 65-1, page 7); "Livestock Contract #81020" (Dkt. 65-2, page 5); and "Livestock Contract #81018" (Dkt. 65-3, page 5). The opening sentence of each reads: "The Seller agrees to sell and Agridime

(the 'Buyer') agrees to purchase from the Seller the below described cattle in accordance with the preceding [sic] terms and conditions and the Master Terms and Conditions on the following 2 pages (total of 3 pages), which are legally binding on the Seller and Buyer."  A table immediately below this statement describes cattle by head count, "Base Wt." and "Delivery Schedule And Dates," referring to the place of delivery as "FOB, Satanta, KS" (Jaeger) (Dkt. 65-1, page 7), "FOB, Satanta, KS" (Ost) (Dkt. 65-2, page 5), and "FOB, Satanta, KS" (Lenton) (Dkt. 65-3, page 5).  After this table, the Contracts refer on page 1 to "Master Terms" and on pages 1-3 contain 23 separately numbered paragraphs.  The Feedyards were not parties to the Livestock Contracts and there is no record evidence that they had notice of such Contracts before delivery of the cattle.

22.    Rancher Jaeger's Affidavit, at paragraph 5 (Dkt. 65-1, page 2) alleges:  "On or about December 4, 2023, I caused 274 head of my North Dakota raised heifers ("Jaeger Cattle at Brookover") to be delivered to the Brookover Feed Yards, Inc in Garden City Kansas, pursuant to a Retained Ownership Agreement with Agridime."  Paragraph 4 says the cattle contract "provides for delivery to Santana [sic], Kansas, which is the Cattle Empire feed yard, but in this instance, I was instructed to deliver half of the cattle to Brookover instead."

23.    Rancher Ost's Affidavit, at paragraph 4 (Dkt. 65-2, page 1), alleges:  "On or about November 12, 2023, I caused 128 head of my North Dakota raised cattle, specifically, 65 steers and 63 heifers ("Ost Cattle") to be delivered to the Cattle Empire LLC ("Cattle Empire") feed yard in Santana [sic], Kansas, pursuant to a Retained Ownership Agreement with Agridime."

24.    Rancher Lenton's Affidavit, at paragraph 4 (Dkt. 65-3, page 1), alleges:  "On or about November 9, 2023, I caused 131 head of my North Dakota raised heifers ("Lenton Cattle") to be delivered to the Cattle Empire LLC ("Cattle Empire") feed yard in Santana [sic], Kansas, pursuant to a Retained Ownership Agreement with Agridime, LLC."

25.     Thus, all of the Ranchers admit they delivered and transferred possession of the cattle in which claim "retained ownership" to Agridime at Cattle Empire or Brookover's facilities.

## III.     RESPONSE AND CROSS-MOTION FOR SUMMARY JUDGMENT OR FOR DECLARATION OF PRIORITY

26.     The Feedyards' interest and priority in the cattle claimed by the Ranchers is superior to the interest claimed by the Ranchers for the reasons set out below.

### A. This Court may issue judgment or other declarations of priority in receiverships through equitable summary proceedings, but such power is constrained by law.

27.     A Court may resolve issues relating to priority in securities receiverships by summary proceeding under the Court's equitable powers.  *See SEC v. Safety Finance Svc., Inc.* 674 F.2d 368, 372 (5th Cir. 1982) (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980)). However, where the law dictates an outcome, as it dictates here in favor of the Feedyards, a "court in equity may not do that which the law forbids."  *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 842 (5th Cir. 2019) (quoting *United States v. Coastal Ref. & Mktg., Inc.*, 911 F.2d 1036, 1043 (5th Cir. 1990)).  Here, as discussed below, the evidence demonstrates that the Feedyards have perfected their security interests as a matter of law and that the Ranchers have not.  At best, the Ranchers may claim to raise a fact issue regarding their purported interests, but the evidence shows they have not.

### B. The Ranchers failed to preserve their alleged trust rights.

28.     The Ranchers' Dealer Trust claims fail because they did not file and serve notices within the 30-day deadline set by 7 U.S.C. Section 217b.  That statute requires an alleged "dealer" (Agridime) to pay "cash sellers" (the Ranchers) before the end of the next business day after delivery of possession of livestock.  7 U.S.C. § 228b(a).  It further provides that unpaid cash sellers "lose the benefit of the trust" if they do not serve and file trust notices within 30 days after the date payment was due.  7 U.S.C. § 217b(b).  The Ranchers did not meet this 31-day deadline.  They

argue that their compliance was excused because one sentence in paragraph 9 of the Livestock Contracts – "Title of cattle will transfer to buyer upon tender of payment" – allegedly excused Agridime's deadline to pay by the end of the next day, thereby extending indefinitely their deadlines to serve and file the statutory notices until, if ever, Agridime "tenders payment."

29.    Even if the language did extend the payment date, it did not extend the statutory notice deadlines.  This claim has no statutory or case law basis and therefore it should be denied.

### 1. The Dealer Trust Act contains clear and specific notice requirements.

30.    The Dealer Trust Act, 7 U.S.C. § 217b, provides in pertinent part:

> (b) Preservation of Trust
>
> An unpaid cash seller shall lose the benefit of a trust under subsection (a) if the unpaid cash seller has not preserved the trust by giving written notice to the dealer involved and filing such notice with the Secretary --
>
> > (1) within 30 days of the final date for making a payment under section 228b of this title in the event that a payment instrument has not been received; or
> >
> > (2) within 15 business days after the date on which the seller receives notice that the payment instrument promptly presented for payment has been dishonored.

31.    The Ranchers have not alleged that they received a dishonored check.  Thus, applied to their claim, the statute required each of them as an "unpaid cash seller" to preserve the trust by "giving written notice to the dealer involved in filing such notice with the Secretary" within 30 days of the final date for making a payment under section 228b of this title."

32.    Section 228b, titled "Prompt payment for purchase of livestock," provides:

> Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price:

7 U.S.C. 228b(a).  The analysis thus turns on the latter of the date of purchase and the date of

delivery.

33.    The Ranchers appear to argue that the purchase did not occur until "tender of payment," but contracts that provide for price to be determined at a later date do not prevent transfer of ownership at the time of delivery under the UCC.[3]  *See* UCC § 2-305 ("The parties if they so intend can conclude a contract for sale even though the price is not settled.").   The Dealer Trust Act does not define purchase, but the UCC does:  "'Purchase' means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, *or any other voluntary transaction creating an interest in property*."  UCC § 1-201(29) (emphasis added).  And the Livestock Contracts, which identified the cattle in question, "create[ed] an interest in property," at the time they were made.  *See* UCC § 2-501 ("The buyer obtains *a special property and an insurable interest in goods* by identification of existing goods as goods to which the contract refers even though the goods so identified are non-conforming and he has an option to return or reject them") (emphasis added).  And even if the Ranchers argue that the cattle were not identified at the time of the Livestock Contracts, the cattle were certainly identified at the time they were delivered to Agridime at the Feedyards' facilities.  Thus, the dates of purchase were the dates of the Livestock Contracts, which preceded delivery; and at the very latest, the dates of purchase were the dates of delivery.  Each of the Ranchers submitted affidavits that identify the dates they delivered the cattle to Agridime and Brookover:  Jaeger, Dec. 4, 2023 (Dkt. 65-1, 1 ¶ 5, 3 ¶ 20); Ost, Nov. 13, 2023 (Dkt. 65-2, at 2 ¶ 4); Lenton, Nov. 9, 2023 (Dkt. 65-3, at 3 ¶ 4).

34.    Furthermore, the "delivery schedule" term also specifies delivery "FOB" to

---

[3]  Feedyards believe that the UCC as enacted in Kansas (Feedyards' place of business), North Dakota (North Dakota Ranchers' place of business), Colorado (North Dakota Ranchers' contract refers to the law of Colorado, see paragraph 18), and Texas (Agridime's place of business) is identical and so will refer to the Uniform Act for citations to the statute.  For the Court's reference the Texas UCC is codified at TEX. BUS. & COM. CODE § 1.___ for Article 1 sections, § 2.____ for Article 2 sections, and § 9.____ for Article 9 sections.  (e.g. UCC Section 2.401 is codified at TEX. BUS. & COM. CODE § 2.401).

Satanta, Kansas, which is where Cattle Empire's facilities are located. The FOB term means that risk shifted from the Ranchers to Agridime upon the cattle's delivery in Kansas. *See* UCC § 2-319(1). This term, taken together with the term providing that "Risk will transfer to the Buyer upon the cattle passing inspection at point of delivery," confirms that "delivery" was achieved when the cattle arrived at the Feedyards' facilities.[4] Because the Ranchers agree that possession was transferred to the Feedyards, then, for purposes of determining when a trust notice is required under the Dealer Trust Act, Sections 217b and 228b, "payment" by Agridime was due by the next business day after the transfer of possession. As the table below calculates, none of the Ranchers met their deadlines to file a claim. The latest deadline was January 4, 2024, and the earliest claim was filed January 6, 2024:

| Rancher | Date of Delivery[5] | Deadline for Dealer Trust Claim Notice (30 days after payment is due)[6] | Date of Notice [7] |
|---|---|---|---|
| Jaeger 7641, 7642 | Dec. 4, 2023 | Jan. 4, 2024 | Jan. 6, 2024 |
| Jaeger 2855, 2856 | Dec. 4, 2023 | Jan. 4, 2024 | Jan. 26, 2024 |
| Ost | Nov. 13, 2023 | Dec. 14, 2023 | Mar. 19, 2024 |
| Lenton | Nov. 9, 2023 | Dec. 10, 2023 | Mar. 13, 2024 |

35.    The Ranchers, however, claim that the deadline for Agridime to make payment was deferred by the Livestock Contracts. Deferred payment is allowed by 7 U.S.C. § 228b under certain conditions:

> (b) Waiver of prompt payment by written agreement; disclosure requirements. Notwithstanding the provisions of subsection (a) of this section and subject to such terms and conditions as the Secretary may prescribe, the parties to the purchase and sale of livestock may expressly agree in writing, before such

---

[4] Jaeger notes that though the Contract specifies Satanta, he was later instructed to deliver half the cattle purchased to Brookover. Dkt. 65-1 at 2 ¶ 6.

[5] Dates of delivery are set forth in the Ranchers' previously-filed affidavits: Jaeger, Dec. 4, 2023 (Dkt. 65-1, 1 ¶ 5, 3 ¶ 20); Ost, Nov. 13, 2023 (Dkt. 65-2, at 2 ¶ 4); Lenton, Nov. 9, 2023 (Dkt. 65-3, at 3 ¶ 4).

[6] Date of Delivery + Next Business Day (7 U.S.C. § 228b) for payment due + 30 days to file claim (7 U.S.C. § 217b).

[7] The Ranchers submitted multiple USDA notices and amendments. See Dkt. 175-1 at 12-21; Dkt. 175-2 at 7-23; Dkt. 175-3 at 8-18. Where the notices identified cattle by lot, the table above indicates the earliest date of notice and filing of the claim specific to the lot. Otherwise, the table above uses the earliest date of any notice filed by the applicable Rancher.

purchase or sale, to effect payment in a manner other than that required in subsection (a). Any such agreement shall be disclosed in the records of any market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction.

36.    The USDA has adopted regulations that set out the requirements of agreements to defer payment and preserve trust rights.  9 C.F.R. § 200 provides:

(b)    No dealer whose average annual purchases of livestock exceed $100,000 shall purchase livestock on credit unless:

(1) Before purchasing livestock on credit, the dealer obtains from the seller a written acknowledgement that includes the information described in this paragraph (b)(1).

(i) The following statement:

On this date I am entering into a written agreement for the sale of livestock on credit to ___, a dealer, and I understand that in doing so I will have no rights under the trust provisions of section 318 of the Packers and Stockyards Act, 1921, as amended (7 U.S.C. 217b), with respect to any such credit sale.

(ii) A statement about whether the credit sales agreement covers a single sale; covers multiple sales and remains in effect through a certain date and states the date; or remains in effect until canceled in writing by either party.

37.    The Livestock Contracts do not contain any waiver of prompt payment language. *See* Dkt 65-1 at 7-9 (Jaeger), 26-27 (Ost), and 35-37 (Lenton).  Therefore, there is no "deferred payment" agreement that modifies the statutory obligation that Agridime make payment by the next business day after it received possession.  This means that the Ranchers' notices under the Dealer Trust Act were due no later than 31 days after Agridime received possession.  The summary judgment evidence shows that the Ranchers did not meet this deadline.

## 2.    Even if valid, the Ranchers' claims under the Dealer Trust Act are subordinate to the security interests of Cattle Empire and Brookover.

38.    Finally, the safe-harbor provision of the Dealer Trust Act protects Cattle Empire

and Brookover such that, even if the Ranchers' claims under the Act were valid, which as discussed above they are not, then such claims are still subordinate to the Feedyards' security interests.

39.     To preserve the Ranchers' purported claims, the Court previously entered an order (Dkts. 95, 98) requiring Cattle Empire and Brookover to pay to the Receiver sales proceeds sales proceeds in excess of feeding and care costs, and related financing costs (the "Disputed Cattle Proceeds"), while reserving to the parties "rights concerning liens, claims, or encumbrances that parties may assert concerning live cattle or proceeds of cattle."  The amounts paid to the Receiver by Feedyards pursuant to this Order  are:

Cattle Empire

| Lot | Claimant | Amount | Date of Payment |
|---|---|---|---|
| 2855 | Jaeger | $173,503.91 | 5-24-24 |
| 2856 | Jaeger | 287,401.98 | 5-21-24 |
|  |  | 5,032.06 | 6-6-24 |
| 2828 | Ost | 189,691.18 | 4-4-24 |
| N220 | Lenton | 283,054.69 | 3-29-24 |
| **Total** |  | **$938,683.82** |  |

Brookover

| Lot | Claimant | Amount | Date of Payment |
|---|---|---|---|
| 7641 | Jaeger | $257,754.29 | 5-7-24 |
| 7642 | Jaeger | 257,422.25 | 5-7-24 |
| **Total** |  | **$515,176.54** |  |

40.     The Feedyards are entitled to prevail even if the Ranchers did perfect an interest under the Dealer Trust Act because of the safe harbor for lenders created by the Act.  7 U.S.C. Section 217b provides:

>  (e) Purchase of livestock subject to trust—

>      (1)     In general.  A person purchasing livestock subject to a dealer trust shall  receive  good  title  to  the  livestock  if  the  person  receives  the livestock—

>          (A)     in exchange for payment of new value; and

>          (B)     in good faith without notice that the transfer is a breach of

trust.

41.      This statute has not been interpreted by published case law, but cases under the

sister statute, the Packers and Stockyards Act, 1921, 7 U.S.C. §§ 181-229c ("PSA"), have long

held that third party lenders who make loans without knowledge of the alleged breach of the trust

created by the statute are not subject to the trust:

> The court is persuaded by the cases relied upon by Farm Credit that the Packers
> and Stockyards Act does not authorize the tracing of trust funds to third party
> payees who have no actual or constructive notice of the character of the funds
> received and who received the funds as payment for antecedent debts for
> services or goods.  *See In re Tanner*, 77 Bankr. 897 (Bkrtcy. N.D. Ala. 1987);
> *Lyng v. JDC Enterprises*, 117 Bankr. 268 (S.D. Tex. 1990); *C.H. Robinson Co.
> v. B.H. Produce Co., Inc*., 723 F.Supp. 785 (N.D. Ga. 1989); *compare In re
> Gotham Provision Co., Inc.*, 669 F.2d 1000 (5th Cir.), *cert. denied*, 459 U.S. 858
> (1982); *Liberty Mutual Ins. Co. v. Bankers Trust Co*. 758 F. Supp. 890 (S.D.N.Y.
> 1991); *In re G & L Packing Co., Inc*., 20 Bankr. 789 (Bkrtcy. N.D.N.Y. 1982)."

*In re Roxford Foods Litig*., 1992 U.S. Dist. LEXIS 12359, at *9 (E.D. Cal. Feb. 28, 1992).

42.      Under the UCC, the terms "purchase" and "good faith" are defined, and these state

law definitions protect Cattle Empire and Brookover.   "Purchase" is defined by UCC §

1.201(b)(29) to mean "taking by sale … lien, security interest ... or any other voluntary transaction

creating an interest in property."   Good faith" is defined by UCC § 1.201(b)(20): "Good faith,"

except as otherwise provided in Chapter 5 [letters of credit], means honesty in fact and the

observance of reasonable commercial standards of fair dealing."  *Samuels & Co.*, 526 F.2d 1238,

1243-44 (the UCC's "definition of an Article Two good faith purchaser does not expressly or

impliedly include lack of knowledge of third-party claims as an element.").   Feedyards did not

have knowledge of the alleged breach of trust.  See Dkt. 108 at 6 ¶ 12(b); Dkt 108 at 22 ¶ 5; Dkt

108 at 23); Dkt. 108 at 25 ¶ B(5); Dkt. 108 at 35 ¶ 6.

43.      The Feedyards acquired their security interest in the cattle and their proceeds before

they acquired any knowledge of the claims of the Ranchers.  See Dkt. 108 at 17-19 (Cattle Empire);

28-30 (Brookover).

44.     Therefore, the safe harbor protection of the Dealer Trust Act applies, and the Ranchers' claims should be denied.

### C. Under the UCC, Cattle Empire and Brookover have perfected security interests that are superior to any interest that may be held by the Ranchers.

#### 1. Any Ranchers' interest terminated on delivery pursuant to the UCC.

45.     Section 2-401 of the Uniform Commercial Code is the starting point in this dispute.  It begins by establishing that the rights and remedies of purchasers, sellers, and third parties established in Article 2 apply "irrespective of title to the goods, except where the provision refers to such title."  Section 2-401(a) applies directly to the Ranchers' claims.  It says:  "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest."  *Id.*  Section 2-401(b) says:  "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest, and even though a document of title is to be delivered at a different time or place…."

46.     Many of the documents submitted as evidence by the Ranchers show that they were representing "their" cattle as owned by Agridime.  See Dkt. 65-1 at 10 (Veterinary Certificate dated 12-3-23 identifying the Jaeger cattle "CONSIGNEE, NEW OWNER OF SHIPMENT" as Agridime at Brookover's address); 65-2 at 8 (same for Ost cattle at Cattle Empire's address); Dkt. 65-3 at 9 (same for Lenton cattle).  This is consistent with paragraph 9 of each of the Livestock Contracts, which provides in its first sentence: "Risk will transfer to the Buyer upon the cattle passing inspection at point of delivery."

47.     Section 2-401 has been applied to defeat the same "retained title" argument

advanced by the Ranchers in other cattle cases.  *See Brumley Estate v. Iowa Beef Processors, Inc.,* 704 F.2d 1351 (5th Cir. 1983); *First Nat'l Bank v. Smoker*, 286 N.E.2d 203, 208-09 (Ind. App. 1972) ("Thus the draftsmen of the code intended that its provisions should not be circumvented by manipulation of the locus of title.  For this reason, consignment sales, conditional sales, and other arrangements or devices whereby title is retained in the seller for a period following possession by the debtor are all treated under Art. 9 as though title had been transferred to the debtor and the creditor-seller had retained only a security interest in the goods. . . .  For the purposes of answering rights of ownership under Art. 9, we hold, based upon the stipulated facts of this case, that defendant had only a security interest in the equipment despite a purported reservation of title and that debtor 'owned' the equipment at the time that the extension agreement was executed.")  Thus, if the seller has not obtained a security agreement that complies with Article 9, the seller's interest in the goods terminates on delivery.  8A ANDERSON, UNIFORM COMMERCIAL CODE, § 9-113:7, p. 668.

48.     The Ranchers have provided no evidence that they obtained a security agreement from Agridime or perfected a security interest pursuant to Article 9.  Therefore, their interest terminated on delivery to Agridime, and they became unsecured creditors.

### 2.  UCC Article 2 shelter rules protect Cattle Empire's and Brookover's security interests over any interest claimed by the Ranchers.

49.     UCC Section 2.403 contains the UCC's "shelter" rules that protect downstream parties.  It protects parties according to their status under the Code's classifications.  *Id.*  Persons who qualify as "good faith purchasers" take good title from one with "voidable" title.  *Id.*

50.     Courts have applied the shelter rules in common fact patterns that arise in cattle marketing disputes.  For example, a lender to an insolvent middleman may be a "good-faith purchaser for value" and enforce its security interest against an unpaid seller.  *See, e.g.*, *Rufenacht*

*v. Iowa Beef Processors, Inc.*, 656 F.2d 198 (5th Cir. 1981), *cert. denied*, 455 U.S. 921 (1982);

*Continental Grain Co. v. Heritage Bank*, 548 N.W.2d 507 (S.D. 1996).

51.     Most directly applicable, in *Matter of Samuels, & Co., Inc.*, 526 F.2d 1238, 1248

(5th Cir. 1976) (*en banc*), the Fifth Circuit held that an unpaid seller's claim to his packer-buyer's

livestock and proceeds was subordinate to the lender's perfected security interest based on the

UCC.  Specifically, the lender with the perfected security interest under Article 9 qualified as a

good faith purchaser for value, and therefore had priority over the seller.  *Id.* at 1247.  The lender's

security interest attached as a result of the seller's voluntary act of delivery of the cattle to the

buyer without reserving a written security interest.  Id. at 1247.

52.     Even if the Ranchers ever had any security interest—which Ranchers have not

asserted and Feedyards dispute—they failed to perfect any such interest and are therefore inferior

claimants to Feedyards' perfected interests.  As the *Samuels* court notes, Article 9 provides a means

for seller to perfect a prior security interest upon ceding possession of the collateral, but failure of

a seller to do so renders the seller unable to defeat a perfected secured party's priority.  *See id.*;

*Kunkel v. Sprague Nat'l Bank*, 128 F.3d 636 (8th Cir. 1997) (in a cattle case, discussing the

requirement that a purchase money security interest must be perfected "at the time the debtor

receives possession of the inventory," among other requirements, in order to assert priority over

other security interests); *see also, e.g.*, UCC §§ 9.301 et seq. (perfection and priority); § 9.110

(providing that a security interest pursuant to Article 2 or 2A is subject to Article 9 once the "debtor

obtains possession of the goods").  Though the Ranchers claim to have a retained ownership

interest rather than a purchase-money sellers' interest, as discussed further below, such claims

likewise failed to establish attachment or perfection of any security interest in the cattle, and

therefore any interest that they claim is necessarily inferior to a perfected interest.

53. Ranchers have presented no evidence that they ever perfected any security interest. Whatever their interest, it is defeated by Feedyards' perfected security interests.

### 3. Feedyards' Article 9 security interests attached either by contract or by estoppel and defeat the claims of the Ranchers

54. Feedyards' security interests were created by written security agreements signed by Agridime and perfected with UCC-1 financing statements and through possession of the cattle and proceeds. This means that Feedyards have an enforceable interest both as to the debtor (Agridime) and as to unpaid sellers like the Ranchers.

55. Section 9.102(a)(74) defines a security agreement as "an agreement that creates or provides for a security interest." Feedyards' agreements do create or provide for a security interest. *See* Dkt. 108 at 3 ¶ 5) (Cattle Empire); Dkt. 108 at 22-23 (Brookover).

56. Section 9.203 provides that "[a] security interest attaches to collateral when it becomes enforceable against the debtor . . . ," and that a security interest in collateral "is enforceable against the debtor and third parties" if three conditions are met:

> (1) value has been given;
> (2) the debtor has rights in the collateral or the power to transfer rights in the collateral . . . and
> (3) one of the following conditions is met:
>> (A) the debtor has authenticated a security agreement that provides a description of the collateral.

All of these conditions are met in this case. Feedyards gave value by advancing loan proceeds to Agridime. Agridime signed a security agreement that granted Feedyards a security interest in the cattle. And Agridime had "rights in the collateral" because it was a buyer of the cattle under agreements to purchase with the Ranchers, assumed the risk of ownership of the cattle in those agreements, and exercised control over the cattle by directing their feed and care while at Feedyards' facilities.

57.    Agridime's rights in the cattle were identical to the factors identified by the *Kunkel* court, 128 F.3d at 641, as satisfying Section 9.203's "rights in collateral" element:

> "An agreement to purchase can give rise to sufficient rights in the debtor to allow a security interest to attach, regardless of whether the debtor has technically obtained title to the property." *United States v. Ables*, 739 F. Supp. 1439, 1444 (D. Kan. 1990). Courts consider factors such as the extent of the debtor's control over the property and whether the debtor bears the risk of ownership. *See, e.g., Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank*, 705 F.2d 396, 399 (10th Cir. 1983) (debtor's control); *Chambersburg Trust Co. v. Eichelberger*, 403 Pa. Super. 199, 588 A.2d 549, 552-53 (Pa. Super. Ct. 1991) (debtor had risk of ownership).   The debtor need not have possession in order to pledge the property; the UCC expressly contemplates that the secured party may retain possession of the collateral. *See* Kan. Stat. Ann. § 84-9-305.

58.    The rights of an unpaid cattle seller are subject to and inferior to a secured lender to the defaulting buyer. *See e.g. Samuels & Co.*, 526 F.2d 1238 (unpaid cattle seller's interest inferior to interest of defaulting buyer's lender); *O'Brien v. Chandler*, 765 P.2d 1165 (N.M. 1988) (same); *Maryott v. Oconto Cattle Co.*, 607 N.W.2d 820 (Neb. 2000) (same); *Bank of Beaver City v. Barretts' Livestock, Inc*., 295 P.3d 1088 (Okla. 2012) (same); *Fricke v. Valley Prod. Credit Asso.*, 721 S.W.2d 747 (Mo. Ct. App. 1986) (same); ); *First Nat'l Bank v. Smoker*, 286 N.E.2d 203, 208-09 (Ind. App. 1972) (same).   The Ranchers' claims therefore fail under established principles set out in the Uniform Commercial Code.

59.    The Ranchers' claims that their alleged "retained ownership agreements" preserved their interests to defeat the attachment of Feedyards' rights to the collateral also fail.   The same arguments have been made and rejected in cattle cases. *See Cont'l Grain Co. v. Brandenburg*, 587 N.W.2d 196 (S.D. 1996) ("Even if a party retains ownership interest in a piece of collateral, a debtor who retains that collateral is still able to mislead potential creditors by exercising his 'rights' of possession and control over the collateral. It is the outward appearance of a debtor's rights of ownership and control in the collateral that

determines whether attachment of a security interest is effective and not the right of a party who may have title to the collateral") (citations omitted). This is precisely what happened here—the Ranchers allowed Agridime to mislead Feedyards by giving Agridime the appearance, if not the reality, of ownership and control of cattle the Ranchers now claim they owned.

60.    Finally, on this priority issue, Feedyards refer to the doctrine of estoppel. *Pleasantview Farms, Inc v. Ness*, 455 N.W.2d 602 (S.D. 1990), another cattle case, held:

> Although mere possession of collateral does not create sufficient rights in the collateral for a security interest to attach, the necessary rights, otherwise non-existent, may be created by means of estoppel. *If the owner of collateral allows another to appear as the owner or to dispose of the collateral, such that a third party is led into dealing with the apparent owner as though he were the actual owner, then the owner will be estopped from asserting that the apparent owner did not have rights in the collateral*. (citing *In re Pubs, Inc.*, 618 F.2d 432 (7th Cir. 1980)) (emphasis added).

The Ranchers allowed Agridime "to appear as the owner" by delivering the cattle to Cattle Empire and Brookover with no indication of their alleged retained ownership claims. Their affidavits all provide: "Said another way, my understanding is that even though possession of the cattle may be with [Cattle Empire/Brookover], the ultimate ownership of the cattle remains with me until payment is tendered to me." But the *Ranchers'* "understanding" is not determinative. By delivering possession and control of the cattle, and failing to assert a claim, they allowed Cattle Empire and Brookover to rely on Agridime's apparent ownership. As a result, they are estopped from attempting to undo the results of their decision. *See id.*; *see also Estate of Harris v. Harris*, 218 F3d 1140 (10th Cir. 2000) (where a creditor "has been misled by an apparent ownership, and has given credit on the faith of such ownership," security interest attaches).

* * *

61.    For the reasons set forth above, Feedyards requests summary judgment or

declaration of priority that their security interests have priority over any interest of Ranchers.

## IV.    ALTERNATIVE MOTION FOR IMPOSITION OF THE DOCTRINE OF MARSHALING

62.    "The equitable doctrine of marshaling 'rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds.'"  *In re Talmo*, 192 B.R. 272, 274-75 (Bankr. S.D. Fla. 1996) (*quoting Meyer v. United States*, 375 U.S. 233, 236 (1963); *All American Holding Corp. v. Elgin State Bank*, 17 B.R. 926, 928 (S.D. Fla. 1982)); *see also Wynnewood Bank & Tr. v. State*, 767 S.W.2d 491, 498 (Tex. App.—Dallas 1989, no writ) ("That doctrine requires a mortgagee to proceed against parcels of mortgaged property in that order which minimizes harm to subsequent grantees or lien holders.").

63.    The Dealer Trust Act provides that "[a]ll livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers."  The Act is based on federal statutes that create trusts which are generally interpreted by courts as precluding any tracing requirement by the claimant of its particular assets in order to participate in a trust recovery.  *In re Gotham Provision Co.*, 669 F.2d 1000, 1010 (5th Cir. 1982) ("the bankruptcy court was correct in rejecting the Bank's argument that specific tracing is required to establish that accounts receivable are subject to a § 206 [Packers and Stockyards Act Packers'] trust. . . .  Congress did not intend that livestock producers perform the almost impossible task of tracing their products into specific receivables.").  *See also Sanzone-Palmisano Co. v. M. Seaman Enters., Inc.*, 986 F.2d 1010, 1012 (6th Cir. 1993) (holding that a Perishable Agricultural Commodities Act floating trust applies to all of a debtor's Produce-related inventory and proceeds thereof, regardless of whether the trust beneficiary or another Produce

supplier was the source of such inventory); *Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co.)*, 81 F. 3d 280, 284 (2d Cir. 1996) (same); *Six L's Packing Co. v. W. Des Moines State Bank*, 967 F.2d 256, 258 (8th Cir. 1992) ("the burden is on the PACA debtor . . . to show that the disputed payment is from a non-trust source"). Further, for agricultural businesses, like Agridime, all of their income is from the sale of such products, so theoretically all their assets could be considered trust assets. *See, e.g.*, *Six L's Packing*, 967 F.2d at 258 (where debtor demonstrated twenty-five percent of income was from non-trust sources, trial court's holding that seventy-five percent of debtor's assets were trust assets was upheld).

64.     The Receiver has reported substantial assets on hand that are described as meat products or proceeds that were not derived from the cattle that were fed by Cattle Empire or Brookover or claims by the Ranchers. *See* Dkt. 96, March 31, 2024 Quarterly Report, at 7 (meat inventory of $20,000,000), 25 ($841,000 in meat proceeds). Subsequent reports describe significant assets from meat sales. *See, e.g.*, Dkt. 148, Mach 31, 2025, Quarterly Report, at 123 (Meat sales to Legendary Meats for $34,889.98); Dkt. 165, June 30, 2025, Quarterly Report, at 3, 5, 7 (anticipating completion of sales of the remaining meat inventory and identifying clawback claims in excess of $15 million; reporting cash on hand of $2.585 million). The reports are incorporated by reference. These assets could be marshalled to pay valid Dealer Trust Claims, and the proceeds sought by the Feedyards could then be used to satisfy their claims separately.

65.     Applying marshaling to this case would mean that the Ranchers could recover their perfected dealer trust claims, if any, from dealer trust assets of the Receiver other than the Disputed Cattle Proceeds the Respondent feedyard lenders seek to recover, and the Disputed Cattle Proceeds remain available to be paid to the feedyard lenders.

## V.     ALTERNATIVE MOTION FOR ENTRY OF SCHEDULING ORDER FOR DISCOVERY AND FURTHER BRIEFING ON RELATIVE PRIORITY OF CREDITORS

66.     In the alternative, Feedyards asks that the Court enter a scheduling order for discovery of evidence and further briefing on the issues of relative priority of claims.  *See Elliott*, 953 F.2d at 1567 (permitting evidence for summary procedures); *id.* at 1569 (reversing the district court's denial of limited discovery prior to the court's summary proceedings).

67.     To the extent needed for determination of the above issues, limited discovery in this case would permit Feedyards and Ranchers to further understand the evidentiary bases for the parties' claims and more thoroughly brief and argue their positions on relative priority.

## VI.   ALTERNATIVE MOTION FOR COURT-ORDERED MEDIATION

68.     In the alternative, Feedyards ask that the Court order Feedyards, Receiver, and Ranchers to early mediation among the parties to attempt to resolve the issues presented in Ranchers' Motion and this Response and Cross-Motion.  Counsel for such parties previously conferred on the possibility of such a mediation, but were unable to reach agreement.

## PRAYER

Therefore, Feedyards respectfully request that the Court deny the Ranchers' Motion, grant this Motion; enter an order that Feedyards' liens on the cattle and interest in any proceeds therefrom are superior to the claims of the Ranchers; and for other relief.

In the alternative, Feedyards request an order requiring marshaling, so as to best protect all secured interests.  Further in the alternative, Feedyards request a scheduling order from this Court for further discovery and briefing on the issues addressed above.  Further in the alternative, Feedyards request that the Court order Feedyards, Ranchers, and the Receiver to early mediation on the issues herein.

Dated: September 19, 2025.

Respectfully submitted,

By: */s/ David L. LeBas*
     **DAVID L. LEBAS**
David L. LeBas, SBN 12098600
dlebas@namanhowell.com
NAMAN HOWELL SMITH & LEE, PLLC
8310 N. Capital of Texas Highway, Ste. 490
Austin, Texas 78731
(512) 479-0300; FAX (512) 474-1901

Jackie Robinson, SBN 17092250
jrobinson@namanhowell.com
NAMAN HOWELL SMITH & LEE, PLLC
1300 Summit Ave., Suite 700
Fort Worth, Texas76102
(817) 509-2025; FAX (817) 509-2060

***Attorneys for Cattle Empire, LLC and***
***Brookover Feed Yards, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 19, 2025, a true and correct copy of the foregoing document was filed and served in accordance with the Federal Rules of Civil Procedure via the CM/ECF filing system on all counsel of record.

     */s/ David L. LeBas*
     **DAVID L. LEBAS**

## <u>CERTIFICATE OF CONFERENCE</u>

This is to certify that the undersigned counsel conferred with counsel for the North Dakota Ranchers and Receiver as follows:

On September 18, 2025, I attempted to confer with counsel for the North Dakota Ranchers by telephone but was unable to reach them. On September 19, 2025, Mr. Petrocchi confirmed by email that he was unable to agree to the relief sought in the Cross-Motion above, the alternative motion for marshaling, and the alternative motion for scheduling order. I also conferred by telephone and email on September 18, 2025 with counsel for the Receiver Mr. Massouh, who indicated the Receiver was opposed to the relief.

On September 3, 2025, after the Ranchers filed their Motion for Payment, I conferred with all counsel via Zoom teleconference, initiated by counsel for Receiver, regarding an early mediation or possible further action by the Receiver to resolve the issues addressed herein, with follow-up discussion over the next two days by email. Counsel for the Receiver indicated the Receiver did not oppose an early mediation to resolve the dispute as to the Ranchers and Feedyards claims. After conferring with my clients, I responded that Cattle Empire and Brookover would agree to an early mediation. Counsel for Ranchers indicated by email on September 5, 2025, and later on September 19, that the Ranchers were unable to agree to an early mediation and as such were opposed.

*/s/ David L. LeBas*
**DAVID L. LEBAS**